IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| T.K., THROUGH HER MOTHER, SHERRI LESHORE, and A.S., THROUGH HER MOTHER, LAURA LOPEZ, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | Case No. 19 C 7915 |
| Plaintiffs, | ) ) | Judge John Robert Blakey |
| vs. | ) ) | Magistrate Judge M. David Weisman |
| | ) | |
| BYTEDANCE TECHNOLOGY CO., LTD., MUSICAL.LY INC., MUSICAL.LY THE CAYMAN ISLANDS CORPORATION, and TIKTOK, INC. | ) ) ) ) ) | |

**OBJECTIONS TO CLASS CERTIFICATION AND SETTLEMENT AGREEMENT AND MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE OF MARK S. ON BEHALF OF HIMSELF AND THE PROPOSED SETTLEMENT CLASS AND AS PARENT AND LEGAL GUARDIAN OF HIS MINOR SON, A.S.**

Dated: May 11, 2020

Respectfully submitted,
MARK S.

By:    /s/ Scott R. Drury
       SCOTT R. DRURY
       *One of the attorneys for Mark S.*

Mike Kanovitz
Scott R. Drury
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
mike@loevy.com
drury@loevy.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................v

INTRODUCTION ............................................................................................................1

THE OBJECTOR................................................................................................................3

BACKGROUND FACTS....................................................................................................4

    *The TikTok App* ................................................................................................4

    *TikTok's History*................................................................................................4

    *How TikTok Works*.............................................................................................5

    *Musical.ly's Privacy Policy* ...............................................................................5

    *Child Victims' Use of Musical.ly* ......................................................................6

    *The Dangers of TikTok to the Child Victims*....................................................9

        *Child Predators*.....................................................................................9

        *Deceptive Advertising* ........................................................................10

        *Propaganda Campaigns* .....................................................................12

    *The FTC's Enforcement Action* ......................................................................13

    *Defendants' Continued COPPA Violations*.....................................................14

    *The Class Action Complaint* ...........................................................................18

    *The Proposed Settlement and Preliminary Approval Motion*...........................20

        *Overview of the Proposed Settlement's Key Provisions* ......................20

        *The Proposed Settlement Provides No Meaningful Benefit to the Child Victims*.................................................................................21

        *Class Counsel's Improper Efforts to Shield Fees from Scrutiny* ..........23

        *The Defective Notice Program*............................................................23

ARGUMENT ..................................................................................................................25

I.     Legal Standards ...................................................................................................25

     A.     The Critical Role of Objectors in Class Action Litigation ....................25

     B.     Class Certification and Settlement Approval Standards ........................26

II.    The Court Should Not Certify the Settlement Class
Because the Putative Class Representatives Have
Not Fairly and Adequately Protected the Interests of the Child Victims. ........................28

III.   The Court Should Reject the Proposed Settlement
Because It Is Not Fair, Reasonable and Adequate .............................................................28

     A.     The Putative Class Representatives and Class
Counsel Have Not Adequately Represented the Child Victims ............................28

          1.     The Proposed Settlement Is Akin to a Racket and Does
Not Achieve Class Counsel's Nominal Goal of
Making the Child Victims' Whole ...........................................................29

          2.     Class Counsel Have Failed to Act with Integrity ......................................30

          3.     The Proposed Settlement Requires the Child
Victims to Release Significant Claims Class Counsel
Failed to Allege .......................................................................................31

          4.     By Agreeing to the Proposed Settlement, the
Putative Class Representatives Have Inadequately
Represented the Child Victims ................................................................31

     B.     The Proposed Settlement Does Not Provide the Child Victims
with Adequate Relief ...........................................................................................32

          1.     The Strength of the Child Victims' Claims
Outweighs the Insignificant Sum Defendants Have
Agreed to Pay to Make Class Counsel Go Away ......................................32

               a.     Federal and State Public Policy Provides
for Heightened Protection of Children's
Sensitive Personal Information .....................................................32

               b.     The Strength and Value of the Child
Victims' Claims .........................................................................33

   c.  Defendants' Settlement Offer Provides No
      Meaningful Benefit to the Child Victims......................................36

   2.  The Other Seventh Circuit Factors Weigh in
      Favor of Rejecting the Proposed Settlement................................38

   3.  The Terms of the Proposed Attorney's Fees Award
      Are Unknown..............................................................................39

  C.  The Proposed Settlement Is Not the Product of Arm's
     Length Negotiations.............................................................................39

IV.  The Court Should Reject the Proposed Settlement Because the
   Notice Program Was Defective .........................................................................40

V.  The Court Should Grant Objector's Motion to Intervene.................................42

  A.  Legal Standards....................................................................................42

  B.  Objector May Intervene as of Right.....................................................43

  C.  Alternatively, the Court Should Permit Objector to Intervene .............44

VI.  The Court Should Appoint Objector's Counsel as Lead Class Counsel............44


CONCLUSION.................................................................................................................46

## EXHIBITS

Exhibit 1:  Oct. 23, 2019 Letter from Sen. Schumer and Sen. Cotton to Acting Director of
     National Intelligence

Exhibit 2:  Musical.ly Privacy Policy (dated July 12, 2016)

Exhibit 3:  *United States v. Musical.ly, et al.*, No. 2:19-cv-1439, Complaint
     for Civil Penalties, Permanent Injunction, and Other Equitable Relief

Exhibit 4:  *United States v. Musical.ly, et al.*, No. 2:19-cv-1439, Stipulated Order
     For Civil Penalties, Permanent Injunction, and Other Relief

Exhibit 5:  Declaration of Professor Angela J. Campbell

Exhibit 6:  FTC Enforcement Policy Statement of Deceptively Formatted Advertisements

Exhibit 7:  TikTok Privacy Police for Younger Users (dated January 2020)

Exhibit 8:     Side-By-Side Comparison of FTC Enforcement Action Complaint Allegations and Class Action Complaint Allegations

Exhibit 9:     Federal Trade Commission, *Video Social Networking App Musical.ly Agrees to Settle FTC Allegations That It Violated Children's Privacy Law: FTC Obtains Largest Monetary Settlement in a COPPA Case* (Feb. 27, 2019)

Exhibit 10:    Angeion Group Project Proposal

Exhibit 11:    Class Notice

Exhibit 12:    *Perkins, et al. v. LinkedIn Corp.*, No. 13-cv-4303-LHK (N.D. Cal.), *Notice of Motion and Motion for Final Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof* (ECF No. 126)

Exhibit 13:    *In re Vizio, Inc. Consumer Privacy Litig.*, No. 08:16-ml-2693-JLS-KES (C.D. Cal.), *Order (1) Granting Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. 311) and (2) Granting Plaintiffs' Motion for Attorneys' Fees, Costs, And Class Representative Incentive Awards (Doc. 310)* (ECF No. 337)

Exhibit 14:    *In re Sony Gaming Networks and Customer Data Security Breach Litig.*, No. 3:11-md-2258-AJB-MDD (S.D. Cal.), *Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Costs, and Expenses* (ECF No. 204-1)

Exhibit 15:    Class Notice as of May 10, 2020

**TABLE OF AUTHORITIES**

**<u>CASES</u>**

*Aranda v. Caribbean Cruise Line, et al.*, No. 12-cv-4096 (N.D. Ill.)...........................................45

*Chaffee v. A&P Tea Co.*, Nos. 79 C 2735 and 79 C 3625,
1991 WL 5859, (N.D. Ill. Jan. 16, 1991) ..........................................................................40

*Eubank v. Pella*, 753 F.3d 718, (7th Cir. 2014) ................................................. *passim*

*Flood v. Dominguez*, No. 08-cv-153 (N.D. Ind.) ............................................................45

*Fraley v. Facebook, Inc.*, 966 F.Supp.2d 939, (N.D. Cal. 2013)....................................37

*G.G. v. Valve Corp.*, No. C16-1941-JCC,
2017 WL 1210220, (W.D. Wash. Apr. 3, 2017) ............................................................36

*Golbert v. Aurora Chicago Lakeshore Hospital, LLC, et al.*,
No. 19-cv-8257 (N.D. Ill.) ...............................................................................................45

*Harriston v. Chicago Tribune Co.*, 992 F.2d 697, (7th Cir. 1993)................................26

*Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, (7th Cir. 2013) ..............................40

*In re Discovery Zone Securities Litig.*, 181 F.R.D. 582 (N.D. Ill. 1998).........................42, 43, 44

*In re Sony Gaming Networks and Customer Data Security Breach Litig.*,
No. 3:11-md-02258-AJB-MDD (S.D. Cal) ......................................................................37

*In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988, (9th Cir. 2010) ........30

*In re Subway Footlong Sandwich Mkt'g and Sales Practices Litig.*,
869 F.3d 551, (7th Cir. 2017) ................................................................................. *passim*

*In re Vizio, Inc. Consumer Privacy Litig.*, No. 8:16-ml-02693-JLS (C.D. Cal.)...........37

*In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016)....................27-28

*Johnson v. Uber Tech., Inc.*, No 16 C 5468,
2017 WL 1155384 (N.D. Ill. Mar. 3, 2017)....................................................................35

*Kylie S., et al. v. Pearson plc, et al.*, No. 19-cv-5936 (N.D. Ill.).....................................45

*Manigault-Johnson v. Google LLC*, No. 2:18-cv-1032-BHH,
2019 WL 3006646, (D.S.C. Mar. 31, 2019) ....................................................................36

*Mutnick v. Clearview, et al.*, No. 20-cv-512 (N.D. Ill.) .................................................................45

*Perkins v. LinkedIn*, No. 5:13-cv-04303 LHK (N.D. Cal.) ...........................................................37

*Redman v. Radio Shack*, 768 F.3d 622, 629 (7th Cir. 2014) ...............................25, 26, 27, 30, 40

*Snyder v. Ocwen Loan Servicing, LLC*, No. 16 C 8677,
2018 WL 4659274 (Sept. 28, 2018).................................................................................32

*Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) .....................27, 38

*Vance v. IBM*, No. 20-cv-520 (N.D. Ill.) ....................................................................................45

*Villalobos v. Cicero School Dist. 99*, 841 N.E.2d 87 (Ill. App. Ct. 2005)..............................35-36

*Young v. County of Cook*, No. 06-cv-552 (N.D. Ill. 2007) ..........................................................45

*Zurich Capital Markets Inc. v. Coglianese*, 256 F.R.D. 379 (N.D. Ill. 2006) ........................42, 43

## STATUTES

*Federal Statutes*

5 U.S.C. § 554.................................................................................................................13

15 U.S.C. § 6501........................................................................................................13, 32

15 U.S.C. § 6502. .............................................................................................................15

18 U.S.C. § 2710(c)(2)......................................................................................................33

20 U.S.C. § 1232g........................................................................................................32-33

*State Statutes*

105 ILCS § 10/1, *et seq.*....................................................................................................33

325 ILCS § 17/1, *et seq.*........................................................................................18, 33, 46

740 ILCS § 14/1*, et seq.*..............................................................................................18, 33

765 ILCS § 1075/1, *et seq.*................................................................................................18

815 ILCS § 505/10a..........................................................................................................34

815 ILCS § 515/3.............................................................................................................34

Cal. Civ. Code § 1798.100, *et seq.*............................................................33

Cal. Civ. Code § 1780.............................................................................33

Cal. Civ. Code § 1798.120 (c) ................................................................33

Cal. Civ. Code § 1798.150.......................................................................33

Cal Civ. Code § 1798.155........................................................................33

## FEDERAL RULES AND REGULATIONS

16 C.F.R. Part 1.............................................................................13, 32

16 C.F.R. Part 312.........................................................................13, 32

16 C.F.R. Part 312.2............................................................................16

16 C.F.R. Part 312.4(d)(1) ..................................................................17

16 C.F.R. Part 312.4(d)(2) ..................................................................17

Fed. R. Civ. P. 5.2.................................................................................1

Fed. R. Civ. P. 23 .......................................................................... *passim*

Fed R. Civ. P. 24.......................................................................42, 43, 44

