EXHIBIT F

1   **LIEFF CABRASER HEIMANN &**          **CARNEY BATES & PULLIAM, PLLC**
    **BERNSTEIN, LLP**                    Hank Bates (SBN 167688)
2   Michael W. Sobol (SBN 194857)         hbates@cbplaw.com
    msobol@lchb.com                       Allen Carney
3   Michael K. Sheen (SBN 288284)         acarney@cbplaw.com
    msheen@lchb.com                       David Slade
4   275 Battery Street, 29th Floor        dslade@cbplaw.com
    San Francisco, CA 94111               519 West 7th St.
5   Telephone: 415.956.1000               Little Rock, AR 72201
    Facsimile: 415.956.1008               Telephone: 501.312.8500
6                                         Facsimile: 501.312.8505

7   **LIEFF CABRASER HEIMANN &**
    **BERNSTEIN, LLP**
8   Nicholas Diamand
    ndiamand@lchb.com
9   Douglas I. Cuthbertson
    dcuthbertson@lchb.com
10  Sean Petterson
    spetterson@lchb.com
11  250 Hudson Street, 8th Floor
    New York, NY 10013
12  Telephone: 212.355.9500
    Facsimile: 212.355.9592

13  *Attorneys for Plaintiffs and the Proposed*
    *Classes*

14

15              **UNITED STATES DISTRICT COURT**

16        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

17              **SAN FRANCISCO DIVISION**

18

19  MICHAEL MCDONALD, et al.,          Case No.: 3:17-cv-04344-JD (L)

20          Plaintiffs,                **PLAINTIFFS' NOTICE OF MOTION**
                                       **AND MOTION FOR PRELIMINARY**
21      v.                             **APPROVAL OF CLASS ACTION**
                                       **SETTLEMENTS**
22  KILOO A/S, et al.,

23          Defendants.

24  ─────────────────────────          Case No.: 3:17-cv-04419-JD
    AMANDA RUSHING, et al.,
25
            Plaintiffs,
26
        v.
27
    THE WALT DISNEY COMPANY, et al.,
28

2016594.3

|  | |
|---|---|
| Defendants. | Case No.: 3:17-cv-04492-JD |
| AMANDA RUSHING, | |
| Plaintiff, | |
| v. | |
| VIACOMCBS INC., et al., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS.................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

I.  INTRODUCTION ........................................................................................... 1

II. PROCEDURAL HISTORY ............................................................................ 3

III. THE SIXTEEN SETTLEMENTS ................................................................... 4

    A.  SDK Defendants AdColony, Chartboost, Flurry, InMobi, ironSource, Tapjoy, Vungle, Twitter, Unity, and Upsight .......................................... 5

        1.  Strict Prohibition on Behavioral Advertising in Thousands of Apps ......... 5

        2.  Strict Prohibition on Behavioral Advertising in *Any* App Where the User Is Identified as Under 13 ................................................................. 7

        3.  Enhancements to Defendants' Intake Process and Dashboards to Improve Screening of Child-Directed Apps and Educate Developers ....... 7

    B.  SDK Defendant Comscore ................................................................. 8

    C.  Developer Defendants Kiloo, Sybo, Disney, and Viacom ................. 8

        1.  Kiloo and Sybo (Subway Surfers) ..................................................... 8

        2.  Disney (Disney Apps) ...................................................................... 10

        3.  Viacom (Llama Spit Spit) ................................................................ 11

IV. LEGAL STANDARD .................................................................................... 11

V.  THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE. .... 11

    A.  The Class Has Been Vigorously Represented ................................... 12

    B.  The Settlements Were Negotiated at Arm's Length. ......................... 13

    C.  The Settlements Provide Meaningful Relief to the Classes. ............. 13

        1.  The Costs, Risks, and Delay of Trial And Appeal ........................... 13

        2.  Class Counsel Will Seek Reasonable Attorney's Fees and Expenses ........................................................................................... 15

    D.  The Settlements Treat Class Members Equitably. ............................ 16

    E.  The Settlements Satisfy the District's Procedural Guidance. ........... 17

        1.  There Are Only Minor Differences Between the Settlement Classes and Those in the Operative Complaints (Procedural Guidance 1(a)). ....... 17

        2.  The Releases Mirror the Allegations in the Complaint (Procedural Guidance 1(c)) ................................................................................. 18

        3.  Settlement Administrator Selection Process (Procedural Guidance 2) ...................................................................................................... 19

        4.  The Proposed Notice Plan (Procedural Guidance 3 & 5). ............... 20

        5.  Service Awards (Procedural Guidance 7). ....................................... 21

        6.  Class Action Fairness Act (Procedural Guidance 10) ...................... 22

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | Page |
|---|---|---|---|
| VI. | THE SETTLEMENT CLASSES WARRANT CERTIFICATION | | 22 |
|  | 1. | Rule 23(a) is Satisfied | 22 |
|  | 2. | The Requirements of Rule 23(b)(2) are Satisfied | 23 |
| VII. | PROPOSED SCHEDULE FOR NOTICE AND FINAL APPROVAL | | 25 |
| VIII. | CONCLUSION | | 25 |

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

*Campbell v. Facebook,*
    No. 4:13-05996-PJH-SK (N.D. Cal. Apr. 26, 2017) ........................................ 23

*Campbell v. Facebook,*
    315 F.R.D. 250, 269 (N.D. Cal. 2016) ........................................ 23

*Churchill Vill. L.L.C. v. Gen. Elec.,*
    361 F.3d 566 (9th Cir. 2004) ........................................ 20

*Harris v. Vector Mktg. Corp.,*
    No. C-08-5198 EMC, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ........................................ 12

*In re Bluetooth Headset Prods. Liab. Litig.,*
    654 F.3d 935, 946-48 (9th Cir. 2011) ........................................ 13

*In re Facebook Biometric Info. Privacy Litig.,*
    326 F.R.D. 535 (N.D. Cal. 2018) ........................................ 22

*In Re: Vizio, Inc., Consumer Privacy Litig.,*
    No. 8:16-ml-02693 (C.D. Cal. Jan. 4, 2019) ........................................ 22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.,*
    MDL No. 2672, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ........................................ 22

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.,*
    2019 WL 387322 (N.D. Cal. Jan. 30, 2019) ........................................ 20

*Jordan v. Los Angeles County,*
    669 F.2d 1311 (9th Cir. 1982) ........................................ 22

*Knight v. Red Door Salons, Inc.,*
    No. 08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009) ........................................ 13

*Matera v. Google Inc.,*
    No. 5:15-cv-04062-LHK (N.D. Cal. Aug. 31, 2017) ........................................ 23

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ........................................ 22, 24

*Rodriguez v. Hayes,*
    591 F.3d 1105 (9th Cir. 2010) ........................................ 23

*Rodriguez v. West Publishing Corp.,*
    563 F.3d 948, 958-59 (9th Cir. 2009) ........................................ 21

*The Civ. Rts. Educ. & Enf't Ctr. v. RLJ Lodging Tr.,*
    2016 WL 314400 (N.D. Cal. Jan. 25, 2016) ........................................ 21

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338, 362 (2011) ........................................ 19, 22

**TABLE OF CONTENTS**
(continued)

Page

## STATUTES

28 U.S.C. § 1715 .................................................................................... 43

Children's Online Privacy Protection Act ("COPPA") Rule,
  16 C.F.R. §312.2 ............................................................................... 6

## OTHER AUTHORITIES

2003 Advisory Comm. Notes on Fed. R. Civ. P. 23 ................................ 22

Fed R. Civ. P. 23(a)(1) ........................................................................... 24

Fed. R. Civ. P. 23(a) .............................................................................. 24

Fed. R. Civ. P. 23(a)(3) .......................................................................... 23

Fed. R. Civ. P. 23(a)(4) ..........................................................................22

Fed. R. Civ. P. 23(b)(2) ................................................................. *passim*

Fed. R. Civ. P. 23(c)(2) .................................................................. 19, 20

Fed. R. Civ. P. 23(e)(1)(B) ..................................................................... 11

Fed. R. Civ. P. 23(e)(1)(B)(i) .................................................................. 12

Fed. R. Civ. P. 23(e)(1)(B)(ii) ................................................................ 21

Fed. R. Civ. P. 23(e)(2) ........................................................................... 11

Fed. R. Civ. P. 23(e)(2)(C) ......................................................................13

Fed. R. Civ. P. 23(e)(2)(C)(ii) .................................................................13

Fed. R. Civ. P. 23(e)(2)(C)(iv) ................................................................13

Fed. R. Civ. P. 23(e)(4) ...........................................................................11

Fed. R. Civ. P. 23(e)(5) ...........................................................................11

Fed. R. Civ. P. 23(g)(1)(A) ..................................................................... 25

Fed. R. Civ. P. 54(b) ......................................................................... 3, 20

## REGULATIONS

78 Fed. Reg. 3972 (Jan. 17, 2013) ........................................................... 5

### NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS

PLEASE TAKE NOTICE that on September 10, 2020, at 10:00 a.m., or soon thereafter in accordance with General Order No. 72-5, Plaintiffs[1] will and hereby do move the Court for an order granting preliminary approval of sixteen proposed settlements with all Defendants[2] in these coordinated Actions (*i.e.*, the *Kiloo* Action, the *Disney* Action, and the *Viacom* Action).