## LEGISLATIVE HISTORY

House Bill 671 from Illinois' 98th General Assembly (now Public Act 98-0707).....................................46

Senate Bill 1009 from Illinois' 98th General Assembly (now Public Act 98-1138) .................................46

## OTHER AUTHORITIES

*About Us*, SWEETY HIGH, https://www.sweetyhigh.com/about
(last accessed on Mar. 12, 2020)......................................................................7

Andrew Prokop, *Cambridge Analytica Shutting Down: The Firm's
Many Scandals, Explained*, <u>Vox</u> (May 2, 2018),
https://www.vox.com/policy-and-politics/2018/3/21/17141428/
cambridge-analytica-trump-russia-mueller (last accessed on Mar. 12, 2020)..............................12

*Baby Shark, Featuring Finny the Shark,* YOUTUBE (Nov. 26, 2016),
https://www.youtube.com/watch?v=GR2o6k8aPlI&t=70s
(last accessed on Mar. 12, 2020)....................................................................6, 7

*Complying with COPPA: Frequently Asked Questions* (Mar. 20, 2015),
https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa
-frequently-asked-questions (last accessed on Mar. 12, 2020)......................................................13

Dami Lee, *TikTok Users Over 13 Are Having Their Accounts Deleted
After Putting in Wrong Birthdays,* The Verge (Feb. 28, 2019),
*https:*//www.theverge.com/2019/2/28/18245011/tiktok-age-coppa-
child-privacy-accounts-deleted-ftc-requirement (accessed on Mar. 12, 2020) ............................14

Famous Birthdays, https://www.famousbirthdays.com/people/
littlefoxhermes-361h.html (last accessed on Mar. 12, 2020)......................................................12

Famous Birthdays, https://www.famousbirthdays.com/people/little-miss-jae.html
(last accessed on Mar. 12, 2020)......................................................12

FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis
 of Settlement Campaigns*, Federal Trade Comm'n (Sept. 2019),
https://www.ftc.gov/system/files/documents/reports/consumers-
class-actions-retrospective-analysis-settlement-campaigns/class_action_
fairness_report_0.pdf (last accessed on Mar. 17, 2020). .................................................23, 37, 41

*Google and YouTube Will Pay Record $170 Million for Alleged Violations of
Children's Privacy Law*, FTC (Sept. 4, 2019),
https://www.ftc.gov/news-events/press-releases/2019/09/google-
youtube-will-pay-record-170-million-alleged-violations
(last accessed on Mar. 15, 2020)......................................................34

Jia Talentino, *How TikTok Holds Our Attention,* The New Yorker (Sept. 23, 2019),
https://www.newyorker.com/magazine/2019/09/30/how-tiktok-holds-our-attention
(last accessed on Mar. 8, 2020)......................................................4, 5

*#KitKatChallenge Musical.ly Campaign*, Shorty Awards,
https://shortyawards.com/9th/kitkatchallenge-musically-campaign-3
(last accessed on Mar. 12, 2020)......................................................12

Leslie Fair, *Largest FTC COPPA Settlement Requires Musical.ly to
Change Its Tune* (Feb. 27, 2019), https://www.ftc.gov/news-events/blogs/
business-blog/2019/02/largest-ftc-coppa-settlement-requires-musically-change-its
(last accessed on Mar. 12, 2020)......................................................7

Marco Silva, *Video app TikTok Fails to Remove Online Predators*,
 BBC News (Apr. 5, 2019), https://www.bbc.com/news/blogs-trending-
47813350 (Video app TikTok fails to remove online predators)
(last accessed on Mar. 12, 2020)......................................................9

Matthew A. Lapierre, *et al., The Effect of Advertising on Children and Adolescents*,
<u>Pediatrics</u> (Nov. 2017), https://pediatrics.aappublications.org/content/140/
Supplement_2/S152 (last accessed on Mar. 12, 2020) ...............................................................11

Pat Reavy, *Centerville Police Investigating Sextortion Case of 8-Year-Old
on Music App*, <u>KLS.com</u> (Sept. 28, 2017), https://www.ksl.com/article/45973704
(last accessed on Mar. 25, 2020) ...............................................................10

Rachel England, *TSA Bans Employees from Making TikTok Videos*, <u>Endgadget</u>
(Feb. 24, 2020), https://www.engadget.com/2020/02/24/
tsa-ban-employees-tiktok-security/ (last accessed on Mar. 12, 2020)...........................................4

Ryan Broderick *TikTok Has a Predator Problem. A Network of Young
Women Is Fighting Back*, <u>Buzzfeed News</u> (June 24, 2019),
https://www.buzzfeednews.com/article/ryanhatesthis/tiktok-has-a-predator-
problem-young-women-are-fighting-back (last accessed on Mar. 12, 2020)...........................9, 10

Reggie Webber, *TikTok Predators*, <u>YouTube</u> (Oct. 28, 2018),
https://www.youtube.com/watch?v=7Gju2x11Lfc (last accessed on Mar. 12, 2020)..................10

Ryan Lovelace, *State Department and DHS Ban TikTok from government-issued
devices,* <u>The Washington Times</u> (Jan. 3, 2020),
https://www.washingtontimes.com/news/2020/jan/3/state-department-
and-dhs-ban-tiktok-government-iss/ (last accessed on Mar. 12, 2020) ........................................4

*Sweety High and Musical.ly Partner to Produce Original Content as
Live Platforms Surge*, <u>Businesswire</u> (June 15, 2017, 8:00 AM),
http://www.businesswire.com/news/home/20170615005392/en/
Sweety-High-musical.ly-Partner-Produce-Original-Content
(last accessed on Mar. 12, 2020)...............................................................7

TechCrunch, *From Brush to Canvas with Alex Zhu of Musical.ly*,
<u>YouTube</u> (Dec. 6, 2016), https://www.youtube.com/watch?v=ey15v81pwII
(last accessed on Mar. 12, 2020)...............................................................6, 9

Tribune Media Wire, *Dad Warns of Popular App After Discovering Disturbing
Messages Sent to 7-Year-Old,* <u>WGN News</u> (Aug. 22, 2017),
https://wgntv.com/2017/08/22/dad-warns-of-popular-app-after-discovering-
disturbing-messages-sent-to-7-year-old/ (last accessed on Mar. 12, 2020)..................................10

Yuan Chen, *Musical.ly Has Lots of Users, Not Much Ad Traction*,
<u>Digiday</u> (Sept. 5, 2017), https://digiday.com/marketing/musical-ly-starts-
selling-ads/ (last accessed on Mar. 12, 2020) ...............................................................11, 34

Pursuant to Federal Rules of Civil Procedure 23(e), 24(a) and 24(b), the Court's Preliminary Approval Order (Doc. 13), Amended General Order 20-0012 (Doc. 16), Second Amended General Order 20-0012 (Doc. 17) and Third Amended General Order 20-0012 (Doc. 21) (Amended, Second Amended and Third Amended General Order, collectively, the "General Orders"), Mark S██████ ("Mark S."), by his attorneys and on behalf of himself and the proposed settlement class and as parent and legal guardian of his minor son, A████ S███████ ("A.S.")[1]: (a) objects to certification of the proposed settlement class and the proposed Settlement Agreement and Release ("the Proposed Settlement") in the matter of *T.K., et al. v. ByteDance Technology Co., Ltd., et al.*, No. 19 C 7915, pending in the United States District Court for the Northern District of Illinois, on the grounds that the putative class representatives and Proposed Settlement fail to comply with the requirements of Federal Rule of Civil Procedure 23 – *i.e.*, the putative representatives have not fairly and adequately protected the interests of the putative class, and the Proposed Settlement is not fair, reasonable and adequate; and (b) seeks to intervene as of right or, alternatively, with the Court's permission. Mark S. respectfully requests that the Court appoint him as class representative and his counsel as lead objector counsel and lead class counsel.

## INTRODUCTION

According to the Class Action Complaint (Doc. 1), Plaintiffs T.K. and A.S., through their respective mothers, filed this action against Defendants ByteDance Technology Co. Ltd. ("ByteDance"); Musical.ly; Musical.ly, Inc.; and TikTok, Inc. (collectively, "Defendants") to

---

[1] Pursuant to Fed. R. Civ. P. 5.2, the full names of Objector and his minor son, as well as their home address and phone number have been redacted. Because the Class Notice requires objectors to provide this information, it is included in this objection. Objector is providing class counsel and the settlement administrator with an unredacted copy of this filing.

make whole the millions of young children and their parents who Defendants harmed (collectively, the "Child Victims") by: (a) unlawfully collecting and selling their personally identifiable information; and (b) exposing the Child Victims to pedophiles and other online predators. Doc. 1, ¶¶ 35, 51, 57. The Proposed Settlement does not come close to achieving that goal and the putative class representatives have not fairly and adequately protected the interests of the proposed settlement class.

Rather, the Proposed Settlement results in fees for class counsel, while failing to provide meaningful relief for the class. Specifically, the Proposed Settlement allows class counsel to seek up to $363,000 in fees, while requiring each of the over 6 million Child Victims to provide Defendants with a broad liability release in return for approximately 11 cents. The Proposed Settlement does not compensate the Child Victims for the improper collection, use and distribution of their personal information, nor will the small size of the settlement deter Defendants from continuing with their unlawful conduct. Moreover, the Proposed Settlement does not provide: (a) injunctive relief; (b) the return or deletion of the unlawfully collected personal information; (c) the disclosure of the entities that have received the personal information; (d) the disclosure of how Defendants used the personal information; or (e) counseling services for exploited Child Victims. Finally, the notice provisions in the Proposed Settlement failed to comply with due process, as the parties: (a) made no attempt to directly notify the Child Victims; (b) failed to properly target the Child Victims; and (c) failed to provide the Child Victims with an updated Notice of Proposed Class Action Settlement that reflected changes in the schedule due to the General Orders.

The Seventh Circuit has warned against class action settlement agreements like this, comparing them to rackets. *See In re Subway Footlong Sandwich Mkt'g and Sales Practices*

*Litig. ("In re Subway")*, 869 F.3d 551, 556 (7th Cir. 2017). Here, the problematic nature of the Proposed Settlement is magnified by the fact that the Class Action Complaint's substantive allegations were largely copied from a previously-filed Federal Trade Commission ("FTC") enforcement action complaint against two of the Defendants. Thus, while the Child Victims will not even be able to purchase a gumball with their settlement proceeds, Plaintiffs' counsel stand to make hundreds of thousands of dollars for work performed by government lawyers.

The Court should: (a) deny certification of the settlement class because the putative class representatives have not fairly and adequately protected the interests of the putative class; (b) reject the Proposed Settlement because it is not fair, reasonable and adequate; (c) grant Mark S.'s motion to intervene in order to protect his interests and those of putative class members; and (d) appoint Mark S. as the class representative and his counsel as lead objector counsel and lead class counsel to prosecute this matter going forward. The Class Action Complaint correctly alleges that the Child Victims should be made whole. They deserve a class representative and class counsel who will advocate for that result.

## THE OBJECTOR

At all relevant times, Objector Mark S. and his minor son, A.S, were citizens of the State of Illinois. Mark S.'s address is ████████████████████████, and his phone number is ██████████. Objector may be contacted through the undersigned counsel. At relevant times, A.S. was under the age of 13 while using Defendants' video social networking application ("TikTok"). TikTok did not ask for or obtain verifiable parental consent to collect, use or disclose A.S.'s personally identifiable information, including persistent identifiers and/or viewing data, nor was Mark S. provided direct notice with regard to TikTok's collection, use and disclosure of such information. As such, A.S. is a member of the proposed settlement class as

described in § 2.3 of the Settlement Agreement (*see* Doc. 5-1 at ECF 22). Objector intends to be present at the fairness hearing currently scheduled on June 18, 2020 (Doc. 20).