Plaintiffs request that the Court: (1) find it will likely approve the settlements; (2) find it will likely certify the settlement classes for settlement purposes; (3) appoint Plaintiffs as class representatives for the settlement classes for purposes of disseminating notice; (4) appoint Lieff, Cabraser, Heimann & Bernstein, LLP and Carney Bates & Pulliam PLLC (collectively, "Class Counsel") as counsel for the settlement classes; (5) direct notice to the settlement classes in connection with the settlements, and approve the form and manner thereof; (6) authorize retention of the Angeion Group ("Angeion") as settlement administrator; and (7) set a schedule for final approval of the settlements and Plaintiffs' request for attorneys' fees and expenses. This motion is supported by the memorandum of points and authorities, the Joint Declaration of Michael W. Sobol and Hank Bates ("Joint Decl."), the Joint Declaration of Nicholas Diamand and Allen Carney ("Joint Fees Decl."), the Declaration of Steven Weisbrot ("Angeion Decl."), all papers and records on file in this matter, and such other matters as the Court may consider.

### MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs respectfully submit for the Court's approval sixteen proposed Class Action Settlement Agreements (the "Settlements"), which together resolve the three related children's privacy Actions on the eve of briefing class certification and represent a milestone achievement

---

[1] Plaintiffs are: Michael McDonald, Tamara Draut, Dominique Murillo, Amanda Rushing, Ashley Supernault, Julie Remold, and Ted Poon.

[2] Defendants are: (i) Kiloo A/S ("Kiloo"); Sybo ApS ("Sybo"); The Walt Disney Co., Disney Enterprises, Inc., and Disney Electronic Content, Inc. (collectively, "Disney"); and ViacomCBS Inc. and Viacom International Inc. (collectively, "Viacom") (together, the "Developer Defendants"); and (ii) AdColony, Inc. ("AdColony"); Chartboost, Inc. ("Chartboost"); Flurry, Inc. ("Flurry"); InMobi Pte Ltd. ("InMobi"); ironSource USA Inc. ("ironSource"); Tapjoy, Inc. ("Tapjoy"); Vungle, Inc. ("Vungle"); Twitter Inc. and MoPub, Inc. (collectively, "Twitter"); Comscore, Inc. and Full Circle Studies, Inc. (collectively, "Comscore"); Unity Technologies SF ("Unity"); and Upsight, Inc. ("Upsight") (together, the "SDK Defendants").

for privacy protection in a rapidly developing mobile advertising ecosystem. The Settlements implement changes and require certain conduct, some of which apply not only in the apps identified in the Complaint but also in thousands of other child-directed and mixed-audience apps, that will provide protections that exceed existing requirements relating to the collection, use, and monetization of children's personal data.

Plaintiffs commenced these Actions after rigorous forensic analysis to prevent Defendants from intruding upon parents' and their children's privacy in violation of firmly established social privacy norms, embodied in traditional state-law remedies and federal statutes. Plaintiffs allege a common course of conduct whereby Defendants embedded code in mobile games (the "Gaming Apps")[3] permitting the exfiltration and commercial use of children's personal data, including tracking children over time. After nearly three years of hard-fought litigation, the parties reached Settlements that call for, *inter alia*: (1) limitations on the collection and use of children's personal data, (2) business practice requirements that exceed existing requirements, and (3) injunctive relief that for most Settlements will be extended industry-wide to cover thousands of apps played by children.

The Settlements satisfy the requirements for preliminary approval. Each balances immediate injunctive relief with the risks of further litigation, and class members (other than Class Representatives) will release no monetary claims. Further, the Settlements are well-informed by a comprehensive pre-filing investigation (including forensic analyses of the Gaming Apps), zealous advocacy by the parties (including two rounds of motions to dismiss), and ten months of extensive discovery (including review of over 150,000 documents, 17 depositions, and source code inspection). Finally, the Settlements are the product of arms-length, non-collusive negotiations aided by the assistance of three highly qualified mediators in Judge Jay Gandhi (Ret.), Lexi W. Myer, and Cathy Yanni. While class notice is not mandatory under Rule 23(b)(2), the parties propose a robust online notice campaign and a settlement website.

---

[3] The Gaming Apps refer to the apps specified in each case: Subway Surfers in the *Kiloo* Action; Princess Palace Pets and three versions of Where's My Water? in the *Disney* Action; and Llama Spit Spit in the *Viacom* Action.

## II.    PROCEDURAL HISTORY

Following a robust forensic examination of the Gaming Apps and Defendants' roles in the online advertising ecosystem, Plaintiffs filed the three Actions in July and August 2017, which were then related for coordinated proceedings. *See Kiloo*, Dkt. 60. According to their Amended Complaints, Plaintiffs allege that the Developer Defendants created the Gaming Apps and contracted with the SDK Defendants to embed their code ("software development kits" or "SDKs") into those apps to exfiltrate personal data for commercial gain, including from children users.[4] Plaintiffs further allege that Defendants' failure to obtain parental consent to collect and use that data constitutes an egregious violation of traditional social norms concerning privacy and children's vulnerability.[5]

In the first eighteen months of litigation, the parties briefed and argued a motion to compel arbitration by Viacom, and multiple motions to dismiss (including six Defendant-specific motions and two consolidated motions applicable to all Actions).  *Kiloo*, Dkts. 113, 114, 115, 193, 195, 202, 204, 205; *Viacom*, Dkt. 66.  On May 22, 2019, this Court issued an order largely denying Defendants' motions to dismiss.  *Kiloo*, Dkt. 270.  As a result, Plaintiffs proceeded on claims of intrusion upon seclusion and claims under the California Constitutional Right to Privacy in all Actions; a claim under the New York General Business Law, Section 349, in the *Kiloo* and *Disney* Actions, and claims under the California Unfair Competition Law and Massachusetts's statutory right to privacy in the *Disney* Action.

In early February 2020, the parties conducted three separate day-long mediation sessions before Judge Jay Gandhi (Ret.) and Lexi W. Myer.[6] Thereafter, and continuing through early April, Plaintiffs mediated and negotiated directly with Defendants, before reaching settlements in principle with each Defendant by early April. *See Kiloo*, Dkts. 337-344, 348; *Disney*, Dkts. 141-43, 145-46; *Viacom*, Dkts. 116-118. Since then, the parties have engaged in extensive negotiations to finalize the text of the agreements themselves, as well as a notice plan and

---

[4] *See Kiloo*, Dkt. 268-1 ¶ 20; *Disney*, Dkt. 117-1 ¶ 19; *Viacom*, Dkt. 90-1 ¶ 12.
[5] *See Kiloo*, Dkt. 268-1 ¶¶ 125-76; *Disney*, Dkt. 117-1 ¶¶ 134-81; *Viacom*, Dkt. 90-1 ¶¶ 72-122.
[6] In addition, Plaintiffs mediated before Cathy Yanni at JAMS with Defendants AdColony and Chartboost on December 13, 2019, and with AdColony again on January 22, 2020.

- 3 -

1    proposed orders for the Court.