## BACKGROUND FACTS

### *The TikTok App*

TikTok is a dangerous and nefarious video social networking application that has been banned by the United States Department of Defense, State Department, Department of Homeland Security and Transportation Security Administration.[2] These bans followed an October 2019 letter from two U.S. Senators to the Acting Director of National Intelligence in which they expressed their concerns about the "national security risks posed by [TikTok's] growing use in the United States." Exhibit 1 (10/23/2019 Sen. Cotton and Schumer letter). According to the Senators, TikTok is a "potential target of foreign influence campaigns like those carried out during the 2016 election on U.S.-based social media platforms" and a "counterintelligence threat we cannot ignore." *Id.*

### *TikTok's History*

TikTok was launched in 2017, and as of September 2019, had been downloaded more than a billion times.[3] Defendant ByteDance is the parent company of Defendant TikTok, Inc., and has been valued at more than $75 billion.[4] Early on, Defendants Musical.ly and Musical.ly,

---

[2] Ryan Lovelace, *State Department and DHS Ban TikTok from Government-Issued Devices,* The Washington Times (Jan. 3, 2020), https://www.washingtontimes.com/news/2020/jan/3/state-department-and-dhs-ban-tiktok-government-iss/ (last accessed on Mar. 12, 2020); Rachel England, *TSA Bans Employees from Making TikTok Videos*, Endgadget (Feb. 24, 2020), https://www.engadget.com/2020/02/24/tsa-ban-employees-tiktok-security/ (last accessed on Mar. 12, 2020).

[3] Jia Talentino, *How TikTok Holds Our Attention,* The New Yorker (Sept. 23, 2019), https://www.newyorker.com/magazine/2019/09/30/how-tiktok-holds-our-attention (last accessed on Mar. 8, 2020).

[4] *Id.*

Inc.[5] competed with TikTok.[6] In 2017, ByteDance bought Musical.ly for an estimated $1 billion.[7] ByteDance merged Musical.ly into TikTok in 2018.[8] (This Objection collectively refers to the TikTok and Musical.ly apps as "TikTok." Where conduct took place before the merger, the Objection refers to the app as "Musical.ly.")

### How TikTok Works

TikTok is a social networking application that allows users to, among other things, create short music videos and superimpose filters onto users' moving faces. With respect to the latter feature, the TikTok app scans users' facial geometries. Unlike other social media applications, TikTok does not depend on a user's social network or "likes" to determine the user's interests.[9] Rather, using powerful algorithms, TikTok determines a user's interests based on what they view and continually serves up content that appeals to the user.[10] As one author described it: "Some social algorithms are like bossy waiters: they solicit your preferences and then recommend a menu. Tik Tok orders you dinner by watching you look at food."[11] A potential danger of TikTok is that over time a user becomes "less and less able to separate algorithmic interests from [his] own."[12]

### Musical.ly's Privacy Policy

At relevant times, Musical.ly's Privacy Policy stated that "[w]e do not knowingly collect information from children under 13 and we do not want it. We will take steps to delete it if we learn we have collected it . . . . If we learn that we have collected any Personal Information from

---

[5] Musical.ly, Inc. is a California corporation that is wholly owned by Musical.ly.
[6] Jia Talentino, *How TikTok Holds Our Attention,* The New Yorker (Sept. 23, 2019), *supra*.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *See id.*
[11] *Id.*
[12] *Id.*

children under 13, then we will promptly take steps to delete such information and terminate the child's account." Exhibit 2 (Musical.ly Privacy Policy dated July 12, 2016). The representations were not true.[13]

### Child Victims' Use of Musical.ly

During a December 2016 interview, Musical.ly's CEO, Alex Zhu, contradicted Musical.ly's Privacy Policy, conceding that "a lot of users, especially top users, they're under 13."[14] This came as no surprise given that Musical.ly: (a) featured content that directly appealed to young children; and (b) took almost no precautions to keep young children off the app. For instance, with respect to content, Musical.ly featured popular children's songs, as evidenced by its "Song Chart" – a chart showing the most popular songs used in Musical.ly videos. A screenshot of the Song Chart obtained during a 2017-2018 investigation into Musical.ly by the Institute for Public Representation at the Georgetown University Law Center shows that one of the most popular songs among users was Baby Shark, a song that had been viewed more than 21 million times on YouTube's Super Simple Songs – Kids Song Channel (Figure 2).[15] *See* Exhibit 5 (Declaration of Professor Angela J. Campbell), ¶¶ 5-8.

---

[13]Exhibit 3 (*United States v. Musical.ly*, 2:19-cv-1439, United States District Court for the Central District of California (ECF No. 1 – FTC Complaint)), ¶ 21); Exhibit 4 (*United States v. Musical.ly*, 2:19-cv-1439 (ECF No. 18 – Stipulated Order)) at ECF 10-11.

[14] TechCrunch, *From Brush to Canvas with Alex Zhu of Musical.ly*, YouTube (Dec. 6, 2016), https://www.youtube.com/watch?v=ey15v81pwII (last accessed on Mar. 8, 2020).

[15] *Baby Shark, Featuring Finny the Shark,* YOUTUBE (Nov. 26, 2016), https://www.youtube.com/watch?v=GR2o6k8aPlI&t=70s (last accessed on Mar. 12, 2020). As of March 12, 2020, the video had over 72.8 million views.



*Figure 1*
*Musical.ly Song Chart Screenshot*

*Figure 2*
*YouTube Baby Shark Video Screenshot*

Moreover, Musical.ly actively sought video content that appealed to tween girls. In June 2017, Musical.ly partnered with Sweety High, to provide original, premium content. Sweety High described itself as "the cultural destination for teens and tween girls."[16] The first joint production between Musical.ly and Sweety High, a series called "After the Bell,"[17] received the highest ratings and most audience engagement among all original series on Musical.ly's livestreaming platform, Live.ly.[18]

Additionally, Musical.ly took almost no precautions to keep young children off the app. Prior to July 2017, a user did not need to enter a birthdate or other age identifier to register to use the app.[19] While Musical.ly eventually added a birthdate requirement to its registration process, that did little to keep the Child Victims from using the app. As described in the Declaration of

---

[16] *About Us*, SWEETY HIGH, https://www.sweetyhigh.com/about (last accessed on Mar. 12, 2020).
[17] *Sweety High and Musical.ly Partner to Produce Original Content as Live Platforms Surge*, Businesswire (June 15, 2017, 8:00 AM),
http://www.businesswire.com/news/home/20170615005392/en/Sweety-High-musical.ly-Partner-Produce-Original-Content (last accessed on Mar. 12, 2020).
[18] *Id.*
[19] Leslie Fair, *Largest FTC COPPA Settlement Requires Musical.ly to Change Its Tune* (Feb. 27, 2019), https://www.ftc.gov/news-events/blogs/business-blog/2019/02/largest-ftc-coppa-settlement-requires-musically-change-its (last accessed on Mar. 12, 2020).

Professor Angela J. Campbell, a law professor at Georgetown University Law Center and a former faculty director of the Institute for Public Representation, if a person entered a birthdate showing an age under 13, the person would receive a message that she was not eligible. Ex.5, ¶¶ 1, 10. However, the app would immediately encourage the user to register through alternative means. *Id.*, ¶ 10.

When Professor Campbell conducted her own registration experiment in June 2017 using a birthdate that indicated she was under 13, she encountered the following: (a) a screen in which she had to enter her phone number; (b) a screen in which she then had to enter a birthdate; (c) after entering a birthdate indicating that she was under 13, a message encouraging her to connect to Musical.ly via Facebook; and (d) after logging in via Facebook, Professor Campbell obtained access to Musical.ly. *Id.* Screenshots of Professor Campbell's registration process are set forth in Figure 3, below:



*Figure 3: Professor Campbell's Musical.ly Registration Experience*

Similarly, a user who entered a birthdate showing she was under 13 could also immediately register using a different birthdate, as depicted in Figure 4, below:



*Figure 4*: Age-Gate Screens in the Musical.ly Registration Process

Notably, during the above-referenced 2016 interview with Musical.ly's CEO, he acknowledged that children lied about their age in order to bypass age-gates like that described above.[20]

In connection with registering for the Musical.ly app, a user would provide his email address, phone number, first and last name, a short biography and a profile picture.[21] Once a child registered, the app began to collect myriad forms of sensitive personal information, including geolocation, login credentials for social media sites, personal information posted to Musical.ly, IP address, and session and persistent cookies. *See* Ex. 2 (Musical.ly Privacy Policy).

**The Dangers of TikTok to the Child Victims**

**Child Predators**

Due to the young age of TikTok's users, at relevant times, TikTok was an online playground for pedophiles.[22] Indeed, TikTok's algorithm fed a pedophile's sickness by: (a)

---

[20] TechCrunch, *From Brush to Canvas with Alex Zhu of Musical.ly*, <u>YouTube</u> (Dec. 6, 2016), *supra.*

[21] Ex. 3 (FTC Compl.), ¶ 13); Ex. 4 (Stipulated Order) at ECF 10-11.

[22] Marco Silva, *Video App TikTok Fails to Remove Online predators*, <u>BBC News</u> (Apr. 5, 2019), https://www.bbc.com/news/blogs-trending-47813350 (last accessed on Mar. 12, 2020); Ryan Broderick, *TikTok Has a Predator Problem. A Network of Young Women Is Fighting Back*, <u>Buzzfeed News</u> (June 24,

serving up endless videos featuring the specific type of child to which the pedophile was attracted; and (b) allowing older men to perform "duets" with minors as shown in Figure 5, below.[23] There have been numerous reports of predators contacting minors through TikTok's messaging feature, including a report of the attempted grooming and sextortion of an 8-year-old victim. *See id.*[24]



*Figure 5: Screen Shot of Older Men Performing Duets with Minor Girls*

### Deceptive Advertising

TikTok also preyed on children's naiveté through the use of a deceptive advertising technique called "native advertising" or "sponsored content" – *i.e.*, advertisements that often are indistinguishable from an app's regular content. In 2015, the FTC addressed the deceptive nature of native advertising in an "Enforcement Policy Statement on Deceptively Formatted Advertisements." Exhibit 6 (FTC Enforcement Policy Statement). According to the Policy Statement, the FTC "has long held the view that advertising and promotional messages that are

---

2019), https://www.buzzfeednews.com/article/ryanhatesthis/tiktok-has-a-predator-problem-young-women-are-fighting-back (last accessed on Mar. 12, 2020).

[23] Ryan Broderick *TikTok Has a Predator Problem. A Network of Young Women Is Fighting Back*, Buzzfeed News (June 24, 2019), *supra*; Reggie Webber, *TikTok Predators*, YouTube (Oct. 28, 2018), https://www.youtube.com/watch?v=7Gju2x11Lfc (last accessed on Mar. 12, 2020).

[24] *See also* Tribune Media Wire, *Dad Warns of Popular App After Discovering Disturbing Messages sent to 7-year-Old,* WGN News (Aug. 22, 2017), https://wgntv.com/2017/08/22/dad-warns-of-popular-app-after-discovering-disturbing-messages-sent-to-7-year-old/ (last accessed on Mar. 12, 2020); Pat Reavy, *Centerville Police Investigating Sextortion Case of 8-Year-Old on Music App*, KLS.com (Sept. 28, 2017), https://www.ksl.com/article/45973704 (last accessed on Mar. 25, 2020).

not identifiable as advertising to consumers are deceptive if they mislead consumers into believing they are independent, impartial, or not from the sponsoring advertiser itself." *Id.* at 1.

The issues surrounding deceptive online advertising are magnified when it comes to children. Unlike others, children are more vulnerable to deceptive advertising because they "have more difficulty understanding that they are being marketed to in these online settings."[25]

TikTok promoted native advertising/sponsored content in the form of "challenges" – a type of video where a user challenges others to make a similar video using the same theme. In or around summer 2016, TikTok introduced custom commercial challenges, whereby advertisers could promote their products via a challenge issued by a popular TikTok user.[26] On average, TikTok charged $75,000 to $150,000 for a custom commercial challenge advertising campaign. *Id.* Custom commercial challenges did not make clear that they were advertisements (*see* Figure 6, below):



*Figure 6 – Custom Commercial Challenge Examples*

[25] Matthew A. Lapierre, *et al., The Effect of Advertising on Children and Adolescents*, <u>Pediatrics</u> (Nov. 2017), https://pediatrics.aappublications.org/content/140/Supplement_2/S152 (last accessed on Mar. 12, 2020).