2    **III.     THE SIXTEEN[7] SETTLEMENTS**

3          The Settlements (Joint Decl. Exs. 1-16) provide significant and far-reaching relief for

4    class members, with most providing relief not only in the 6 Gaming Apps at issue in these

5    Actions but also across *thousands* of apps embedded with the SDK Defendants' technology, and

6    dozens of Disney apps. And while each Settlement was negotiated separately, they share three

7    foundational principles.

8          *First*, the Settlements provide stringent privacy protections, in some cases exceeding

9    federal limitations on how children's personal data[8] may be collected and used, to prevent

10   Defendants and others from tracking children over time and across apps for commercial purposes.

11   Children will be protected from advertising based on *any* past online activities or *any* previously

12   collected data in the subject app or anywhere else on the internet. No personal data collected from

13   a current app session can be used *in any manner* to target that user in *future* sessions in the same

14   app, across other apps, or elsewhere on the internet.

15         *Second*, the Settlements mandate business practices including those that *exceed* prevailing

16   industry standards and federal requirements, ensuring app developers and their SDK partners

17   proactively protect children's privacy in an ecosystem that is largely unpoliced. These

18   requirements also benefit parents because they will be implemented in the covered apps without

19   the need to obtain parental consent or other affirmative action, as parents' ability to monitor

20   children's privacy is hampered by the complexity, information imbalance, and hidden nature of

21   the tracking technology at issue.

22         *Third*, much of the core injunctive relief provided through the Settlements will apply

23   industry-wide, extending to thousands of apps popular with children. Because the SDK

24   Defendants represent a significant portion of the mobile advertising industry, the Settlements

25   collectively cover a large number of current and future apps aimed at children. Moreover, the

26   ──────────────────

27   [7] Although there are fifteen Defendants across the Actions, there are *sixteen* settlements because
     separate settlements with Upsight were reached in both the *Disney* and *Viacom* Actions.

28   [8] Each Settlement that refers to personal data defines it consistent with the Children's Online
     Privacy Protection Act ("COPPA") Rule, 16 C.F.R. §312.2, and with the Amended Complaint in
     each Action.

Settlements will increase protections for children playing one of the world's most popular mobile gaming apps (Subway Surfers), and apps developed by Disney, Viacom, and Kiloo/Sybo.

### A. SDK Defendants AdColony, Chartboost, Flurry, InMobi, ironSource, Tapjoy, Vungle, Twitter, Unity, and Upsight

All SDK Defendants' Settlements include requirements extending beyond the six Gaming Apps, to thousands of other apps containing their SDKs. The Settlements with all SDK Defendants except Comscore feature three common components: (1) a prohibition on behavioral advertising to children; (2) a requirement that advertising services be limited to contextual advertising[9] in *any* app where the user identifies as a child under thirteen; and (3) requirements in the enrollment process for app developers to (i) educate app developers and (ii) enable these SDK Defendants to screen apps for child-directed content.

### 1. Limiting Advertising to Contextual Advertising (and Prohibiting Behavioral Advertising) in Thousands of Apps

At their core, the Settlements with the SDK Defendants—except Comscore, discussed *infra*, which uses a different technology and has thus agreed to unique relief—place strict limitations on thousands of child-directed apps so that, at minimum, only contextual advertising is served to children under thirteen. *See* Joint Decl. ¶¶ 25(a), 25(d), 25(g), 25(h), 25(j).

The parties employed three methods to identify the apps that would be subject to injunctive relief under the Settlements. *First*, through forensic analysis, Class Counsel identified tens of thousands of apps that (i) are featured in Google's Designed for Families program, the Family section of Google Play, and the Kids Category of the Apple App Store; and (ii) contain these Defendants' SDKs. Altogether, as detailed below, Class Counsel identified 16,093 unique apps (with approximately 63,388 versions) across relevant SDK Defendants:

---

[9] The terms "contextual advertising" and "behavioral advertising" are often inconsistently defined, albeit generally recognized as mutually exclusive forms of advertising (*i.e.*, contextual advertising is *not* behavioral advertising, and vice versa). In light of this ambiguity in the law, where relevant, the Settlements adopt a definition for contextual advertising that is consistent with the Federal Trade Commission's ("FTC") articulation of that term. *See* 78 Fed. Reg. 3972, 3979 n. 94 (Jan. 17, 2013). This definitional clarity is critically important, as a more robust definition of contextual advertising thereby serves to limit the potential scope of behavioral advertising.

| Defendant | Number of Unique Apps Detected | Number of Versions Detected |
|---|---|---|
| AdColony | 1,470 | 5,597 |
| Chartboost | 2,626 | 9,603 |
| Flurry | 1,420 | 4,527 |
| InMobi | 1,227 | 4,612 |
| ironSource | 1,269 | 7,769 |
| Tapjoy | 535 | 2,162 |
| Twitter | 1,981 | 5,251 |
| Vungle | 2,197 | 8,812 |
| Unity Ads | 3,339 | 14,993 |
| Upsight | 29 | 62 |
| **TOTAL** | **16,093** | **63,388** |

*Second*, these SDK Defendants (except Unity, s*ee* Joint Decl. ¶ 25(f)) will limit their services to contextual advertising in apps that the Children's Advertising Review Unit ("CARU") identified as child-directed. *See* Joint Decl. ¶ 25(d). *Third*, because the presence of child-centric words is a strong indicator of an app's intended audience, each Settlement (except Unity) identifies over a thousand popular apps that include child-centric words that will be subject to the relevant Settlements. *See* Joint Decl. ¶ 25(e).

Each of these SDK Defendants then agreed either (a) to stop providing any advertising services in these identified apps, or (b) to limit its advertising service (i) exclusively to contextual advertising or (ii) in some circumstances where the apps include age gates, exclusively to contextual advertising for children who identify as under age 13. *See* Joint Decl. ¶ 25. And each of these SDK Defendants has agreed to either delete or refrain from disclosing, using, or benefiting from any personal data previously collected from child users in any apps identified above, with certain exceptions (*e.g.*, to comply with a Court order). *See* Joint Decl. ¶ 25(g).

Finally, every Settlement includes a process for exempting specified apps that may in fact not be child-directed, by either mediation or notification to developers who must then attest that the specified app is not directed to children. *See* Joint Decl. ¶ 25(i).

## 2. Limiting Advertising to Contextual Advertising in *Any* App Where the User Is Identified as Under 13

These SDK Defendants also have agreed to limit any advertising to contextual advertising in an app where a user is identified as under age 13. If a user of *any* app that incorporates an applicable SDK is identified to one of these Defendants as under age 13, that Defendant shall either (a) stop providing all advertising services, or (b) limit any service to Contextual Advertising for that user. *See* Joint Decl. ¶ 25(j).

## 3. Requirements for Defendants' Intake Process and Dashboards to Screen Child-Directed Apps and Educate Developers

Each Settlement includes requirements for these SDK Defendants' enrollment processes for integrating their SDKs into apps, including their "dashboard," where developers choose settings that impact the SDKs' behavior within the relevant apps. These requirements serve two purposes. First, they require Defendants to include screening procedure for apps directed to children, increasing the likelihood that advertising within those apps is contextual. Second, the SDK Defendants comprise a substantial share of the online ad network marketplace,[10] and most app developers integrate several competing SDKs into their apps. As a result, these requirements will collectively educate developers and improve industry norms as those developers repeatedly engage with the improved dashboards and are guided to identify child-directed apps that should be limited to contextual advertising.

Each Defendant must certify compliance with the requirements of the Settlements by a prescribed deadline (ranging from 120 to 180 days after the entry of final approval) and any term for the injunctive relief (if there is one) is set for three years. *See* Joint Decl. ¶ 25(l). Although the above-described injunctive relief shares common goals and structures, each Settlement was negotiated separately and tailored to each Defendant's current platform and business model.

---

[10]*See, e.g.*, 42Matters, *Top 20 Ad Network SDKs Used in Android Apps*, https://42matters.com/sdk-analysis/top-ad-network-sdks (last updated Aug. 2, 2020) (identifying SDK Defendants AdColony, Chartboost, InMobi, MoPub, Tapjoy, Unity, and Vungle as numbering among "the 20 most widely-integrated ad network SDKs used"); *see also* Monetize More, *The Best Ad Networks for 2020*, https://www.monetizemore.com/blog/best-app-ad-networks/ (last visited Aug. 2, 2020) (citing AdColony, ironSource, InMobi, and Unity in a list of top mobile app ad networks).