[26] Yuan Chen, *Musical.ly Has Lots of Users, Not Much Ad Traction*, <u>Digiday</u> (Sept. 5, 2017), https://digiday.com/marketing/musical-ly-starts-selling-ads/ (last accessed on Mar. 12, 2020).

As shown above, the custom commercial challenges: (a) did not indicate they were paid advertisements; and (b) featured children promoters, such as "@littlefoxhermes," who was 10 years old at the time of the challenge in 2016,[27] and "@littlemissjae," who was under 10 at the time.[28] While some custom commercial challenges may have included the hashtag "#ad" in the video description, as shown above, any such hashtag may not have been visible or was cutoff with ellipses in its place.

Not only did the custom commercial challenges mislead the Child Victims, it also deprived them of their lawful right to control their publicity. By deceptively encouraging the Child Victims to star in custom commercial challenges, TikTok converted the children into product spokespeople without their knowledge and without compensation.

### *Propaganda Campaigns*

As discussed above, two U.S. Senators have expressed concerns that TikTok is a "potential target of foreign influence campaigns like those carried out during the 2016 election on U.S.-based social media platforms . . . ." Ex. 1. In 2016, the data of up to 87 million Facebook users was obtained and allegedly used by Cambridge Analytica to sway voters in the United States presidential election.[29] Combining the fact that TikTok has collected data on the Child Victims from very young ages with the powerful nature of its mind-controlling algorithm, it is easy to see how TikTok, the Chinese government and/or another entity with access to TikTok's

---

[27] Famous Birthdays, https://www.famousbirthdays.com/people/littlefoxhermes-361h.html (last accessed on Mar. 12, 2020); *#KitKatChallenge Musical.ly Campaign*, Shorty Awards, https://shortyawards.com/9th/kitkatchallenge-musically-campaign-3 (last accessed on Mar. 12, 2020).
[28] *See* Famous Birthdays, https://www.famousbirthdays.com/people/little-miss-jae.html (last accessed on Mar. 12, 2020).
[29] *See* Andrew Prokop, *Cambridge Analytica Shutting Down: The Firm's Many Scandals, Explained*, Vox (May 2, 2018), https://www.vox.com/policy-and-politics/2018/3/21/17141428/cambridge-analytica-trump-russia-mueller (last accessed on Mar. 12, 2020).

data and platform could use that information to influence the Child Victims' future election decisions, as well as other, decisions.

***The FTC's Enforcement Action***

On February 27, 2019, the FTC filed a federal enforcement action against Defendants Musical.ly and Musical.ly, Inc. for their multiple violations of the Child Online Privacy Protection Act, 15 U.S.C. § 6501, *et seq.* ("COPPA"). Ex. 3. COPPA empowers parents to maintain control over what information is collected about their young children – *i.e.*, children under 13 – online. *See id.*[30] COPPA also required the FTC to promulgate a rule implementing its provisions, which it has done (the "COPPA Rule"). *See id.*; 5 U.S.C. § 554; 16 C.F.R. Part 312. The COPPA Rule permits a court to impose a $43,280 penalty against an entity for each COPPA violation it commits. *See* 16 C.F.R. Part 1 at 2014.

On March 27, 2019, a federal court entered a Stipulated Order for Civil Penalties, Permanent Injunction, and Other Relief (the "Stipulated Order"), in which the Musical.ly Defendants agreed to the following: (a) a $5.7 million civil penalty for their COPPA violations; (b) a permanent injunction and restraining order prohibiting the Musical.ly Defendants from further COPPA Rule violations; and (c) deletion of specified personal information of TikTok users. Ex. 4. While the civil penalty may seem large, it was not even 1% of Defendant ByteDance's estimated $75 billion net worth. Similarly, while the data deletion requirement may seem significant, as discussed below, it is seemingly illusory. *Id.* at 9-10.

The Stipulated Order's data deletion provision provided the Musical.ly Defendants with two data deletion options. *Id.* They could: (a) destroy all personal information existing at the time of the Stipulated Order's entry; or (b) destroy personal information based on the *identified*

---

[30] *See also Complying with COPPA: Frequently Asked Questions* (Mar. 20, 2015), https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-asked-questions (last accessed on Mar. 12, 2020).

ages of users. *Id.* With respect to the latter, the Stipulated Order required the Musical.ly Defendants to do the following: (a) destroy the personal information of account users who "*identify as under age 13*" at the time of the order's entry; (b) destroy the personal information of account users who "*identify as age 13 or over who were under age 13* at the time Defendants collected personal information," unless the users provided affirmative consent for the Musical.ly Defendants to retain the user's registration information; or (c) if a user's age could not be identified, the Musicial.ly Defendants were to remove the user's information from their websites and online services within 45 days, refrain from disclosing that information, and destroy the information within 12 months of the Stipulated Order's entry. *Id.*

Defendants chose the age-based data deletion option.[31] That option was problematic because, as discussed above, numerous child users falsely "identified" as being over age 13 in order to register for TikTok. The Stipulated Order's terms did not require deletion of those accounts. Regarding users whose age Defendants could not immediately identify, Objector has been unable to find any information showing what efforts, if any, Defendants undertook to determine the users' ages or to verify that an "ageless" user who subsequently identified as being "over 13," in fact was.

### *Defendants' Continued COPPA Violations*

The Stipulated Order makes clear that Defendants are "permanently restrained and enjoined from violating" the COPPA Rule, including but not limited to:

- Failing to make reasonable efforts to ensure that a parent receives direct notice of Defendants' practices regarding the collection, use and disclosure of children's personal information;

---

[31] *See* Dami Lee, *TikTok Users Over 13 Are Having Their Accounts Deleted After Putting in Wrong Birthdays,* The Verge (Feb. 28, 2019), *https*://www.theverge.com/2019/2/28/18245011/tiktok-age-coppa-child-privacy-accounts-deleted-ftc-requirement (accessed on Mar. 12, 2020).

- Failing to post a prominent and clearly labeled link to an online notice of Defendants' information practices with respect to children;

- Failing to obtain verifiable parental consent before collecting, using or disclosing children's personal information; and

- Failing to delete a child's personal information at the request of a parent.

Ex. 4 at ECF 8-10. Underlying the above provisions is COPPA's primary tenet that operators of websites and online services are prohibited from collecting, using or disclosing children's personal information without first obtaining verifiable parental consent. 15 U.S.C. § 6502.

Since the entry of the Stipulated Order, TikTok has created a "Privacy Policy for Younger Users." Exhibit 7 (Privacy Policy for Younger Users). According to the Privacy Policy for Younger Users, TikTok continues to collect the personal information of children under 13 in the form of, among other things: (a) device identifiers; (b) IP addresses; (c) web browser type and version; (c) country-level location; and (d) app activity data such as "video watches, time in the app and general usage data." *Id.* The privacy policy further provides that TikTok uses the collected data to "provide personalized content" and that it shares the data with "our corporate group and with service providers as necessary for them to perform a business purpose, professional service, or technology support function for us." *Id.*

Since entering into the Stipulated Order, TikTok also has created a "TikTok experience for Younger Users" under 13 which severely limits the capabilities of the TikTok app. *See id.* For instance, the TikTok experience for Younger Users only allows users to save videos to their personal devices, as opposed to being able to upload and share them. *Id.*

As was the case before the Stipulated Order, nothing prevents a "Younger User" from registering for TikTok with a false birthdate. Given the severe restrictions on the capabilities of the TikTok experience for Younger Users and the lack of age verification, TikTok tacitly encourages children to register for the adult version where TikTok can continue to unlawfully

collect even more types of children's sensitive personal information than in the version for Younger Users.

Beyond TikTok tacitly encouraging children to register with false birthdates, it seemingly is in direct violation of the Stipulated Order and the COPPA Rule.[32] The Stipulated Order prohibits TikTok from failing to obtain verifiable parental consent before collecting, using or disclosing children's personal information. Ex. 4 at ECF 8. Yet, TikTok admittedly collects children's IP addresses and unique device identifiers – information that can be used to recognize a user over time and across different websites or online services, and, therefore, constitutes "personal information" (16 C.F.R. Part 312.2) – while having no mechanism in place for obtaining verifiable parental consent.

In further violation of the Stipulated Order, TikTok fails to post a "prominent and clearly labeled link to an online notice of its information practices with regard to children . . . on the home or landing page or screen of its web site or online service." Ex. 4 at ECF 8. Set forth in Figure 7, below, are screenshots of TikTok's landing and "Profile" pages. Nowhere on the landing page is there a clearly labeled link to the requisite online notice. *See* Ex. 5, ¶¶ 11-12. The only way to access the notice is to click on the "Me" button located in the bottom right corner of the landing page and then click on the ". . ." button in the top right corner of the Profile page. *See id.* However, there is nothing to indicate or otherwise instruct a user on the above-described process.

---

[32] As discussed in § III, below, Defendants' continued violations of the COPPA Rule are relevant to, among other things, punitive damages. Further, the Child Victims' claims against Defendants allow the Court to impose injunctive relief, which would provide the victims with enforceable rights against Defendants. Objector does not seek to have this Court enforce the injunction entered in the FTC action.



*Figure 7*
*TikTok Landing Page (left) and Profile Page (right)*

Additionally, in violation of the Stipulated Order and the COPPA Rule, TikTok fails to give parents the right to review their children's personal information and have it deleted. *See* Ex. 4 at ECF 8; 16 C.F.R. Part 312.4. Instead, TikTok's Privacy Policy for Younger Users allows *child users* to request to access or delete information collected about them. *See* Ex. 7. Nowhere in the privacy policy does it allow for *parents* to request data deletion. *Id.* Moreover, nowhere does TikTok inform parents of their right to review and delete the data collected about their children.

Finally, in violation of the Stipulated Order, TikTok continues to violate the COPPA Rule by failing to: (a) disclose the name, address, telephone number and email address of all third-party operators collecting or maintaining personal information from children through the website or online service (*see* 16 C.F.R. Part 312.4(d)(1)); and (b) provide a description of the information the third-party operators collect from children, including whether the website or online service enables a child to make the personal information publicly available. 16 C.F.R. Part 312.4(d)(2). While TikTok discloses that it shares data with third parties (*see* Ex. 7), that disclosure falls far short of what is required by the COPPA Rule.

*The Class Action Complaint*

On December 3, 2019, Plaintiffs filed the Class Action Complaint, contending that the Stipulated Order did not make whole the millions of consumers harmed by Defendants' unlawful conduct. Doc. 1, ¶¶ 52-57. Plaintiffs seek to certify a National Class, a California Subclass and an Illinois Subclass, consisting of United States, California and Illinois children under 13 and their parents and/or legal guardians, respectively. Doc. 1, ¶ 61, 57.[33] Plaintiffs allege that the number of class members is approximately 6 million. *Id.*, ¶ 65. Plaintiffs further allege the following five causes of action: (a) violation of the Video Privacy Protection Act; (b) Intrusion Upon Seclusion; (c) violation of the California Constitutional Right to Privacy; (d) violation of the California Consumer Legal Remedies Act; and (e) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *Id.*, ¶¶ 70-110.

Plaintiffs do not seek injunctive relief, deletion or return of the Child Victims' personal information, disclosure of the entities that have received the Child Victims' personal information, or disclosure of the personal information Defendants have collected. Moreover, Plaintiffs do not assert additional claims such as breach of contract; unjust enrichment; a violation of the Illinois Right of Publicity Act, 765 ILCS § 1075/1, *et seq.*; a violation of the provisions of the Illinois Children's Privacy Protection and Parental Empowerment Act, 325 ILCS § 17/1, *et seq.* (the "Children's Privacy Protection Act") – which prohibits the sale or purchase of personal information regarding children under 16; or a violation of the Illinois Biometric Information Privacy Act, 740 ILCS § 14/1, *et seq.* – which prohibits an entity from collecting, obtaining, disseminating or profiteering from others' biometric identifiers and information.