1    Accordingly, in addition to the above summaries Plaintiffs have reproduced the relevant

2    paragraphs from each Settlement in a single document. *See* Joint Decl. Ex. 18.

3          **B.**     **SDK Defendant Comscore**

4            Comscore does not provide advertising services directly, but instead enables developers

5    and publishers to identify and measure their respective audiences. But because its practices

6    include the collection of personal data which, under certain circumstances, is used for advertising

7    purposes by its clients, Comscore has agreed to four business practice changes to bolster its

8    capacity to protect children's privacy. *First*, Comscore will update external-facing documentation

9    to require app developers seeking to integrate their SDKs to affirmatively confirm whether an app

10   is child-directed. *See* Joint Decl. ¶ 26(a) (describing training and updates to language/processes).

11   *Second*, Comscore will contract with a third-party app intelligence entity to identify child-directed

12   apps, and then review new apps with which it does business against those identified apps, and

13   delete personal data transmitted to Comscore from them upon receipt. *Id.* ¶ 26(b). *Third*,

14   Comscore will review its client list against the list of child-directed apps and notify those clients

15   whose apps are categorized as child-directed, providing instructions to update the Comscore SDK

16   to ensure data is not collected. If the client does not respond to Comscore's notification within 60

17   days, Comscore will take reasonable efforts to cease transmitting or receiving certain personal

18   data to or from that client's child-directed app. *Id.* ¶ 26(c). *Fourth*, for data used with standalone

19   behavioral advertising products, Comscore will require that behavioral advertising exclude

20   identifiers where the age was modeled as under 18, in contrast to the current practice, which only

21   applies to identifiers for users under 13. *Id.* ¶ 26(d).

22         **C.**     **Developer Defendants Kiloo, Sybo, Disney, and Viacom**

23             **1.**     **Kiloo and Sybo (Subway Surfers)**

24           Kiloo and Sybo co-developed Subway Surfers, the popular app at the heart of the *Kiloo*

25   *Action.* Historically, Sybo was responsible for developing gameplay, graphics, sounds, and in-

26   game programming, while Kiloo was responsible for publishing the app and monetizing it

27   through agreements with SDKs that collected Subway Surfers users' personal data to serve

28   advertisements within the game. In October 2019, Sybo and Kiloo reached an agreement to

transfer responsibilities for Subway Surfers from Kiloo to Sybo, including for monetizing the app through advertising. Accordingly, in the Settlements with Kiloo and Sybo, there are no material differences regarding the obligations of the two companies, and the injunctive relief provisions are designed to account for this transfer. Each Defendant agrees (for the relevant period they responsible for the app) to the following core provisions.

First, Kiloo and Sybo commit to employing a different age gate to screen users into over and under age 13 categories. Critically, when an app is "mixed-audience"—*i.e.*, its audience is comprised of both children and adults—the FTC allows developers to employ a screening mechanism whereby users who identify as "13 and over" may have their personal data used for behavioral advertising, but those identifying as under-13 may only have their personal data used for contextual advertising.[11] However, the age-gate must be "neutral" and not prompt a user to enter "13 and over" by default.[12] Subway Surfers did not include any age gate until version 1.73 of the game released on June 22, 2017. Plaintiffs allege that the current Subway Surfers age gate is not sufficiently neutral because it defaulted to a birth year of 2000 and then required users to scroll up or down on a wheel to find their actual birth years, making those users who chose the default age susceptible to targeted advertising even if they were under 13.[13] As a result of the Settlements, Kiloo and Sybo commit that Subway Surfers will now include an age gate that either requires the input of a player's age into a blank box or, alternatively, into a mechanism with a default age-entry that starts closest to age "zero" with a wheel/bar that move numbers in increasing age-order only (*i.e.* 1, 2, 3, 4, etc.). Any user who identifies as under 13 will not have personal data collected for behavioral advertising. *See* Joint Decl. ¶ 27(a).

Second, Kiloo and Sybo will delete or otherwise refrain from disclosing, using, or benefitting from any personal data collected from Subway Surfers users in three different circumstances. *See* Joint Decl. ¶ 27(b) (describing in more detail) & Exs. A (Kiloo Settlement) ¶ 3.6, Ex. B (Sybo Settlement) ¶ 3.5.

---

[11] FTC, *Complying With COPPA: Frequently Asked Questions*, at G.2-3 (available at https://www.ftc.gov/tips-advice/business-center/guidance/complying-coppa-frequently-asked-questions).

[12] *Id.*

[13] *See Kiloo*, Dkt. 268-1 (Am. Compl.) ¶¶ 107-09.

- 9 -

1    Finally, moving forward, for any user who identifies as under age 13 via the new Subway

2    Surfers age gate, neither Kiloo nor Sybo will collect location information sufficient to identify a

3    street name combined with the name of a city or town, and will obtain written assurance from any

4    advertising SDK that it does not track the same location information in Subway Surfers. Neither

5    Kiloo nor Sybo will use personal data to send "push notifications" relating to Subway Surfers to

6    users under age 13. *Id.* ¶ 27(c) & Ex. A (Kiloo Settlement) ¶ 3.7, Ex. B (Sybo Settlement) ¶ 3.6.

7    This relief, like the relief obtained from the SDK Defendants, provides substantial and

8    prospective privacy protections around the acquisition and use of personal data of children, as it

9    requires further deletion or sequestration of any personal data *previously* collected from users

10   during the time period that Plaintiffs allege sufficient privacy-protective safeguards were not in

11   place.

12                    **2.    Disney (Disney Apps)**

13   The Disney Settlement applies to dozens of Disney gaming apps (the "Disney Covered

14   Apps"), and not just the apps at issue in this action.[14] Disney has agreed to create an enforceable

15   right for all class members to ensure that federal privacy standards are met or exceeded for their

16   children's apps and will continue to abide by COPPA's requirements regarding the collection and

17   use of children's personal data in the Disney Covered Apps. Beyond this grant of rights across the

18   Disney Covered Apps, the Disney Settlement provides additional protections for two sub-groups

19   of apps: "Primary Child" apps (whose audiences are intended to be primarily under-13) and

20   "Family Friendly" apps (which are directed to children, but not primarily directed to children

21   under age 13). Joint Decl. ¶ 28 & Ex. 10 (Disney Settlement) ¶¶ 1.7, 3.3, 3.4.

22   For all "Primary Child" apps, Disney will either (1) remove or disable any Advertising

23   SDKs contained within the app or (2) continue to configure the SDKs so that they collect and/or

24   use personal data only for Contextual Advertising. *Id.* ¶ 28(b). For "Family Friendly" apps, the

25   above-described restrictions for "Primary Child" apps will apply, but Disney may also continue to

26   employ a neutral age gate in "Family Friendly" apps, and only collect and use personal data for

27   behavioral advertising if a user enters an age of 13 or greater. *Id.* ¶ 28(c).

28

---

[14] Sobol Decl. Ex. 10 (Disney Settlement) Exs. A & B (listing the Disney Covered Apps).

MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENTS
3:17-CV-04344-JD; 3:17-CV-4419-JD; 3:17-CV-4492-JD

Finally, for the Where's My Water? apps at issue in this Action, Disney has agreed to modify its existing age gate—a wheel that starts at an age of zero, but which spins so that it either goes up chronologically (1, 2, 3, 4, etc.) or down chronologically (99, 98, 97, 96, etc.)—by replacing the wheel with an age gate that requires users to numerically enter their age on a keypad. *Id.* ¶ 28(d).

### 3. Viacom (Llama Spit Spit)

The release in the Viacom Settlement is limited to the Gaming App at issue in the *Viacom Action*, Llama Spit Spit. Like other agreements, this Settlement creates an enforceable right among class members to ensure that Viacom abides by federally articulated privacy standards. The Viacom Settlement enhances current industry standard and COPPA requirements by including a specific commitment by Viacom to modify Llama Spit Spit so that the app will not use Persistent Identifiers for cross-promotions, to the extent that the Persistent Identifier is used to draw inferences about users' usage of other Viacom apps—including whether or not a user has installed additional Viacom apps on his or her device. *See* Joint Decl. Ex. 15 (Viacom Settlement) ¶ 3.1.