---

[33] The Class Action Complaint is mis-numbered as follows: 61, 57, 62.

Notably, class counsel largely copied the Class Action Complaint's substantive allegations from the FTC enforcement complaint – without giving attribution. A side-by-side comparison of the virtually identical substantive allegations in each complaint is attached hereto as Exhibit 8. A sampling of the copied allegations is set forth below:

| FTC COMP. ¶ No. | ALLEGATION | PL. COMP. ¶ No. | ALLEGATION |
|---|---|---|---|
| 12 | Since at least 2014, Defendants have operated a video social networking app ("Musical.ly App" or "App"). The App is free to download from Apple's App Store, Google Play, and the Amazon Appstore, but generates revenue for Defendants through various means, including in-app purchases. Since 2014, over 200 million users have downloaded the App worldwide; 65 million Musical.ly accounts are registered in the United States. | 18 | Since at least 2014, Defendants have operated the App which, at all relevant times, was known as "Musical.ly". The App was free to download from Apple's App Store, Google Play, and the Amazon Appstore, but generated revenue for Defendants through various means, including in-app purchases. Since 2014, over 200 million users have downloaded the App worldwide; and, at least, 65 million 'Musical.ly' accounts were registered in the United States. |
| 13 | To register for the Musical.ly App, users provide their email address, phone number, username, first and last name, short bio, and a profile picture. Between December 2015 and October 2016, Defendants also collected geolocation information from users of the App. | 19 | To register for the App, users provided their email address, phone number, username, first and last name, short bio, and a profile picture. Between December 2015 and October 2016, Defendants also collected geolocation information from users of the App, which enabled Defendants and other users of the App to identify where a user was located. |
| 17 | The App also allows users to send direct messages to communicate with other users. These direct messages can include colorful and bright emoji characters ranging from animals, smiley faces, cars, trucks, and hearts, among many others. By default, an App user can direct message any other user . . . . | 24 | The App also allowed users to send direct messages to communicate with other users. These direct messages could include colorful and bright emoji characters ranging from animals, smiley faces, cars, trucks, and hearts, among many others. By default, an App user could direct message any other user. |

Seemingly not satisfied with merely copying the FTC's complaint, class counsel also copied into their complaint several statements made by the FTC in a press release announcing the Stipulated Order:

| FTC PRESS RELEASE | STATEMENT | PL. COMP. ¶ No. | ALLEGATION |
|---|---|---|---|
| ¶ 1 | The operators of the video social networking app Musical.ly, now known as TikTok, have agreed to pay $5.7 to settle Federal Trade Commission allegations that the company illegally collected personal information from children. | 53 | Subsequent to the filing of the FTC complaint, Defendants agreed to pay $5.7 million to settle the allegations that the company illegally collected personally identifiable information from children in violation of COPPA. |
| ¶ 1 | This is the largest civil penalty ever obtained by the Commission in a children's privacy case. | 54 | At the time, the 'Muscial.ly settlement' was the largest civil penalty ever obtained by the FTC in a children's privacy case. |
| ¶ 8 | In addition to the monetary payment, the settlement also requires the app's operators to comply with COPPA going forward and to take offline all videos made by children under the age of 13. | 55 | In addition to the monetary penalty, the settlement also requires Defendants to comply with COPPA going forward and to take offline all videos made by children under the age of 13. |

*Compare* Exhibit 9 (FTC Feb. 27, 2019 Press Release) and Doc. 1, ¶¶ 53-55.

***The Proposed Settlement and Preliminary Approval Motion***

On November 18 and 19, 2019 – prior to the filing of the Class Action Complaint – Plaintiffs and Defendants entered into the Proposed Settlement. Doc. 5-1 at ECF 35-36. On December 5, 2019, Plaintiffs filed their Unopposed Motion and Memorandum in Support for Preliminary Approval of Class Action Settlement ("Preliminary Approval Motion"), to which they attached the Proposed Settlement and other related documents. Doc. 5.

***Overview of the Proposed Settlement's Key Provisions***

The Proposed Settlement contemplates Defendants paying a total of $1.1 million into a settlement fund, which sum is to be to be allocated as follows: (a) to pay undisclosed expenses incurred by the Settlement Administrator; (b) to pay any taxes; (c) to allocate and pay funds for attorneys' fees and Plaintiffs' incentive awards; (d) to pay class members on a *pro rata* basis; and (e) to distribute any residue to a *cy pres* recipient. Doc. 5-1 at ECF 25, 27. The settlement class is defined as follows:

All persons residing in the United States who registered for or used the Musical.ly and/or TikTok software application prior to the Effective Date when under the age of 13 and their parents and/or legal guardians.

*Id.* at ECF 22.

The Proposed Settlement requires the Child Victims to grant Defendants an extremely broad release. *Id.* at ECF 24. Specifically, the Child Victims must release any:

> claims, complaints, actions, proceedings, or remedies ***of any kind*** . . . ***on any grounds whatsoever***, arising ***from the beginning of time*** through the Effective Date, that were, could have been, or could be asserted by the Releasing Parties arising out of or relating to any acts, facts, omissions or obligations, whether known or unknown, whether foreseen or unforeseen, ***arising out of or relating to*** the Civil Actions or the subject matter of the Complaint.

*Id.* (emphasis added). In short, the Proposed Settlement requires the Child Victims to release viable claims that class counsel failed to allege and for which class counsel did not seek compensation.

According to the Preliminary Approval Motion, class counsel intend to seek fees in the amount of 33% of the settlement fund, or $363,000. Doc. 5 at ECF 23. Class counsel have yet to file any motion for attorney's fees, nor have they provided the Child Victims with notice of any such motion, as required by law. This has inhibited objectors from challenging class counsel's fees.

Pursuant to the Settlement Agreement, the class representatives may seek a collective incentive award totaling $5,000. Doc. 5-1 at ECF 31.

### *The Proposed Settlement Provides No Meaningful Benefit to the Child Victims*

The Child Victims do not receive any meaningful benefit in return for the broad release described above. Based on objective data – 6,070,000 class members (*id.* at ECF 187, ¶ 15) and a $1.1 million settlement payment – the Proposed Settlement allows for a *pro rata* award of 18 cents for each Child Victim. Once attorneys' fees and incentive awards are deducted from the

$1.1 million settlement amount, each Child Victims' *pro rata* share of the settlement fund plummets to 12 cents ($732,000/6,070,000).

The *pro rata* share drops even further once estimated settlement administrator fees/costs are figured in. Based on a fee/cost proposal submitted by the settlement administrator in a different matter (Exhibit 10), Objector conservatively estimates those fees/costs to be $75,000. Based on this estimate, each Child Victim's *pro rata* share of the settlement fund once all fees, awards and costs are deducted is 11 cents ($657,000/6,070,000).

Without reference to the objective data, class counsel makes contradictory, unsupported and speculative claims regarding the Proposed Settlement's value to the Child Victims. In the Preliminary Approval Motion, class counsel represents that the "proposed Settlement Administrator estimates amounts to a recovery [sic] of $10-$15." Doc. 5 at ECF 21. However, the proposed settlement administrator makes no such estimate in his declaration. *See* Doc. 5-1 at ECF 182-90. Moreover, the Declaration of Gary E. Mason (class counsel) directly contradicts his own representation. *See id.* at ECF 7, ¶ 24. Mason attests that he estimates that each Child Victim will recover between $5 and $10 – not $10 and $15.. *Id.* Mason provides no support for his estimate and no explanation for why his declaration contradicts the representation in the Preliminary Approval Motion.

Notably, like whack-a-mole, if one accepts, *arguendo*, the $10 to $15 recovery range, it causes another problem to pop up – namely, the Proposed Settlement's defective notice program. In order to achieve a $10 to $15 recovery for the Child Victims, class counsel must assume a notice program that yields a claim rate of 0.7% to 1.0%. That is, assuming a net settlement fund of $657,000, in order to achieve a *pro rata* payout of $10, only 65,700 class members – approximately 1% – can file claims. To achieve a $15 payout, only 43,800 class members –

approximately 0.7% – can file claims. These percentages are well below the mean and median claim rates in consumer class actions – 4% and 9%, respectively.[34]

### Class Counsel's Improper Efforts to Shield Fees from Scrutiny

It is class counsel's responsibility to propose an objection schedule that is fair to the class and complies with the law. Contravening those requirements, class counsel proposed a filing schedule that required objectors to file their objections prior to class counsel filing their fee petition. *See* Doc. 5-1 at ECF 175-80 (Proposed Order Granting Preliminary Approval of Class Settlement and Direction of Notice Under Rule 23(e) (the "Proposed Preliminary Approval Order"); Exhibit 11 (Class Notice). As set forth in the Proposed Preliminary Approval Order and the Class Notice, objections originally were due on March 17, 2020, while the fee petition was not due until 45 days before May 6, 2020 – or March 22, 2020. *See id.* The Court entered the Proposed Preliminary Approval Order on December 19, 2020.[35] Doc. 13.

Based on the General Orders (Doc. 16, 17, 21) and the rescheduled final approval hearing (Doc. 20), it appears that the fee petition is now due on June 1, 2020, with objections due one day later on June 2, 2020. Class counsel has not issued an updated Notice of Proposed Class Action Settlement. *See* Exhibit 15 (Class Notice as of May 10, 2020).

### The Defective Notice Program

The Preliminary Approval Motion contains a description of the proposed notice program. Doc. 5-1 at ECF 182-99. As discussed above, class counsel necessarily concedes the defective nature of the proposed notice program.

---

[34] FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, Federal Trade Comm'n (Sept. 2019) at 11, https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf (last accessed on Mar. 17, 2020).
[35] Pursuant to the General Orders, all deadlines seemingly have been extended by 77 days.

The notice program does not provide for direct notice to any class member. *Id.* at 186. According to the Preliminary Approval Motion, "Defendants assert that they have no way to directly contact or identify Class Members . . . ." Doc. 5 at ECF 13; *see also* Doc. 5-1 at ECF 29, ¶ 8.2. This assertion contradicts one of the fundamental bases of the Class Action Complaint – namely, that Defendants obtained the Child Victims' personal information, including email addresses, first and last names, geolocation and dates of births in connection with their registration for the app. Moreover, it ignores the messaging feature built into TikTok, and the fact that Defendants could determine, based on a review of a user's TikTok videos, whether a person may presently be under 13, or may have been under 13, at any time during the class period. Defendants could perform this review using their data analytics and powerful algorithms, or they could perform it manually.

Instead of undertaking a direct notice campaign, class counsel opted for an online publication campaign. *Id.* A review of that campaign reveals that it targets the wrong audience. *Id.* at ECF 186-87. According to the settlement administrator, the campaign relies on digital notice that targets: (a) parents who, in the last 30 days: (i) used apps to listen to music, watch videos or access social media; and (ii) have children under 18 living in their household; or (b) individuals based on their monthly use of TikTok. *Id.* at ECF 187. That targeting is based on the faulty assumption that kids who use TikTok have parents who use TikTok. The settlement administrator provides no support for the assumption. It is more likely that this older population could best be targeted through traditional notice methods (*e.g.*, newspapers and television). The settlement administrator provides no explanation for why he shunned those traditional methods.

As for targeting TikTok users, the settlement administrator ignores that the Child Victims are likely either under 13 or in their teens. He provides no information or data on whether minor children who receive class notice, pass that notice on to their parents or file claims themselves.

## ARGUMENT

The Proposed Settlement provides no meaningful benefit to the Child Victims, while bestowing a windfall on class counsel. As such, the Proposed Settlement is not fair, reasonable and adequate and demonstrates that the putative class representatives have not fairly and adequately protected the Child Victims' interests. Moreover, the notice program fails to comply with due process requirements and is, otherwise, defective. Accordingly, the Court should: (a) grant Objector's motion to intervene; (b) not certify the class unless it replaces the putative class representatives; (c) reject the Proposed Settlement; and (d) appoint new class counsel. Objector respectfully suggests that the Court appoint him and his counsel as class representative and lead class counsel, respectively.