Further, because Viacom classifies Llama Spit Spit as a "primarily child-directed app," and treats all users as under-13 for data-collection purposes, these business practice changes apply to all users, regardless of age. *Id.*

## IV. LEGAL STANDARD

Rule 23(e) of the Federal Rules of Civil Procedure requires a preliminary evaluation of a proposed class action settlement, the first step in a three-stage process. At this stage, the Court must initially determine whether it "will likely be able to" (i) approve the settlement as fair, reasonable, and adequate; and (ii) "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Then, after potential class members are given notice and an opportunity to object, the Court must hold a hearing to consider whether to approve the settlement and certify the settlement classes. *See* Fed. R. Civ. P. 23(e)(2), (4), (5).

## V. THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE.

In determining whether a proposed settlement initially appears fair, reasonable, and

adequate, the Court must consider whether (1) the class representatives and Class Counsel have adequately represented the classes; (2) the Settlements were negotiated at arm's length; (3) the relief provided is adequate; and (4) the Settlements treat class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2); *see also* Procedural Guidance for Class Action Settlements, Preliminary Approval ("Procedural Guidance") (instructing parties to submit specific information to the Northern District of California). The proposed Settlements should be approved.

### A.    The Class Has Been Vigorously Represented.

For over three years, the class representatives and their counsel zealously represented the interests of the classes. Before Plaintiffs commenced these Actions, Class Counsel undertook a robust forensic investigation into the Gaming Apps and researched the applicable law to craft novel, cutting-edge children's privacy claims. Moreover, during the litigation, Plaintiffs engaged in substantial motion practice—briefing several motions to dismiss at the outset of the litigation, and filing a motion for class certification on the eve of settling with all Defendants.

This motion practice was supported by vigorous fact and expert discovery over ten months. Plaintiffs served and responded to hundreds of requests for production and interrogatories; met and conferred with Defendants numerous times for months to narrow the scope of disputed issues; identified search terms, custodians, and time periods for relevant discovery; established relevant protocols, including Source Code and ESI Stipulations (*see Kiloo*, Dkts. 296, 303); and briefed several discovery-related motions (*see Kiloo*, Dkts. 306, 309, 314, 323, 324, 326, 327-3, 329, 332; *Viacom*, Dkts. 103, 106).  By the time the parties reached settlements in principle, Plaintiffs had reviewed over 150,000 documents, produced hundreds of documents related to the class representatives, inspected relevant source code, and worked with third-party consultants to preserve and/or forensically image approximately seventeen mobile devices, from which Plaintiffs produced requested information to Defendants. Plaintiffs also took seventeen depositions across two continents (including six in Denmark), and prepared to defend seven class representative depositions which, as negotiations advanced, were cancelled shortly before their scheduled dates. Lastly, Plaintiffs committed hundreds of hours to working with multiple experts to develop their claims for trial. Taken together, these efforts demonstrate that the Settlements are

1 the product of well-informed and vigorous advocacy on behalf of the class.

2       **B.**     **The Settlements Were Negotiated at Arm's Length.**

3       The Settlements were reached after serious, informed, arm's-length negotiations. After

4 significant motion practice and discovery efforts, the parties hired JAMS mediators Judge Gandhi

5 (Ret.) and Ms. Myer (and Plaintiffs, AdColony, and Chartboost also hired Ms. Yanni) for private

6 mediation sessions totaling five days, with extensive follow-up negotiations over four months.

7 The involvement of these highly experienced mediators supports a finding that the Settlements

8 are not the product of collusion. *See Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *8

9 (N.D. Cal. Apr. 29, 2011) (finding that involvement of a mediator suggested the settlement "was

10 not the result of collusion of bad faith by the parties or counsel"). Separately, the Settlements

11 themselves bear none of the traditional signs of collusion. *See In re Bluetooth Headset Prods.*

12 *Liab. Litig.*, 654 F.3d 935, 946-48 (9th Cir. 2011). In short, Plaintiffs possessed a wealth of

13 information before engaging in settlement negotiations. Based on this knowledge and their

14 experience litigating and settling privacy class actions, Class Counsel believe that the Settlements

15 are fair, reasonable, and adequate. *Knight v. Red Door Salons, Inc.*, 2009 WL 248367, at *4 (N.D.

16 Cal. Feb. 2, 2009) ("The recommendations of plaintiffs' counsel should be given a presumption

17 of reasonableness.") (citation omitted).

18       **C.**     **The Settlements Provide Meaningful Relief to the Classes.**

19       The injunctive relief provided to the classes under these Settlements is more than

20 "adequate" considering (i) the costs, risks, and delay of trial and appeal; and (ii) the terms of any

21 proposed award of attorney's fees. *See* Fed. R. Civ. P. 23(e)(2)(C); Procedural Guidance (1)(e).[15]

22       **1.**     **The Costs, Risks, and Delay of Trial And Appeal**

23       In reaching the Settlements, Plaintiffs achieved their principal goal of effectuating broad

24 and meaningful changes to Defendants' practices by limiting the collection and use of children's

25 personal data for commercial gain. *See* Section III, *supra*. By extending relief across thousands of

26

27 ────────────

[15] Because the Settlements provide only injunctive relief pursuant to Rule 23(b)(2), there is no claims process or distribution plan. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii). Moreover, Plaintiffs have

28 not entered into any agreements "in connection with the proposal" under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

- 13 - MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENTS
3:17-CV-04344-JD; 3:17-CV-4419-JD; 3:17-CV-4492-JD

1   apps and enhancing screening procedures for current and future apps aimed at children, the

2   Settlements will result in industry-wide change. And, as Chairman Simons of the FTC recently

3   remarked, injunctive relief (like the remedies provided under the Settlements) will carry powerful

4   deterrent effects in the form of "the costs and constraints of complying with the injunction; the

5   fencing in of otherwise legal conduct; the reputational effect of the sanction; the threat of follow-

6   on actions" and "other collateral consequences."[16]

7       In contrast to the significant benefits conferred by the Settlements, continued litigation

8   (including trial and near-certain appeal) would have carried significant costs, risks, and delay with

9   little additional payoff. Absent these Settlements, Plaintiffs anticipate Defendants would have

10  continued to aggressively challenge Plaintiffs' claims—by opposing class certification, filing both

11  consolidated and individual summary judgment and *Daubert* motions, and appealing an adverse

12  judgment. Despite Plaintiffs' confidence in the facts and legal theory that underpin their claims,

13  they recognize that such claims are novel and that the relevant law is still undeveloped as it

14  applies to these Actions. By way of example, Defendants have already disputed the extent to

15  which the personal data collected from Plaintiffs' devices constitutes "children's personal data",

16  and whether Defendants' conduct is considered "highly offensive" to a reasonable person

17  (particularly in light of the unique nature of each Defendant's data collection practices), whether

18  Defendants engaged in any "deceptive" or "misleading" business practices, and whether Plaintiffs

19  have suffered sufficient injury or are entitled to damages.

20      Moreover, the prospect of continued litigation threatens to delay implementation of

21  injunctive relief to the classes. The only significant benefit that the Settlements do not provide is

22  monetary relief through a class under Rule 23(b)(3). However, the risks of further litigation for

23  damages outweighed the benefits of immediate injunctive relief available through these

24  Settlements, particularly where any damage award would likely be nominal for most class

25  members.[17] In any event, class members will continue to retain their rights to pursue damages

26  ───────────────────────

27  [16] Statement of Chairman Simons, *FTC v. HyperBeard Inc.*, No. 1923109 (June 4, 2020),
    https://www.ftc.gov/system/files/documents/public_statements/1576438/192_3109_hyperbeard_-_statement_of_chairman_simons.pdf.

28  [17] Plaintiffs asserted claims under New York General Business Law § 349 in the *Kiloo* and
    (continued…)

1    under the Settlements.

2          Considering the costs, risks, and delay associated with continued litigation, the robust

3    injunctive relief secured through these Settlements represents an excellent result for the

4    settlement classes.