## I.    Legal Standards

### A.    The Critical Role of Objectors in Class Action Litigation

The Seventh Circuit has recognized that the "class action is a worthwhile supplement to conventional litigation procedure . . . , but it is controversial and embattled . . . in part because it is frequently abused." *Eubank v. Pella*, 753 F.3d 718, 719 (7th Cir. 2014) (internal citations omitted). The abuse results from class counsel who are driven by the desire to maximize fees, and defendants who care only about the size of the settlement, not how it is divided between compensation and fees. *Id.* at 720; *see also Redman v. Radio Shack*, 768 F.3d 622, 629 (7th Cir. 2014). Given the respective interests of class and defense counsel, there exists a strong

temptation for them to act in concert to sell out class members by agreeing to a settlement that provides for large fee awards and meager class compensation. *Eubank*, 753 F.3d at 719.

Courts presiding over class actions are handicapped in their ability to determine the fairness of a proposed settlement because the process is not truly adversarial. *Id.* This is where objectors come in. *Id.* "Members of the class who smell a rat can object to approval of the settlement." *Id.* Objectors ease the judge's task of assessing the value of a proposed settlement to the class and the reasonableness of class counsel's fees because the judge "has the benefit of an adversary process: objectors versus settlors (that is, versus class counsel and the defendant)." *Redman*, 768 F.3d at 629. As such, objectors are essential to a proper judicial review of a proposed settlement. *In re Subway*, 869 F.3d at 556.

### B. Class Certification and Settlement Approval Standards

Federal Rule of Civil Procedure 23(a) requires class representatives who will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Failure to meet any one of the Rule 23(a) requirements precludes class certification. *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).

Federal Rule of Civil Procedure 23(e)(2) requires that a proposed settlement be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In determining whether a settlement complies with Rule 23(e)(2), a court must consider whether:

(A)     the class representatives and class counsel have adequately represented the class;

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

(i)     the costs, risks, and delay of trial and appeal;

<ol type="i" start="2">
<li>the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;</li>
<li>the terms of any proposed award of attorney's fees, including timing of payment; and</li>
<li>any agreement required to be identified under Rule 23(e)(3); and</li>
</ol>

(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Seventh Circuit also requires a court to consider the following five factors: (a) the strength of the plaintiff's case as compared to the amount of the defendant's settlement offer; (b) the length, expense and complexity of continued litigation; (c) the amount of opposition to the proposed settlement; (d) competent counsel's opinion; and (e) the stage of the litigation and the amount of discovery completed. *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

The first of the above-described five factors is the most important one. *Id.* In analyzing the strength of the plaintiff's case, the court should quantify the net expected value of continued litigation. *Id.* While a court cannot do this with a high degree of precision, the court should require the parties to present evidence that allows for possible outcomes to be estimated. *Id.*

A district judge asked to approve a settlement is tantamount to a fiduciary of the class members and, therefore, must act with the high duty of care required of fiduciaries. *In re Subway*, 869 F.3d at 555. In scrutinizing a proposed class action settlement, the district court must employ the highest degree of vigilance and give the class certification requirements heightened and undiluted attention. *In re Subway*, 869 F.3d at 555. The judge may not assume a passive role in the process. *Redman*, 768 F.3d at 629.

"A class settlement that results in fees for class counsel but yields no meaningful relief for the class 'is no better than a racket.'" *In re Subway*, 869 F.3d at 556 (quoting *In re Walgreen*

*Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016). Where a class settlement does not provide the class with effectual relief and principally serves to induce the defendant to pay class counsel enough money to go away, the class representatives have failed to fulfill their Rule 23 duty to fairly and adequately protect the class' interests. *In re Subway*, 869 F.3d at 556. Relatedly, "if the class representatives have agreed to a settlement that provides meaningless relief to the putative class, the district court should refuse to certify . . . the class." *Id.*

## II.     The Court Should Not Certify the Settlement Class Because the Putative Class Representatives Have Not Fairly and Adequately Protected the Interests of the Child Victims.

The Court should not certify the proposed settlement class unless it appoints a new class representative because the current putative class representatives have failed to fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(4). As discussed more thoroughly in § III, below, the putative class representatives have agreed to a settlement that provides meaningless relief to the putative class and is, otherwise, stacked against the Child Victims. *See In re Subway*, 869 F.3d at 556; *Eubanks*, 753 F.3d at 724. Objector respectively suggests that the Court appoint him as class representative.

## III.     The Court Should Reject the Proposed Settlement Because It Is Not Fair, Reasonable and Adequate.

### A.     The Putative Class Representatives and Class Counsel Have Not Adequately Represented the Child Victims.

Neither class counsel nor the putative class representatives can credibly contend that they have adequately represented the Child Victims. *See* Fed. R. Civ. P. 23(e)(2)(A). Class counsel filed a complaint largely copied from a previously-filed FTC complaint. Counsel then quickly agreed to a settlement that rewards them with $363,000 in fees, while providing the Child Victims with no meaningful benefit. Making matters worse, to inhibit meaningful objections to

their requested fees, class counsel proposed a filing schedule that required objectors to file their objections *before* class counsel was required to file their fee petition.[36] Class counsel also approved a notice program that they tacitly admit was designed to reach, at most, one percent of the Child Victims and is otherwise in violation of the Child Victims' due process rights. The putative class representatives have gone along with class counsel's conduct.

     **1.**      **The Proposed Settlement Is Akin to a Racket and Does Not Achieve Class Counsel's Nominal Goal of Making the Child Victims' Whole.**

The Seventh Circuit has warned against settlements like the one proposed here. *See In re Subway*, 869 F.3d at 556. Because the Proposed Settlement delivers no meaningful benefit to the Child Victims, while allowing for $363,000 in attorney's fees, it is no better than a racket. *See id.*

Class counsel cannot dispute this as they have failed to achieve their nominal goal of making the Child Victims whole. *See* Doc. 1, ¶ 57. As discussed, in § III.B, below, the Proposed Settlement does not compensate the Child Victims for their injuries, including the unlawful use of their personalities for commercial purposes or and the collection, dissemination and profiteering from their biometric data. Moreover, the Proposed Settlement does not provide for counseling for those Child Victims who were subjected to the trauma of being exposed to online sexual predators.[37]

Additionally, the Proposed Settlement does not give the Child Victims any substantive rights against Defendants. The Proposed Settlement does not: (a) enjoin Defendants from continuing to engage in their unlawful conduct; (b) require Defendants to delete or return the personal information they unlawfully obtained; (c) require Defendants to disclose to whom they have provided the Child Victims' personal information; or (d) require Defendants to make any

---

[36] While the fee petition currently is due one day before objections, that does not provide objectors any meaningful amount of time to object to the petition. Further, the revised schedule was set by the Court and the General Orders, not because class counsel sought to correct the unlawful schedule they proposed.

[37] This group of victims could form a separate subclass.

changes to their privacy policies or child data collection practices. As discussed below, the Court has authority to grant this relief based on Defendants' violations of various federal and state statutes.

### 2. Class Counsel Have Failed to Act with Integrity.

Class counsel's conduct in filing a complaint that they largely copied (and for which they provided no attribution) (*see* Ex. 8) demonstrates a lack of integrity. Where class counsel have demonstrated a lack of integrity, it follows that the Court can have no confidence that class counsel have fulfilled, or will fulfill, their fiduciary obligations to the Child Victims. *Eubank*, 753 F.3d at 724.

Further evidence of class counsel's inadequate representation and lack of integrity in this matter was their proposal of the above-described unlawful filing schedule that required the filing of objections *before* the filing of counsel's fee petition. *See* Doc. 5-1 at ECF 175-80 (Proposed Preliminary Approval Order); Ex. 11 (Class Notice). Rule 23(h) required class counsel to file their fee petition before the filing deadline for objections. *See Redman*, 768 F.3d at 637-38. A filing schedule in which objections are due prior to the filing of class counsel's fee petition is unlawful. *Id.* at 638. There is no excuse for such a procedure. *Id.*; *see also In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988, 993-95 (9th Cir. 2010) (cited with approval in *Redman*, 768 F.3d at 637-38) (error to deprive objectors of ability to object to fee petition).

Here, in contravention of Rule 23(h), class counsel's proposed preliminary approval order included a schedule whereby objections were due before counsel's fee petition: objections originally were due on March 17, 2020, while class counsel's fee petition was not due until March 22, 2020. *See* Doc. 5-1 at ECF 175-80 (Proposed Preliminary Approval Order); Ex. 11 (Class Notice). While the Court entered the Proposed Preliminary Approval Order, it does not

appear that class counsel advised the Court of the unlawful nature of their proposal or that they ever sought to correct it. Class counsel's conduct has inhibited Objector's ability to meaningfully object to the fees class counsel intend to seek.

Finally, given that class counsel has made contradictory representations regarding the value the Settlement Proposal provides to the Child Victims, they cannot contend to have adequately represented the victims' interests. In contrast to the objective data that shows an 11-cent recovery for the Child Victims, class counsel has thrown out varying numbers that are unsupported by any facts or testimony and, to be believed, necessarily assumes a defective notice program.

### 3. The Proposed Settlement Requires the Child Victims to Release Significant Claims Class Counsel Failed to Allege.

Class counsel failed to allege significant claims held by the Child Victims, including breach of contract, unjust enrichment and violation of deceptive business practices and privacy statutes. *See* § III.B.1.b, below, for further discussion of those claims. Nevertheless, the Proposed Settlement seeks to have the Child Victims release Defendants from any liability for those claims. This is further evidence of counsel's disinterest in the outcome achieved for the Child Victims. Rather than taking the time to adequately research the underlying facts and the legal claims those facts support, class counsel opted for a "get the money and run" approach.

### 4. By Agreeing to the Proposed Settlement, the Putative Class Representatives Have Inadequately Represented the Child Victims.

By agreeing to the Proposed Settlement and going along with class counsel's decisions throughout, the putative class representatives have failed to fairly and adequately protect the Child Victims' interests and, therefore, have inadequately represented the Child Victims. *See In re Subway*, 869 F.3d at 556.

**B. The Proposed Settlement Does Not Provide the Child Victims with Adequate Relief.**

The factors identified by the Seventh Circuit for determining the adequacy of relief provided by a proposed settlement subsume the factors set forth in Rule 23(e)(2)(C). *Snyder v. Ocwen Loan Servicing, LLC*, No. 16 C 8677, 2018 WL 4659274, at *4 (Sept. 28, 2018). As such, the Court may consider the Seventh Circuit's factors in determining compliance with Rule 23(e)(2)(C). *Id.*

**1. The Strength of the Child Victims' Claims Outweighs the Insignificant Sum Defendants Have Agreed to Pay to Make Class Counsel Go Away.**

**a. Federal and State Public Policy Provides for Heightened Protection of Children's Sensitive Personal Information.**

In determining the strength of the Child Victims' claims, it is important to recognize that this is not a run-of-the-mill data breach or invasion of privacy case. At issue here is the unlawful collection, use and distribution of young children's sensitive personal information by a company so dangerous and nefarious that the U.S. military and top federal law enforcement and intelligence agencies have banned its use. Both the federal and state governments recognize the sensitivity of children's personal information and the overall vulnerability of children. Thus, as a matter of public policy these governments have passed numerous laws that cloak children's sensitive personal information with heightened protections.

Through the enactment of COPPA and the COPPA Rule, the federal government has made clear that protecting against the unlawful and covert collection, use and disclosure of young children's sensitive personal information is of the utmost importance. As such, the government has authorized the imposition of a $43,280 civil penalty for each COPPA violation. 15 U.S.C. § 6501, *et seq.*; 16 C.F.R. Part 312; 16 C.F.R. Part 1 at 2014; *see also* 20 U.S.C. §

1232g (Family Education Rights and Privacy Act – protecting release of students' personally identifiable information without written parental consent).