5                **2.**      **Class Counsel Will Seek Reasonable Attorney's Fees and Expenses.**

6          The parties negotiated the payment of reasonable attorney's fees and expenses only *after*

7    they reached agreement in principle with respect to the proposed injunctive relief set forth in the

8    Settlements. Because these Settlements provide injunctive relief only under Rule 23(b)(2), any

9    award of attorneys' fees and expenses will not come out of a common fund. Rather, Class

10   Counsel and each Defendant separately negotiated an aggregate payment cap for fees and

11   expenses. Defendants reserve the right to contest the amount of Class Counsel's request for

12   attorney's fees and expenses, except that all parties will accept, and not appeal, any order on

13   attorneys' fees and expenses. Joint Decl. ¶ 56.  As detailed in the table below, Class Counsel

14   anticipates requesting an aggregate award of $9,045,000 in attorney's fees and expenses, equal to

15   the maximum amount recoverable under all respective payment caps.  Joint Fee Decl. ¶ 9.

16

17

18

19

20

21

22

23

24

25

26

---

27   *Disney* Actions (which provides for the greater of actual damages or $50 per Class Member) and
     under Massachusetts General Laws ch. 93A in the *Disney* Action (which provides for the greater
     of actual damages or $25), but statutory damages for those class members in New York and/or
28   Massachusetts were uncertain due to challenging case law concerning digital privacy rights under
     GBL § 349, and the novel nature of the claims under both statutes.

| Action | Defendant | Est. Fee Request | Est. Expense Request | Est. Total Request | Payment Cap (maximum) |
|---|---|---|---|---|---|
| *Kiloo* | Kiloo | $704,026 | $55,974 | $760,000 | $760,000 |
| | Sybo | $469,026 | $55,974 | $525,000 | $525,000 |
| | AdColony | $469,026 | $55,974 | $525,000 | $525,000 |
| | Chartboost | $94,026 | $55,974 | $150,000 | $150,000 |
| | Flurry | $694,026 | $55,974 | $750,000 | $750,000 |
| | InMobi | $694,026 | $55,974 | $750,000 | $750,000 |
| | ironSource | $694,026 | $55,974 | $750,000 | $750,000 |
| | Tapjoy | $694,026 | $55,974 | $750,000 | $750,000 |
| | Vungle | $694,026 | $55,974 | $750,000 | $750,000 |
| | **Total** | **$5,206,234** | **$503,776** | **$5,710,000** | **$5,710,000** |
| *Disney* | Disney | $440573 | $49,427 | $490,000 | $490,000 |
| | Comscore | $335,573 | $49,427 | $385,000 | $385,000 |
| | Twitter | $225,573 | $49,427 | $275,000 | $275,000 |
| | Unity | $700,573 | $49,427 | $750,000 | $750,000 |
| | Upsight | $450,573 | $49,427 | $500,000 | $500,000 |
| | **Total** | **$2,152,865** | **$247,135** | **$2,400,000** | **$2,400,000** |
| *Viacom* | Viacom | $338,867 | $96,133 | $435,000 | $435,000 |
| | Upsight | $403,867 | $96,133 | $500,000 | $500,000 |
| | **Total** | **$742,734** | **$192,266** | **$935,000** | **$935,000** |
| **Grand Total** | | **$8,101,833** | **$943,177** | **$9,045,000** | **$9,045,000** |

Further, based on preliminary review, Class Counsel estimates its lodestar by Action (as of June 30, 2020) as follows:

| Action | Hours Billed | Total Lodestar | Multiplier |
|---|---|---|---|
| *Kiloo* | 11,487 | $6,653,711 | 0.85 |
| *Disney* | 5,150 | $3,017,388 | 0.79 |
| *Viacom* | 2,896 | $1,679,001 | 0.56 |
| **Total** | **19,533** | **$11,350,102** | **0.79** |

Joint Fee Decl. ¶ 10. Accordingly, Class Counsel's anticipated fee request is reasonable in view of a lodestar of $11,350,102 based on 19,533 hours across all Actions, which would presently result in a lodestar multiplier of 0.79.

**D.      The Settlements Treat Class Members Equitably.**

The Settlements benefit all class members equally by changing how thousands of apps played by the children collect and treat *each* child's data from the start of the game, as well as

their policies regarding the destruction or segregation of previously collected data. Because the injunctive relief is based on objective criteria that make changes at the app level, the benefits are shared equally among class members and their children. This factor supports preliminary approval.

### E. The Settlements Satisfy the District's Procedural Guidance.

The discussion in other sections of this brief provides relevant information regarding (and is equally applicable to) Procedural Guidance 1(e) (*see* Section V.C.1); Procedural Guidance 6 (*see* Section V.C.2); and Procedural Guidance 9 (*see* Section VII.  Because no litigation class has been certified and the Settlements provide injunctive relief pursuant to Rule 23(b)(2), provisions 1(b), 1(d), 1(f), 1(g), 1(h), 4, 8, and 11 of the Procedural Guidance do not apply.  The remaining provisions are addressed below.

#### 1. There Are Only Minor Differences Between the Settlement Classes and Those in the Operative Complaints (Procedural Guidance 1(a)).

The Settlement Classes are substantively identical to those in the Amended Complaints, with minor variations that are necessary and appropriate to mirror the injunctive relief applicable to certain Defendants or covered apps. *Compare* Joint Decl. Ex. 17 (listing settlement class definitions), *with Kiloo*, Dkt. 268-1 ¶¶ 207-212; *Disney*, Dkt. 117-1 ¶¶ 228-234; *Viacom*, Dkt. 90-1 ¶¶ 152-154.

Parents of Children Under Age 13. While the Amended Complaints assert classes of parents of children under age 18 when they played the Gaming Apps, the nine Settlements in the *Kiloo* Action, the Disney Settlement, and the Twitter Settlement define classes of parents of children under age 13, consistent with the Plaintiffs' *original* complaints.[18] This is appropriate because the injunctive relief provisions in these Settlements track and enhance current industry standards and COPPA requirements, which distinguish between children under age 13 and those age 13 and over. This includes the Kiloo, Sybo, and Disney Settlements, which include injunctive provisions concerning their apps, which provide different protections to users who identify as being either under age 13 or those age of 13 and over. The remaining Settlements—with

---

[18] *See Kiloo*, Dkt. 1 ¶¶ 92-94; *Disney*, Dkt. 1 ¶¶ 77-78.

Comscore, Unity, Upsight, and Viacom—define classes of parents of children under age 18, consistent with the Amended Complaints.

Expanded List of Apps. Five Settlements feature expanded class definitions to cover parents of children who played apps beyond the Gaming Apps to align with the expanded scope of the agreed-upon injunctive relief. For example, the Disney Settlement covers all Disney Covered Apps; the Twitter Settlement covers the applicable Gaming Apps in addition to apps listed in Exhibits A-C thereto; both Upsight Settlements cover the applicable Gaming Apps in addition to apps listed in Exhibit A thereto; and the Unity Settlement covers all apps in which its advertising SDK is embedded.

### 2. The Releases Mirror the Allegations in the Complaint (Procedural Guidance 1(c)).

In exchange for the foregoing changes to Defendants' data collection practices and technology, the Actions will be dismissed with prejudice as to all Defendants upon final approval of the Settlements. Class members will thereby release all claims for injunctive and non-monetary equitable relief which have been or could have been asserted against Defendants under the identical factual predicate in each Action as applied to the apps encompassed within the scope of each Settlement. No class member, except the Class Representatives, will release any claims for monetary damages. *See* Joint Decl. ¶ 30. In other words, these releases parallel the contours of the class definitions and injunctive relief provisions.

While there is slight variance from the Amended Complaints as to the scope of the Settlement Classes in some Settlements (*see* Section V.E.1, *supra*), each Settlement releases the same types of claims asserted in the Amended Complaints against each Defendant, and does not release any additional claims. Thus, the claims released in the Settlements mirror the claims set forth in the operative complaints (but also expand the relief obtained to thousands of additional apps that were not the subject of the three Actions). The only difference is the scope of Rule (b)(2) settlements, which include significant injunctive relief, but which do not release damages or other monetary claims for Settlement Class Members and their children (excluding the Class Representatives and their children).