In Illinois, the Children's Privacy Protection Act, 325 ILCS § 17/1, *et seq.*, prohibits the sale or purchase of personal information of a child under 16 without parental consent and treats a violation of the act as a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *See* 325 ILCS § 17/1, *et seq.* Further, Illinois protects student data by prohibiting the release, transfer, disclosure or dissemination of student records except in extremely limited circumstances. *See* 105 ILCS § 10/1, *et seq.* (Illinois School Student Records Act).

The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100, *et. seq*, also prohibits the sale of the personal information of a child: (a) under 16 without the child's express consent; and (b) under 13 without affirmative parental authorization. The CCPA authorizes civil penalties between $2,500 and $7,500 per violation and statutory damages between $100 and $750 per incident. Cal. Civ. Code §§ 1798.120 (c), 1798.150, 1798.155.

<b>b.      The Strength and Value of the Child Victims' Claims.</b>

Contrary to the nominal value class counsel placed on the Child Victims' claims, the claims – as alleged and that could have been alleged – are strong and worth far in excess of 11 cents or even $15. Indeed, many of the claims allow for statutory damages, punitive damages, injunctive relief and/or attorney's fees – *e.g.*: (a) Video Privacy Protection Act – $2500 statutory damages, punitive damages, injunctive relief and attorney's fees, 18 U.S.C. § 2710(c)(2); (b) California Consumer Legal Remedies Act – $1,000 statutory damages, punitive damages, injunctive relief and attorney's fees, Cal. Civ. Code § 1780; (c) Illinois Right of Publicity Act – $1,000 statutory damages, injunctive relief and punitive damages, 765 ILCS § 1075/40; (d) Illinois Biometric Information Privacy Act, 740 ILCS § 14/20 – between $1,000 and $5,000

statutory damages, injunctive relief and attorney's fees; (e) Illinois Consumer Fraud and Deceptive Business Practices Act – punitive damages, injunctive relief and attorney's fees, 815 ILCS § 505/10a; (f) Illinois Deceptive Trade Practices Act – injunctive relief and attorney's fees, 815 ILCS § 515/3; and (g) Intrusion Upon Seclusion – punitive damages.

Additionally, Defendants unjustly enriched themselves at the expense of the Child Victims by: (a) deceptively collecting, using and disclosing the Child Victims' personal information; (b) using deceptive advertising methods such as native advertising and sponsored content; and (c) deceptively enticing Child Victims to unwittingly star in custom commercial challenges. The settlement offer does not account for this unjust enrichment – which, at a minimum was between $75,000 and $150,000 for each deceptive advertisement (the average price paid by advertisers to participate in Defendants' deceptive advertising schemes).[38]

The availability of punitive damages, in addition to other forms of relief, is significant here. Defendant ByteDance has a reported net worth of $75 billion. Moreover, Defendants have failed to cease their COPPA Rule violations, notwithstanding being enjoined from doing so by the FTC enforcement action and having been penalized $5.7 million. Given the brazenness of Defendants' conduct and citizens' growing intolerance for corporations' ever-increasing invasion of their privacy, it is likely that a jury would award punitive damages in this matter.

A jury seeking to penalize Defendants for their unlawful conduct and wanting to ensure that Defendants cease engaging in such conduct could be expected to return a punitive damages award in the 100s of millions, if not billions of dollars. Notably, the FTC recently levied a $170 million penalty against YouTube for its unlawful child data collection practices.[39] In determining

---

[38] Yuan Chen, *Musical.ly Has Lots of Users, Not Much Ad Traction*, <u>Digiday</u> (Sept. 5, 2017), *supra.*
[39] *Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law*, FTC (Sept. 4, 2019), https://www.ftc.gov/news-events/press-releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations (last accessed on Mar. 15, 2020).

a punitive damages award, a jury could look to the COPPA Rule and determine that awarding $43,280 for each unlawful act committed by Defendants is a reasonable way to assess punitive damages. It could also look to the fact that the FTC's $5.7 million penalty did not deter Defendants' conduct.

Given the value assigned to the Child Victims' claims, the question becomes whether the claims can be proven. The answer is yes. Defendants unquestionably breached their agreement with the Child Victims to not knowingly collect their personal information. Moreover, the FTC has made clear that the way in which Defendants utilized native advertising was a deceptive business or trade practice. *See* Ex. 6. Further, Defendants cannot credibly contend that their unlawful conduct did not unjustly enrich them. The Child Victims' privacy claims are equally strong. Defendants surreptitiously obtained the Child Victims' sensitive personal information without their consent or parental consent and shared that information with third parties that Defendants have yet to disclose.

Fortuitously, in evaluating the strength of the Child Victims' claims, the Court need not rely on the Child Victims' analysis. Perhaps the best evidence of the strength of the merits of the Child Victims' claims is the fact that Defendants do not challenge the merits. *See* Doc. 5 at 19. Instead, Defendants have asserted a few procedural defenses that are easily dispensed with.

Defendants contend: (a) the Child Victims are bound by an arbitration agreement that precludes class actions; (b) a court would not certify a class; and (c) COPPA preempts the claims. *See id.* Beyond the enforceability of an arbitration agreement being a fact-intensive endeavor for which Defendants have not met their burden, *see Johnson v. Uber Tech., Inc.*, No 16 C 5468, 2017 WL 1155384, at *2 (N.D. Ill. Mar. 3, 2017), even if an arbitration agreement existed, the Child Victims could disaffirm it. *See Villalobos v. Cicero School Dist. 99*, 841

N.E.2d 87, 94 (Ill. App. Ct. 2005). As such, this case is distinguishable from *G.G. v. Valve Corp.*, No. C16-1941-JCC, 2017 WL 1210220, at *1. (W.D. Wash. Apr. 3, 2017).

Further, as the facts make clear, common questions of law and fact abound regarding Defendants' conduct, far outweighing any individual issues. As such, this case is ripe for class certification.

With respect to preemption, the case relied on by Defendants – *Manigault-Johnson v. Google LLC*, No. 2:18-cv-1032-BHH, 2019 WL 3006646 (D.S.C. Mar. 31, 2019) – is inapposite. Unlike the plaintiff in that case, the Child Victims' claims are not an attempt to bring a private cause of action under COPPA or solely based on alleged COPPA violations. *See id.* at *6. Rather, the claims are based on Defendants' deceptive conduct, invasions of the Child Victims' privacy, breach of their agreement with the Child Victims and unjust enrichment in direct violation of federal and state statutes, as well as the common law. Thus, preemption is not an issue.

In short, the Child Victims' claims are strong and worth far in excess of Defendants' meager settlement offer.

### c.    Defendants' Settlement Offer Provides No Meaningful Benefit to the Child Victims.

Notwithstanding the strength of the Child Victims' claims, Defendants' settlement offer – viewed as a whole or net of fees and expenses – fails to provide the Child Victims with any meaningful relief. Based on available objective data, the settlement offer provides each Child Victims with 11 cents.

While class counsel attempt to make it appear that the contemplated recovery for the Child Victims "compares well with other privacy class action settlements" (Doc. 5 at ECF 21), that is not the case. Class counsel provide no support for their representation in the Preliminary

Approval Motion that each Child Victim who submits a claim will receive $10 to $15. *Id.* Indeed, Mr. Mason's own declaration directly contradicts the representation. *See* Doc. 5-1 at ECF 7, ¶ 24 (Mason Decl.). While class counsel claim that the $10 to $15 estimate came from the settlement administrator, the settlement administrator's declaration provides no such estimate. *See id.* at ECF 182-90 (Decl. of Settlement Administrator). Notably, in representing an anticipated recovery of $10 to $15, class counsel necessarily assume a defective notice program in which only 0.7 to 1.0%[40] of the Child Victims will file a claim, far below the mean and median claim rate in consumer class actions.[41]

The settlements in other cases upon which class counsel rely are distinguishable, as they provided materially different relief than that contemplated by the Proposed Settlement. In *Perkins v. LinkedIn*, No. 5:13-cv-04303 LHK (N.D. Cal.) (ECF No. 126 at ECF 10 – attached hereto as Exhibit 12), *Fraley v. Facebook, Inc.*, 966 F.Supp.2d 939, 941 (N.D. Cal. 2013), and *In re Vizio, Inc. Consumer Privacy Litig.*, No. 8:16-ml-02693-JLS (C.D. Cal.) (ECF No. 337 at ECF 5 – attached hereto as Exhibit 13), the defendants were required to change their business practices, in addition to a cash payout. In *In re Sony Gaming Networks and Customer Data Security Breach Litig.*, No. 3:11-md-02258-AJB-MDD (S.D. Cal) (ECF No. 204-1 at ECF 16 – attached hereto as Exhibit 14), the settlement provided for myriad types of settlement relief, including up to $2,500 in reimbursable identity theft losses. Unlike those settlements, the Proposed Settlement only provides for a small payment to the Child Victims.

Given that the Seventh Circuit has held that the strength of the plaintiff's case as compared to the defendant's settlement offer is the most important factor in terms of determining

---

[40] The defective notice program is discussed in § IV, below.
[41] FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, <u>Federal Trade Comm'n</u> (Sept. 2019) at 11, *supra.*

the adequacy of a settlement, *see Synfuel Tech., Inc.*, 463 F.3d at 653, the Proposed Settlement clearly is inadequate. Accordingly, the Court should not approve it.

2.   **The Other Seventh Circuit Factors Weigh in Favor of Rejecting the Proposed Settlement.**

Consideration of the other adequacy factors described by the Seventh Circuit further supports rejection of the Proposed Settlement. Because class counsel sought to settle this matter as quickly as possible, Objector anticipates that continued litigation will be lengthy. However, this adversarial process is necessary to achieve a just result for the Child Victims.

Information regarding opposition to the Proposed Settlement is not yet available to Objector because of the way in which class counsel structured the filings. To the extent there is little opposition, that is of no import. *See Eubank*, 753 F.3d at 728. "[O]pting out of a class action is very rare. Virtually no one who receives notice that he is a member of a class in a class action suit opts out." *Id.* Thus the Seventh Circuit has held that a "low opt-out rate is no evidence that a class action settlement was 'fair' to the members of the class." *Id.*

As for competent counsel's opinion, without addressing class counsel's overall competence, their conduct in this case makes clear that they have not acted competently or with integrity. Thus, their opinion as to the fairness, reasonableness and adequacy of the Proposed Settlement is entitled to no weight. Finally, as discussed above, the case is in its infancy and no formal discovery has been conducted. The Child Victims are entitled to know the true extent of Defendants' unlawful conduct – *e.g.*, with whom have Defendants shared their personal information and how has their personal information been used – and to further develop their claims before being required to accept any settlement offer.

### 3. The Terms of the Proposed Attorney's Fees Award Are Unknown.

Rule 23(e)(2)(C)(iii) requires the Court to examine the terms of any proposed attorney's fees. As discussed above, class counsel structured the filings in this case to preclude objectors from having the information necessary to address this factor. However, given that the complaint in this matter is not class counsel's original work, it does not appear that class counsel is entitled to the fees they seek. If anything, their fees should be paid to the federal government, as it was taxpayer-funded lawyers who drafted the complaint.

### C. The Proposed Settlement Is Not the Product of Arm's Length Negotiations.

As discussed throughout, the Proposed Settlement serves to benefit class counsel and Defendants, without consideration of the Child Victims and, therefore, does not satisfy the requirement of Rule 23(e)(2)(B) that negotiations be at arm's length. *See* Fed. R. Civ. P. 23(e)(2)(B). While class counsel and Defendants attempted to cloak the Proposed Settlement with neutrality via the use of a mediator (*see* Doc. 5 at ECF 18), that tactic does not offset their collusive efforts. Defendants were willing to pay a sum of money to make class counsel go away, and that is what they are trying to do via the Proposed Settlement. The fact that a mediator was involved in this process does not change these facts.