- 18 -

Plaintiffs believe that the important injunctive relief obtained now is not just appropriate, but preferable to holding out for the possibility of uncertain monetary damages, whether through settlements or at trial. This is because Plaintiffs' claims are novel and untested, facing class certification challenges and significant hurdles at summary judgment and trial, including arguments that that damages are too individualized to warrant certification or that a jury would not find the conduct to be an egregious violation of societal norms, resulting in little or no classwide payments. Furthermore, assuming Plaintiffs could overcome these obstacles, any damage award would likely be nominal under existing law for most Class Members, and potentially as low as $1 each. If Plaintiffs prevail at trial, any monetary damages award—no matter the size—would be delayed during the inevitable appeals to any favorable rulings, dragging out resolution for years as the ever-changing mobile advertising ecosystem consolidates and evolves, risking the possibility of non-payment from Defendants that no longer exist in their current form or at all.

Instead, Plaintiffs have secured valuable injunctive relief through these sixteen settlements that impact a large swath of the children's mobile advertising space, offering significant protections to children and their parents *now*, in order to prevent the kinds of tracking and exfiltration that would continue absent these settlements, and to ensure that previously collected personal data is segregated or destroyed. This is particularly true in the current regulatory environment, in which technology companies are actively seeking to scale back or erode many of the common-law privacy rights embodied in the Children's Online Privacy Protection Act. And while federal law is supposed to protect Class Members from the alleged conduct at the center of Plaintiffs' allegations, these settlements offer additional protections (*see supra* Section III), and also provide an otherwise absent mechanism for parents to enforce existing federal law. This is far more valuable to Class Members than small individual damages awards.

### 3. Settlement Administrator Selection Process (Procedural Guidance 2).

To select a settlement administrator, Class Counsel solicited bids from five well-known and experienced administrators. Joint Decl. ¶ 61. Specifically, Class Counsel required that any proposal employ contemporary methods of notice to ensure the broadest and most effective reach

1   possible. *Id*. After considering the bids, Plaintiffs selected Angeion, based on its vast experience

2   in similar class actions and a notice plan proposal that includes innovative, thoughtful, and

3   technologically sophisticated means of notice to settlement class members. *Id.* ¶ 62.  Class

4   Counsel has previously worked with Angeion on ten different matters in the past two years,

5   though initially engaged Angeion for certain of these matters more than two years ago. *Id* ¶ 63.

6        The total cost of the proposed notice plan is approximately $136,000. *See* Angeion Decl.

7   ¶ 28. These costs are reasonably necessary to establish a settlement website and to conduct an

8   online advertising campaign that informs potential class members about the Settlements and

9   directs them to the settlement website.

10  ### 4. The Proposed Notice Plan (Procedural Guidance 3 & 5).

11       Notice is not mandatory for settlements that seek only injunctive, non-monetary relief.

12  *See* Fed. R. Civ. P. 23(c)(2); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011) ("The

13  Rule provides no opportunity for  (b)(1) or (b)(2) class members to opt out, and does not even

14  oblige the District Court to afford them notice."). For Rule 23(b)(2) classes, the Advisory

15  Committee on the Federal Rules directs courts to exercise their authority to direct notice with care

16  because the characteristics of (b)(2) classes reduce the need for notice.  *See* 2003 Advisory

17  Comm. Notes on Fed. R. Civ. P. 23. Thus, "the discretion and flexibility established by

18  subdivision (c)(2)(A) extend[s] to the method of giving notice," including informal methods such

19  as "[a] simple posting in a place visited by many class members, directing attention to a source of

20  more detailed information . . . ." *Id.*

21       Here, the parties have agreed to provide notice to the Settlement Classes in accordance

22  with the Notice Plan. *See* Angeion Decl. Ex. B. Under the terms of the Proposed Order, 10 days

23  after the Court's preliminary approval order, Angeion will publish a Notice to class members

24  (Angeion Decl. Ex. C) on a single settlement website, and links to the website will be published

25  online using contextual advertisements on various websites likely to be visited and used by

26  settlement class members.

27       The contents of Notice were formulated in plain, easy-to-understand language to alert

28  Class Members of the pendency of the Settlements and the opportunity to object and be heard.

1   *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2019 WL 387322, at *5 (N.D. Cal. Jan.

2   30, 2019) (notice contents should contain "'plain, easily understood language' and 'generally

3   describe the terms of the settlement in sufficient detail to alert those with adverse viewpoints to

4   investigate and to come forward and be heard.'") (quoting Fed. R. Civ. P. 23(c)(2); *Churchill Vill.*

5   *L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004)). Consistent with this District's Procedural

6   Guidance, the Notice informs Class Members of (1) Class Counsel's contact information, and a

7   toll-free number to ask questions about the Settlements; (2) the address of the Class Settlement

8   Website maintained by the Settlement Administrator that links to important case documents,

9   including motion for preliminary approval papers, and instructions on how to access the case

10  docket via PACER or in person; (3) the pendency of the litigation and of the Settlements,

11  including the terms thereof; (4) the Class Representatives' applications for service awards; (5) the

12  procedures for filing an objection to the Settlements pursuant to the Guidance; (6) important dates

13  in the settlement approval process, including the date of the Fairness Hearing; and (7) Plaintiffs'

14  forthcoming Attorneys' Fees Motion. Angeion Decl. Ex. C.

15          The proposed Notice Plan and form of notice is therefore fair and appropriate.

16                    **5.     Service Awards (Procedural Guidance 7).**

17          Pursuant to the Settlements, Class Counsel intends to seek, and Defendants agree to pay

18  (pro rata), service awards totaling $2,500 for each class representative. Each Plaintiff devoted

19  extensive resources and energy to these Actions. First, Plaintiffs provided information to Class

20  Counsel that informed the class action complaints and, thereafter, regularly communicated with

21  Class Counsel about strategy and major case developments throughout the litigation. Second,

22  during the course of discovery that lasted almost one year, Plaintiffs provided documents and

23  information to respond to scores of written interrogatories and requests for production, and

24  verified the accuracy and truthfulness of all discovery responses. Third, each Plaintiff provided

25  one or more of his or her (and his or her family's) mobile devices to Class Counsel, so that those

26  devices could be completely forensically imaged and safely preserved for discovery purposes.

27  Joint Decl. ¶ 50. Fourth, Plaintiffs each prepared and made themselves available for a deposition,

28  though none ultimately took place in light of the Settlements. Finally, each Plaintiff reviewed and

1   approved the Settlements after consulting with Class Counsel. In light of this work, these awards

2   are eminently reasonable and supported by law. *See Rodriguez v. West Publishing Corp.*, 563

3   F.3d 948, 958-59 (9th Cir. 2009).

### 6.   Class Action Fairness Act (Procedural Guidance 10).

5   CAFA notice is required under the Settlements, and each Defendant is coordinating

6   compliance with 28 U.S.C. § 1715 at its own cost. *See* Proposed Order § 5 (CAFA Notice).

## VI.   THE SETTLEMENT CLASSES WARRANT CERTIFICATION.

8   At this stage, the Court must also determine that it is likely to certify the settlement classes

9   for purposes of judgment on the proposal. Fed. R. Civ. P. 23(e)(1)(B)(ii). Each of the

10   requirements of Rules 23(a) and 23(b)(2) are satisfied here.

### 1.   Rule 23(a) is Satisfied.

12   Numerosity. The settlement classes readily satisfy the numerosity requirement, because

13   the relevant apps have been downloaded millions of times in the United States alone.[19] *See The*

14   *Civ. Rts. Educ. & Enf't Ctr. v. RLJ Lodging Tr.*, 2016 WL 314400, at *6 (N.D. Cal. Jan. 25, 2016)

15   (noting this requirement is "relaxed" where the class seeks injunctive relief only).