To the extent any question exists as to whether class counsel and Defendants acted in concert, the Court need only look at class counsel's failure to address the deficiencies of Defendants' proffered defenses. *Id.* at ECF 20. As discussed above, those defenses have no merit, and a true advocate would have viewed them as a sign of Defendants' weakness. Instead, class counsel tries to sell those defenses as a reason for accepting the inadequate Proposed Settlement.

\*      \*      \*

The Proposed Settlement has all of the elements of a settlement the Seventh Circuit looks upon with strong disfavor. Similar to other cases where the Seventh Circuit has strongly criticized class action settlements – *e.g.*, *In re Subway, Eubanks and Redman* – the Proposed Settlement provides no meaningful benefit to the Child Victims and resulted from class counsel's desire for fees, and Defendants' desire to make the case go away. The Court should reject the Proposed Settlement.

## IV. The Court Should Reject the Proposed Settlement Because the Notice Program Was Defective.

Rule 23(c)(2)(B) requires that for any class certified under Rule 23(b)(3) or upon a court ordering notice under Rule 23(e)(1), as is the case here, "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Where individual class members can be identified, they are entitled to individual notice even if providing such notice would be very costly. *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 676-77 (7th Cir. 2013). The "notice requirement of Rule 23 is designed to guaranty that those bound by the ruling in a class action were accorded their due process rights to notice and an opportunity to be heard." *Chaffee v. A&P Tea Co.*, Nos. 79 C 2735 and 79 C 3625, 1991 WL 5859, at *2 (N.D. Ill. Jan. 16, 1991).

Here, the notice program did not provide for individual notice (*see* Doc. 5-1 at ECF 186, ¶ 10 (Decl. of Settlement Administrator)) and, therefore, did not accord the Child Victims their due process rights. According to the Proposed Settlement, "[b]ecause TikTok asserts that it has no way to directly contact or identify Class Members, notification will be through a combination of online social media ads and website link." Doc. 5-1 at ECF 29, ¶ 8.2. TikTok's assertion is directly contrary to: (a) the premise of the complaint – *i.e.*, Defendants unlawfully collected the

Child Victims' personal information, including email addresses, first and last names and geolocation information (*see* Doc. 1, ¶ 19); and (b) Defendants' own privacy policy which stated that they also collected users' persistent identifiers. *See* Ex. 2.

Contrary to Defendants' representation, through their data analytics and powerful algorithms, they undoubtedly had, and have, the capability to identify the Child Victims but simply chose not to. Moreover, Defendants could manually review user videos to identify Child Victims. Defendants' failure to take these actions and to provide direct notice makes the notice program defective.

Even if individual notice was not practicable under the circumstances, the notice program still was defective because it targeted the wrong people. According to the Preliminary Approval Motion and the settlement administrator's declaration, the notice program targeted the ad network used by Defendants' app and parents who used music and social media apps. Doc. 5 at ECF 29; Doc. 5-1 at ECF 186-88, ¶¶ 14, 19. The built-in assumption is that parents of children who used TikTok also used TikTok or similar apps, themselves. Class counsel provides no support for that assumption. Moreover, class counsel does not explain why it shunned traditional notice methods, such as newspaper publication and television advertisements.

As discussed above, class counsel concedes the defective nature of the notice program. According to counsel, they anticipate that only 0.7% to 1.0% of the Child Victims will file a claim, far below the mean and median numbers in a consumer class action.[42]

The notice program was also defective because it did not update the Child Victims of schedule changes and new dates. As such, the Child Victims have been kept in the dark

---

[42] FTC Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, <u>Federal Trade Comm'n</u> (Sept. 2019) at 11, *supra.*

regarding dates that impact their substantive rights, including the dates for objections and the final approval hearing.

Because the notice program was defective and did not afford the Child Victims their due process rights, the Court should reject the Proposed Settlement.

## V. The Court Should Grant Objector's Motion to Intervene.

### A. Legal Standards.

Federal Rule of Civil Procedure 24 allows a party to intervene in an existing matter as of right or with the court's permission. Fed. R. Civ. P. 24. To intervene as of a right, a movant must: (a) timely file a motion; (b) assert an interest relating to the subject matter of the main action; (c) show potential impairment of the interest absent intervention; and (d) demonstrate lack of adequate representation by the parties to the main matter. *Zurich Capital Markets Inc. v. Coglianese*, 256 F.R.D. 379, 383 (N.D. Ill. 2006); Fed. R. Civ. P. 24(a). Alternatively, pursuant to Rule 24(b), "[o]n timely motion" of a movant, a court may permit a movant to intervene where: (a) the movant "has a claim or defense that shares with the main action a common question of law or fact"; and (b) the intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b).

In the class action context, an unnamed class member "generally can intervene if the class representatives are no longer adequately representing [his] interests . . . ." *In re Discovery Zone Securities Litig.*, 181 F.R.D. 582, 589 (N.D. Ill. 1998). This is because an unnamed class member "would have little difficulty showing an interest in the action (Rule 24(a)) or a common question of law or fact with the class (Rule 24(b))." *Id.*

**B.**     **Objector May Intervene as of Right.**

Objector satisfies the four requirements for intervention as of right. This request for intervention is timely. In determining timeliness, courts look to the totality of the circumstances and consider the following four factors: (a) the length of time the intervenor knew or should have known of his interest in the case; (b) the prejudice to the original parties caused by the delay; (c) the prejudice to the intervenor absent intervention; and (d) any unusual circumstances. *Coglianese*, 236 F.R.D. at 383. Here, the totality of the circumstances show that Objector timely seeks to intervene.

The first possible date on which Objector could have learned that intervention was necessary was December 5, 2019 – the date on which the Proposed Settlement was filed. *See* Doc. 5-1. Only five months have passed since that date.

Even if the Court were to determine that the above-described timeline weighs in favor of untimeliness, the Court still must assess prejudice to the parties. *See id.* at 384. Here, the class representatives will not be prejudiced by intervention by Objector's motion. Indeed, since the filing of the Proposed Settlement, very little has happened in this case. The docket only has 20 entries, and many of them relate to the General Orders, other issues arising out of the COVID-19 pandemic and attorney address changes. *See* Doc. 16-21. Thus, the class representatives cannot claim any prejudice from a delay in the filing of this motion. Moreover, a claim that intervention may "inhibit, disrupt or destroy settlement negotiations or agreements" does not constitute prejudice in the intervention context. *In re Discovery Zone Securities Litig.*, 181 F.R.D. at 596.

On the other hand, absent intervention, Objector will suffer extreme prejudice, as discussed throughout. In short, absent intervention, Objector will not have the opportunity to protect his and his minor child's interests and will be required to provide an extremely broad

release despite receiving virtually nothing in return. Based on all of the circumstances, the motion is timely.

Regarding the other Rule 24(a) factors, Objector and A.S. are members of the settlement class. *See* Doc. 5-1 at ECF 22. At relevant times, A.S. was under 13 and used the TikTok app. Mark S. was A.S.'s parent and guardian. As such, Objector has an interest in the action. *See In re Discovery Zone Securities Litig.*, 181 F.R.D. at 589. Moreover, as discussed above, absent intervention, Objector's interest potentially will be impaired because the Proposed Settlement requires Objector to release numerous claims that class counsel failed to assert and for which class counsel failed to obtain proper compensation. Finally, as discussed above, class counsel have failed to adequately represent Objector in numerous ways.

### C.       Alternatively, the Court Should Permit Objector to Intervene.

Even if the Court determines that Objector cannot intervene as of right, the Court should permit Objector to intervene. For the reasons set forth above, the motion is timely. Moreover, as an unnamed class member, A.S. has little difficulty showing a common question or law or fact with the class. *Id.* Finally, as discussed above, the intervention will not unduly delay or prejudice the original parties' rights.

### VI.       The Court Should Appoint Objector's Counsel as Lead Class Counsel.

The Child Victims deserve counsel who will fairly and adequately protects their interests. Objector's counsel, Scott R. Drury, is the founder and leader of Loevy & Loevy's Data Privacy and Cyber-Intelligence Practice Group, which focuses on protecting consumer's and children's privacy interests. Loevy & Loevy has successfully litigated numerous large class actions that have resulted in substantial relief to class members throughout the country, including Loevy & Loevy's representation in: (a) *Young v. County of Cook*, No. 06-cv-552 (N.D. Ill. 2007), and a

related case against Cook County's former insurers, that resulted in $107 million in settlements after winning a trial on liability and multiple damages trials in the original case and another trial in the case against the insurance companies; (b) *Flood v. Dominguez*, No. 08-cv-153 (N.D. Ind.), which resulted in a court-approved $7.2 million settlement; and (c) *Aranda v. Caribbean Cruise Line, et al.*, No. 12-cv-4096 (N.D. Ill.), in which a Loevy & Loevy lawyer was co-class counsel in a TCPA case securing a $56-$76 million settlement, which was the largest recorded TCPA settlement in history. Loevy & Loevy also has an extraordinary record of achieving successful results for their clients, and it is particularly well-known for its winning of complex cases at trial. Loevy & Loevy has won dozens of jury trials and has secured verdicts and settlements on behalf of its clients in excess of $250 million.

Mr. Drury has substantial experience litigating complex matters and advocating for and protecting children's and citizens' privacy rights. Mr. Drury currently represents the Cook County Public Guardian in an action against a psychiatric hospital that allegedly physically and emotionally abused numerous minor children. *Golbert v. Aurora Chicago Lakeshore Hospital, LLC, et al.*, No. 19-cv-8257 (N.D. Ill.). Moreover, he currently is litigating numerous putative class actions involving privacy rights, including: (a) *Mutnick v. Clearview, et al.*, No. 20-cv-512 (N.D. Ill.); (b) *Kylie S., et al. v. Pearson plc, et al.*, No. 19-cv-5936 (N.D. Ill.); and *Vance v. IBM*, No. 20-cv-520 (N.D. Ill.). From 2003 until 2011, Mr. Drury was an Assistant United States Attorney for the Northern District of Illinois, where his duties included investigating and prosecuting child sex traffickers. From 2013 through 2018, Mr. Drury served as an Illinois State Representative. During that time, he amended the Illinois Children's Privacy Protection and Parental Empowerment Act, 325 ILCS § 17/1, *et seq*., to prohibit the sale or purchase of personal

information of children under 16 without parental consent.[43] Moreover, he was responsible for passing strongest-in-the-nation legislation that prohibits the non-consensual dissemination of private sexual images online and elsewhere (commonly referred to as "revenge porn").[44] Mr. Drury has tried numerous cases to verdict and is a member of the trial bar of the United States District Court for the Northern District of Illinois. Mr. Drury is also an Adjunct Professor of Law at the Northwestern Pritzker School of Law where he teaches trial advocacy. Mr. Drury formerly worked at Reed Smith LLP, one of the largest law firms in the world, where he represented clients in complex commercial disputes and white collar criminal matters.

## CONCLUSION

The Proposed Settlement is not fair, reasonable and adequate. Moreover, the putative class representatives have failed to fairly and adequately protect the Child Victims' interests. Accordingly, the Court should permit Objector to intervene, reject the Proposed Settlement and not certify the settlement class unless it replaces the putative class representatives. Objector respectfully suggests that the Court appoint him as the class representative and appoint his counsel as lead objector counsel and lead class counsel to prosecute this matter going forward.

---

[43] *See* House Bill 671 from Illinois' 98th General Assembly (now Public Act 98-0707), http://ilga.gov/legislation/BillStatus.asp?GA=98&DocTypeID=HB&DocNum=671&GAID=12&SessionID=85&LegID=70907.
[44] *See* Senate Bill 1009 from Illinois' 98th General Assembly (now Public Act 98-1138), http://ilga.gov/legislation/BillStatus.asp?GA=98&DocTypeID=SB&DocNum=1009&GAID=12&SessionID=85&LegID=70713

**<u>CERTIFICATE OF SERVICE</u>**

I, Scott R. Drury, an attorney, hereby certify that, on May 11, 2020, I filed the foregoing

document using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Scott R. Drury
*One of the attorneys for Mark S.*