16   Commonality. The claims of the settlement classes are sufficiently common as they

17   "depend upon a common contention . . . of such a nature that it is capable of classwide

18   resolution." *Wal-Mart*, 564 U.S. at 350; Fed. R. Civ. P. 23(a)(2). Common questions underlie all

19   class members' claims, including whether Defendants collected and used children's personal data

20   for commercial purposes, whether Defendants intended or knew that children play the Gaming

21   Apps, and whether Defendants' conduct violates reasonable expectation of privacy and is highly

22   offensive to a reasonable person. *See* Order, *In re Vizio, Inc., Consumer Privacy Litig.*, No. 8:16-

23   ml-02693 (C.D. Cal. Jan. 4, 2019), Dkt. 297 at 8 (commonality established where defendant's

24   "alleged data collection and disclosure practices were uniform" across all devices); *In re*

---

[19] On the Android platform alone, each of the Gaming Apps has exceeded one million installations. *See, e.g., Subway Surfers*, Google Play, https://play.google.com/store/apps/details?id=com.kiloo.subwaysurf (over 1 billion); *Where's My Water?*, Google Play, https://play.google.com/store/apps/details?id=com.disney.WMW (over 1 million); *Where's My Water? 2*, Google Play, https://play.google.com/store/apps/details?id=com.disney.wheresmywater2_goo (over 100 million); *Llama Spit Spit*, Google Play, https://play.google.com/store/apps/details?id=com.mtvn.llamaspit (over 1 million).

MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENTS
3:17-CV-04344-JD; 3:17-CV-4419-JD; 3:17-CV-4492-JD

*Volkswagen "Clean Diesel" Mktg., Sales Practices & Prods. Liab. Litig.*, 2017 WL 672727, at *13 (N.D. Cal. Feb. 16, 2017) (finding commonality satisfied where the class representative claims "arise from Volkswagen's common course of conduct").

<u>Typicality</u>.  The class representatives' claims are "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). Typicality does not require total identity between representative plaintiffs and the class. *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014). Rather, typicality is satisfied here, where Plaintiffs' claims stem "from the same event, practice, or course of conduct that forms the basis of the class claims, and . . .  upon the same legal theory . . . ." *Jordan v. Los Angeles County*, 669 F.2d 1311, 1321 (9th Cir. 1982). Plaintiffs allege a common scheme whereby Defendants processed Plaintiffs' children's personal data for commercial purposes.  *See In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 543 (N.D. Cal. 2018) (typicality satisfied where class representatives used Facebook like all others).

<u>Adequacy of Representation</u>. The class representatives "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Plaintiffs have no interests in conflict with those of the classes. Moreover, Plaintiffs' commitment to the case demonstrates their adequacy: as described above. *See* Section V.A, *supra*; Joint Decl. ¶¶ 64-83.

Separately, Rule 23(g) requires the Court to appoint class counsel to represent the settlement classes. Considering counsel's work in this action, their collective familiarity and experience in handling similar actions, and the resources they have committed to representing the classes, they should be appointed class counsel for the proposed settlement classes under Rule 23(g)(3), and confirmed under Rule 23(g)(1). *See* Joint Decl. Exs. 19 & 20.

### 2.      The Requirements of Rule 23(b)(2) are Satisfied.

The proposed Settlement Classes satisfy Rule 23(b)(2), which permits a class treatment where Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Here, Plaintiffs allege Defendants have been engaged in the ongoing practice of exfiltrating personal data from children for commercial use without age-based restrictions, and seek to compel the destruction or sequestration of previously obtained personal data so it may no

1  longer be used that way. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (Rule

2  23(b)(2) satisfied where plaintiffs "complain of a pattern or practice that is generally applicable to

3  the class as a whole.").

4        The conduct Plaintiffs challenge in the respective Actions—including allowing

5  exfiltration, tracking, storage, and use of children's personal data—affects each of the Settlement

6  Classes in those Actions through the implementation of SDK technology that was uniformly

7  applied to users who accessed the Gaming Apps. Further, the relief sought—cessation of the

8  challenged practices, requirement of appropriate safeguards to protect children moving forward,

9  and segregation and/or destruction and/or segregation of previously exfiltrated personal data—

10 would provide benefits to all members of the Settlement Classes. This Court has certified

11 analogous Rule 23(b)(2) class settlements in privacy cases that similarly sought to enjoin a

12 defendant's common, privacy-invasive conduct. *See, e.g.*, Order, *Matera v. Google Inc.*, No.

13 5:15-cv-04062-LHK (N.D. Cal. Aug. 31, 2017), Dkt. 89 at 2-3 (approving Rule 23(b)(2)

14 settlement requiring that Google "cease all processing of email content" from class members that

15 is used for advertising purposes); Order, *Campbell v. Facebook*, No. 4:13-05996-PJH-SK (N.D.

16 Cal. Apr. 26, 2017), Dkt. 235 at 3 (granting preliminary approval where "[d]efendant is alleged to

17 have acted or refused to act on grounds that apply generally to the Settlement Class");

18 *Campbell v. Facebook*, 315 F.R.D. 250, 269 (N.D. Cal. 2016) (certifying a 23(b)(2) class where

19 defendant "utilized a uniform system architecture and source code").

20       Finally, with respect to the *Kiloo* and *Disney* Actions, Plaintiffs' challenges to the age

21 gates in Subway Surfers and the Where's My Water? Gaming Apps raise multiple issues

22 particularly apt for common resolution on a Rule 23(b)(2) basis. First, Plaintiffs allege that

23 Kiloo's/Sybo's and Disney's age gates are not sufficiently neutral, thereby encouraging or

24 permitting the selection of an age that, unknown to the children, permits exfiltration and use of

25 personal data for commercial purposes. Because the proposed injunctive relief seeks revisions of

26 the age gates in Subway Surfers and the Where's My Water apps used by any users of those apps,

27 the relief uniformly benefits all Class Members in the *Kiloo* and *Disney* Actions, respectively.

28 Second, even if the Class Members' children played the Gaming Apps in versions that post-dated

MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENTS
3:17-CV-04344-JD; 3:17-CV-4419-JD; 3:17-CV-4492-JD

or pre-dated the age gates, or engaged with the age gates differently, Rule 23(b)(2) certification would still be warranted. That some Class Members may have been impacted in different ways by the operation of these uniformly-designed age gates does not preclude finding that Kiloo's, Sybo's, or Disney's conduct is "generally applicable to the class as a whole," thereby making certification appropriate. *Parsons*, 754 F.3d at 688 ((b)(2) certification "does not require a finding [of] . . . identical injuries"). Accordingly, the Court should allow the Rule 23(b)(2) Settlement Classes to seek immediate, prospective injunctive relief.

## VII. PROPOSED SCHEDULE FOR NOTICE AND FINAL APPROVAL

The parties have submitted a proposed order regarding preliminary approval concurrently with this Motion, pursuant to Local Civil Rule 7.2(c), setting forth the proposed schedule of events from here through final approval. Specifically, the parties propose the following schedule:

| Date | Event |
|---|---|
| No later than ten (10) <u>business</u> days following the entry of this Order | Notice shall be posted on the Class Settlement Website, along with the Stipulation and all relevant Court orders in the Actions. |
| Subject to the Court's discretion, the parties recommend 65 calendar days before the Final Approval Hearing | Deadline for Plaintiffs to file Final Approval Motion and Attorneys' Fees Motion |
| Subject to the Court's discretion, the parties recommend 30 calendar days before the Final Approval Hearing | Objection Deadline |
| Subject to the Court's discretion, the parties recommend 15 calendar days before the Final Approval Hearing | Deadline for Plaintiffs to file respond to Objections |
| _____, 2020, at __:__ a.m. | **Final Approval Hearing** |

## VIII. CONCLUSION

Plaintiffs respectfully request the Court (1) find it will likely approve the Settlements; (2) find it will likely certify the settlement classes; (3) appoint the Plaintiffs as class representatives for the settlement classes for purposes of disseminating notice; (4) appoint Class Counsel as counsel for the settlement classes; (5) direct notice to the settlement classes; (6) authorize retention of the Angeion as settlement administrator; and (7) set a final approval hearing.

Dated: August 5, 2020

/s/ Hank Bates

Hank Bates (State Bar No. 167688)
hbates@cbplaw.com
Allen Carney (admitted *pro hac vice*)
acarney@cbplaw.com
David Slade (admitted *pro hac vice*)
dslade@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Telephone: 501.312.8500
Facsimile: 501.312.8505

Michael W. Sobol (SBN 194857)
msobol@lchb.com
Michael K. Sheen (SBN 288284)
msheen@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Nicholas Diamand (admitted *pro hac vice*)
ndiamand@lchb.com
Douglas I. Cuthbertson (admitted *pro hac vice*)
dcuthbertson@lchb.com
Sean Petterson (admitted *pro hac vice*)
spetterson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592

*Attorneys for Plaintiffs*