# EXHIBIT L

BEN BARNOW
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, Illinois 60602
(312) 621-2000
(312) 641-5504 (fax)

PAUL J. GELLER
ROBBINS GELLER RUDMAN
& DOWD LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000
(561) 750-3364 (fax)

DAVID A. MCKAY
LAW OFFICES OF DAVID A.
MCKAY LLC
555 North Point Center East, Suite 400
Alpharetta, Georgia 30022
(678) 366-5180
(678) 366-5001 (fax)

ADAM J. LEVITT
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 2350
Chicago, Illinois 60602
(312) 214-0000
(312) 214-0001 (fax)

BRIAN R. STRANGE (103252)
STRANGE & CARPENTER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
(310) 826-3210 (fax)

TIMOTHY G. BLOOD (149343)
BLOOD HURST & O'REARDON LLP
701 B Street, Suite 1700
San Diego, California 92101
(619) 338-1100
(619) 338-1101 (fax)

GAYLE M. BLATT (122048)
CASEY GERRY SCHENK
FRANCAVILLA
BLATT & PENFIELD LLP
110 Laurel Street
San Diego, California 92101
(619) 238-1811
(619) 544-9232 (fax)

*Co-Lead Settlement Class Counsel*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: SONY GAMING NETWORKS AND CUSTOMER DATA SECURITY BREACH LITIGATION, | MDL No.: 3:11-md-02258-AJB-MDD |
| | <u>CLASS ACTION</u> |
| This Document Pertains To: All Actions | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES, COSTS, AND EXPENSES** |
| | Judge: Hon. Anthony J. Battaglia<br>Courtroom: 3B<br>Date: May 1, 2015<br>Time: 2:00 p.m. PT |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

   I.   Nature of the Litigation .................................................................... 3

   II.  Procedural History............................................................................ 4

   III. Summary of the Settlement ............................................................. 5

       A.   The Settlement Class............................................................ 5

       B.   Settlement Benefits .............................................................. 6

            1.   PSN Accountholder Benefits.................................... 6

            2.   Qriocity Accountholder Benefits ............................. 9

            3.   SOE Accountholder Benefits.................................... 9

            4.   Reimbursement of Identity Theft Losses ............... 10

            5.   The Costs of Notice and Claims Administration...... 10

            6.   Attorneys' Fees, Costs, and Expenses ..................... 11

       C.   Confirmatory Discovery .................................................... 11

       D.   The Court-Approved Notice Program Was Substantial
            and Effective ..................................................................... 12

ARGUMENT........................................................................................................ 15

   I.   Final Approval of the Settlement is Appropriate ......................... 15

       A.   The Strength of Plaintiffs' Case and the Risk, Complexity,
            and Likely Duration of Future Litigation........................... 16

       B.   The Amount Offered by the Settlement............................. 17

       C.   The Extent of Discovery Completed and the Stage
            of the Proceedings ............................................................ 18

       D.   The Views and Experience of Counsel.............................. 20

       E.   The Reaction of Absent Class Members............................ 21

   II.  The Requested Award of Attorneys' Fees, Costs, and Expenses is
       Reasonable...................................................................................... 21

i

A.     Co-Lead Settlement Class Counsel and Their Firms Report  Reasonably Spending in Excess of 5,580 Hours Advancing the Litigation.......................................................23

B.     The Hourly Rates of Co-Lead Settlement Class Counsel and Their Firms are Reasonable.........................................25

C.     The Requested Award Is Reasonable and Appropriate ....................28

      1.     Time and Labor Required............................................29

      2.     Novelty and Difficulty of the Questions Presented and the Requisite Skill to Perform the Legal Service Properly.........29

      3.     The Preclusion of Other Employment .......................................29

      4.     Whether the Fee Is Fixed or Contingent....................................30

      5.     Limitations Imposed by the Client of the Circumstances and the Nature and Length of the Professional Relationship with the Client................................30

      6.     The Amount Involved or the Results Obtained.........................31

      7.     The Experience, Reputation and Ability of the Attorneys .........31

      8.     The "Undesirability" of the Case................................................31

      9.     The Customary Fee and Awards in Similar Cases ....................32

CONCLUSION.......................................................................................33

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adoma v. Univ. of Phoenix, Inc.*,
913 F. Supp. 2d 964 (E.D. Cal. 2012) .................................................. 15

*Arnold v. Fitflop USA, LLC*,
No. 11-CV-0973 W KSC,
2014 WL 1670133 (S.D. Cal. Apr. 28, 2014) ...................................... 20

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
No. 10-CV-419-GPC (WVG),
2014 WL 5438532 (S.D. Cal. 2014) ...................................................... 25

*Bros. v. Cambridge Lee Indus., Inc.*,
630 F. Supp. 482 (E.D. Pa. 1985) ......................................................... 20

*Camacho v. Bridgeport Fin., Inc.*,
523 F.3d 973 (9th Cir. 2008) ................................................................ 25

*Chaikin v. Lululemon USA Inc.*,
No. 3:12-CV-02481-GPC-MDD,
2014 WL 1245461 (S.D. Cal. Mar. 15, 2014) .............................. 21, 27

*Dennis v. Kellogg Co.*,
No. 09-cv-1786-L (WMC),
2013 WL 6055326 (S.D. Cal. Nov. 14, 2013) ...................................... 27

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974) .............................................................................. 12

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) ................................................................... 30

*Grant v. Capital Mgmt. Servs., L.P.*,
No. 10-CV-WQH BGS, 2014 WL 888665 (S.D. Cal. Mar. 5, 2014) ......... 16, 17

*Hartless v. Clorox Co.*,
273 F.R.D. 630 (S.D. Cal. 2011) .......................................................... 27

*In re Austrian & German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000) .................................................... 16

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
No. 09-md-2087-BTM (KSC),
2014 WL 6473044 (S.D. Cal. Nov. 18, 2014) ...................................... 28

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
No. 3:08-MD-01998, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) ............... 32

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ................................................................. 19

*In re Sunrise Sec. Litig.*,
131 F.R.D. 450 (E.D. Pa. 1990) ............................................................. 17

*In re TJX Cos. Retail Sec. Breach Litig.*,
584 F. Supp. 2d 395 (D. Mass. 2008) .................................................... 32

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) ................................................................. 30

*Johnson v. General Mills, Inc.*,
No. SACV 10-00061-CJC (ANx),
2013 WL 3213832 (C.D. Cal. June 17, 2013) ....................................... 27

*Kerr v. Screen Extras Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975) ................................................................... 29

*Linney v. Cellular Alaska P'ship*,
151 F.3d 1234 (9th Cir. 1998) ............................................................... 15

*Morales v. City of San Rafael*,
96 F.3d 359 (9th Cir. 1996) ............................................................. 21, 29

*Morey v. Louis Vuitton N. Am., Inc.*,
No. 11-cv-1517 WQH (BLM),
2014 WL 109194 (S.D. Cal. Jan. 9, 2014) ............................................ 26

*Negrete v. Allianz Life Ins. Co.*,
No. CV-05-6838-CAS(MANx) (C.D. Cal. March 17, 2015) ................. 28

*Peters v. Nat'l R.R. Passenger Corp.*,
966 F.2d 1483 (D.C. Cir. 1992) ............................................................. 12

*Prison Legal News v. Schwarzenegger*,
608 F.3d 446 (9th Cir. 2010) ................................................................. 26

*Rannis v. Recchia*,
380 F. App'x 646 (9th Cir. 2010) ........................................................... 12

*Rodriguez v. West Publ'g Corp.*,
563 F.3d 948 (9th Cir. 2009) ................................................................. 20

*Shames v. Hertz Corp.*,
No. 07-cv-2174-MMA (WMC),
2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) .................................... 22, 27

*Stuart v. RadioShack Corp.*,
No. C-07-4499 EMC, 2010 WL 3155645 (N.D. Cal. Aug. 9, 2010) ................. 27

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
8 F.2d 403 (9th Cir. 1990) ..................................................................... 26

*Van Gerwen v. Guarantee Mut. Life Ins.*,
  214 F.3d 1041 (9th Cir. 2000).................................................................................21, 28

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002)...........................................................................................32

*Weinberger v. Kendrick,*
  698 F.2d 61 (2d Cir. 1982) ...............................................................................................17

<u>Statutes and Rules</u>

Fed. R. Civ. P. 23(e) .................................................................................................................15

Fed. R. Civ. P. 23(h).................................................................................................................21

<u>Other Authorities</u>

Manual for Complex Litigation (Fourth) § 11.423 (2004)......................................................19

Manual for Complex Litigation (Fourth) § 13.12 (2004)........................................................19

3:11-md-02258-AJB-MDD

Representative Plaintiffs Scott Lieberman, Kyle Johnson, Arthur Howe, Adam Schucher, Rebecca Mitchell, Christopher Wilson, James Wright, Robert Bova, Christian Kalled, Christopher Munsterman, and Timothy Whyland (collectively, "Plaintiffs"), individually and on behalf of the Settlement Class (as defined in the Settlement Agreement and stated below),[1] by and through Co-Lead Settlement Class Counsel, respectfully submit this memorandum of points and authorities in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Costs, and Expenses.

## **INTRODUCTION**

The Settlement resolves this 65-case multidistrict litigation and provides valuable relief to the millions of PSN Accountholders, SOE Accountholders, and Qriocity Accountholders affected by the attacks on the Sony Entities' computer network in April 2011. Under the Settlement, depending on whether a Settlement Class Member qualifies as a PSN Accountholder, SOE Accountholder, or Qriocity Accountholder, Settlement Class Members are eligible to receive, among other benefits, free PS3 and PSP games, free PS3 themes,[2] free subscriptions to *PlayStation Plus*, a $9.99 cash payment, free SOE Station Cash, and the payment of documented, unreimbursed Identity-Theft-Related-Charges shown to have more likely than not resulted from the Intrusions. On July 10, 2014, after briefing, a hearing, and due consideration, the Court granted preliminary approval of the Settlement Agreement. *See* Order Granting Preliminary Approval of Class Action Settlement ("Preliminary Approval Order") [D.E. #193].

---

[1] The definitions contained in the Settlement are incorporated herein by reference.

[2] PS3 themes customize the background, font, and icons on the PS3 user interface.

The Court-approved Notice Program has been extremely effective. The program was designed and implemented by one of the largest and most respected class action notice providers in the country. Under the program, notice was delivered directly to Settlement Class Members via 24,895,248 emails and 13,151 postcards. Notice appeared in three nationally circulated consumer magazines (*Maxim*, *Sports Illustrated,* and *Game Informer*) and in targeted local newspapers published in U.S. territories and possessions. Notice was also provided on the Internet, including on social networking sites, through an extensive and targeted Internet advertising campaign, and via a press release was issued that reached approximately 5,000 media outlets and 5,400 websites. A website dedicated to the Settlement was established, as well as a toll-free hotline that Settlement Class Members could use to call about the Settlement. The Notice Program, as implemented, is estimated to have reached 83.4% of potential Settlement Class Members an average of 3 times each.

Settlement Class Members' reaction to the Settlement has been overwhelmingly positive. To date, of the estimated tens of millions of Settlement Class Members, only 40 opt-outs and one "objection"[3] have been received.[4] The Settlement readily exceeds the required standard of fair, reasonable, and adequate.

Representative Plaintiffs' request for attorneys' fees, costs, and expenses is reasonable and in accord with applicable law.[5] The requested $2,750,000 for

---

[3] The sole objection was accompanied by and part of an opt-out request. Persons who opt-out of the Settlement have no right to object to the Settlement.

[4] Opt-outs and objections to the settlement must be postmarked no later than April 10, 2015. Plaintiffs will file a reply brief addressing all objections to the Settlement no later than April 24, 2015.

[5] Co-Lead Settlement Class Counsel are reporting only common benefit attorney time, costs, and expenses expended after November 29, 2011. *See* Order at 6 (Nov. 29, 2011) [D.E. #60] ("[Only time spent on matters common to all claimants in MDL 2258 will be considered in determining

3:11-md-02258-AJB-MDD

attorneys' fees, costs, and expenses equates to $77,724 for costs and expenses and $2,672,276 for attorneys' fees for a negative lodestar multiplier of .80.[6] Given the time and expense required to litigate this matter to successful resolution, the complexity of the issues involved in this MDL, and the excellent benefits provided for under the Settlement, the requested amounts are reasonable and appropriate.

Respectfully, the Court should grant final approval of the Settlement and award the attorneys' fees, costs, and expenses as requested herein.

## BACKGROUND

## I.    Nature of the Litigation

On April 26, 2011, Sony Network Entertainment International LLC ("SNE") and Sony Computer Entertainment America LLC ("SCEA") announced that an unauthorized person or persons had perpetrated an attack on the computer network systems used to provide PlayStation Network ("PSN") services, and that certain PSN and Qriocity accountholder information appeared to have been accessed as a result of the unauthorized intrusion ("the PSN Intrusion"). On May 2, 2011, Sony Online Entertainment LLC ("SOE") announced that an unauthorized person or persons had perpetrated an attack on the SOE network, and that certain SOE accountholder information appeared to have been accessed as a result of the unauthorized intrusion ("the SOE Intrusion") (together with the PSN Intrusion, the "Intrusions"). Services on both the PSN and SOE networks were suspended and unavailable to accountholders for a period of approximately two to three weeks.

---

fees. No time spent on developing or processing any case for an individual client (claimant) will be considered or should be considered.").

[6] This figure was calculated as follows: (1) total costs and expenses incurred by Co-Lead Settlement Class Counsel and their firms were subtracted from the requested award ($2,750,000 - $77,724); and (2) the resulting figure ($2,672,276) was divided by the collective lodestar reported by Co-Lead Settlement Class Counsel and their firms ($3,320,002). The complete formula is as follows: ($2,750,000 - $77,724) / $3,320,002 = .80.

3:11-md-02258-AJB-MDD

Operations were restored on the networks by on or about May 15, 2011. A "Welcome Back" package of various benefits (including the opportunity to obtain identity theft insurance) thereafter was made available to accountholders of both networks.

## II. Procedural History

Following announcement of the Intrusions, 65 class action complaints were filed asserting claims against the Sony Entities in courts throughout the country. On August 8, 2011, the Judicial Panel on Multidistrict Litigation transferred all related actions to the Court for coordinated or consolidated pretrial proceedings. On November 29, 2011, after reviewing applications for leadership positions, the Court appointed Co-Lead Settlement Class Counsel as the Plaintiffs' Steering Committee. [D.E. #60].

On January 31, 2012, a Consolidated Class Action Complaint ("CAC") was filed. [D.E. #78]. The Sony Entities responded with a motion to dismiss the CAC. [D.E. #94]. After briefing and a hearing on the Sony Entities' motion, the Court entered an Order dismissing all counts of the CAC, but granting Plaintiffs' leave to amend certain counts. [D.E. #120].

On December 10, 2012, Plaintiffs filed their First Amended Consolidated Class Action Complaint ("FAC"), asserting 51 counts against the Sony Entities. [D.E. #128]. The Sony Entities again moved to dismiss. [D.E. #135]. On January 21, 2014, after briefing and a hearing on the matter, the Court entered an Order granting in part and denying in part Defendants' motion to dismiss the FAC. [D.E. #167]. The Court denied the Sony Entities' motion to dismiss with respect to the following causes of action: (1) California Unfair Competition Law ("UCL"), California False Advertising Law ("FAL"), and California Consumers Legal Remedies Act claims "based on misrepresentations and omissions regarding reasonable network security and industry-standard encryption" and Plaintiffs'

3:11-md-02258-AJB-MDD

ability to seek restitution under the UCL and FAL; (2) Florida Deceptive and Unfair Trade Practices Act and Michigan Consumer Protection Act claims requesting declaratory and injunctive relief; (3) Missouri Merchandising Practices Act claim seeking damages and equitable relief; (4) New Hampshire Consumer Protection Act claim seeking individual damages and injunctive relief; (5) California Database Breach Act claims requesting injunctive relief; and (6) partial performance/breach of the covenant of good faith and fair dealing claims. Order at 97 [D.E. #167].

The Settling Parties engaged in several rounds of settlement discussions prior to reaching the Settlement. These discussions began over three years ago and have included a number of face-to-face meetings and telephone conference calls. During the fall of 2012, the Settling Parties engaged in mediation and subsequently continued settlement negotiations. After the Court's ruling on the Sony Entities' motion to dismiss the FAC, the Settling Parties engaged in renewed settlement discussions. The Settlement was reached as a result of such discussions.

## III. Summary of the Settlement

### A. The Settlement Class

The Court's Preliminary Approval Order certifies the following Settlement Class:

> All Persons residing in the United States who had a PlayStation Network account or sub-account, a Qriocity account, or a Sony Online Entertainment account at any time prior to May 15, 2011.

Preliminary Approval Order at 2; *see also* SA ¶ 1.23.[7] "United States" as used in the Settlement Agreement includes the District of Columbia and territories of the United States. SA ¶ 1.29. Excluded from the Settlement Class are the Sony Entities

---

[7] References to particular paragraphs of the Settlement Agreement are prefixed by "SA ¶".

3:11-md-02258-AJB-MDD

and their officers and directors, and Persons who timely and validly request exclusion from the Settlement Class. SA ¶ 1.23.

### B. Settlement Benefits

The Settlement was structured to provide Settlement Class Members with valuable relief tailored to the facts of this litigation and to allow Settlement Class Members to submit claims online through the Settlement website or through U.S. Mail, at their discretion. The deadline for submitting claims has not yet elapsed and is defined as sixty (60) days after the "Effective Date," which is in turn defined by reference to the date final approval is granted, judgment is entered, and completion of appellate processes, if any. SA ¶ 1.6, 1.7, and 8.7(a). The Settlement includes the following benefit provisions:[8]

#### 1. PSN Accountholder Benefits

*PSN User Benefits for "Welcome Back" Non-Participants*. PSN Claimants who did not participate in the "Welcome Back" package offered to PSN Accountholders had the opportunity to select two of the following PSN Benefit Options (*i.e.*, either two separate PSN Benefit Options or two instances of one PSN Benefit Option): (1) one of the following PlayStation 3 ("PS3") or PlayStation Portable ("PSP") games (the "Game Benefit"): *Dead Nation*[TM] (PS3), *inFAMOUS*[TM], *LittleBigPlanet*[TM], *Super Stardust*[TM] HD (PS3), *rain*[TM] (PS3), *Puppeteer*[TM] (PS3), *Invizimals*[TM]: *Lost Kingdom* (PS3), *God of War*® HD (PS3), *LittleBigPlanet*[TM] (PSP), *ModNation*[TM] *Racers* (PSP), *Killzone*® *Liberation* (PSP), *WipEout*® *Pure* (PSP), and *Syphon Filter*®: *Dark Mirror* (PSP); (2) three PlayStation 3 themes selected from the following list (the "Theme Benefit"): *WipEout*® *HD Dynamic Theme*, *UNCHARTED 3: Drake's Deception*[TM] *Dynamic*

---

[8] *See* SA ¶ 8.1 (as amended by Amendment to the Settlement dated June 9, 2014).

*Theme*, *TOKYO JUNGLE*[TM] *Dynamic Theme*, *The Last Of Us*[TM] *Dynamic Theme*, *Ratchet & Clank® Dynamic Theme, and UNCHARTED 2: Among Thieves*[TM] *Dynamic Theme*; or (3) a three month subscription to the *PlayStation Plus* service free of charge ("the *PlayStation Plus* New Subscription Benefit").[9] SA ¶¶ 1.8, 1.17, 1.27, 2.1(c)(2), 2.1(c)(3); Detailed Notice, available at: https://psnsoesettlement.com/english/Portals/0/Documents/141210-2444-LF-Final-approvedbyclient.pdf (last visited Mar. 31, 2015).

Claims by PSN "Welcome Back" Non-Participants are to be honored on a first-come, first-served basis subject to an aggregate cap of $6,000,000. SA ¶ 2.1(c)(2). Each Game Benefit will be credited at $9.00 per game with the exception that if, at the time of distribution, the PSN's retail price for a game listed on the Claim Form is less than $9.00, the corresponding credit relating to such game will be proportionally reduced. SA ¶ 1.8. Each Theme Benefit will also be credited at $9.00 with the exception that if, at the time of distribution, the PSN's retail price for a theme listed on the Claim Form is less than $3.00, the corresponding credit relating to such theme will be proportionally reduced. SA ¶ 1.27. The *PlayStation Plus* New Subscription Benefit will be credited at $9.00 per *PlayStation Plus* New Subscription Benefit. SA ¶ 1.17. If the aggregate $6,000,000 cap is reached, PSN Claimants submitting valid claims after the cap is reached will receive a free one-month subscription to the *PlayStation Plus* service, which currently costs $9.99 per month. SA ¶¶ 1.16, 2.1(c)(5).

*PSN User Benefits for "Welcome Back" Participants*. PSN Claimants who participated in the "Welcome Back" package are eligible to receive one Game

---

[9] The *PlayStation Plus* New Subscription Benefit was available only to Settlement Class Members who at the time of submitting their claim had not previously subscribed to *PlayStation Plus*. SA ¶ 1.17.

Benefit, Theme Benefit, or *PlayStation Plus* New Subscription Benefit. SA ¶¶ 1.8, 1.17, 1.27, 2.1(c)(1), 2.1(c)(3). Claims by PSN "Welcome Back" participants will be honored on a first-come, first-served basis subject to an aggregate cap of $4,000,000. SA ¶ 2.1(c)(2). In the event the aggregate $4,000,000 cap is reached, PSN Claimants submitting valid claims after such cap is reached will receive a free one-month subscription ($9.99 value) to the *PlayStation Plus* service. SA ¶¶ 1.16, 2.1(c)(5).

*Unused PSN Wallet Credits*. PSN Claimants with a PSN Account that was logged onto at least once during the period of time from January 1, 2011 to May 14, 2011, that was not accessed between May 15, 2011 and April 18, 2014 (the date of the Settlement) on account of the Intrusions, are eligible to receive payment in cash equal to any Unused PSN Wallet Credit in their PSN Account(s) for which the Unused PSN Wallet Credit in the account is equal to or exceeds $2.00. SA ¶ 2.1(a).

*Unreimbursed Third-Party Services*. PSN Claimants who used their PSN account to access third-party service providers Netflix or Hulu Plus at any time from January 1, 2011 to and including May 14, 2011, and who provide documentation that they paid for such service during the period of time when the PSN was offline from April 20, 2011 through and including May 14, 2011, and were unable to and did not access such services during this period of time, are eligible to receive either: (1) a Theme Benefit (claimant has a choice of three PlayStation themes from a selection of six themes); or (2) a *PlayStation Plus* New Subscription Benefit (a subscription to the *PlayStation Plus* service for 3 months for claimants who have not previously subscribed to *PlayStation Plus*). SA ¶¶ 1.27, 1.17, 2.1(b).

*Per Accountholder Benefit Availability*. PSN benefits are available to eligible PSN Claimants for valid claims on a per Settlement Class Member basis,

3:11-md-02258-AJB-MDD

regardless of the number of PSN accounts a PSN Claimant has or had. SA ¶ 2.4(e)(i). PSN Welcome Back non-participants and participant benefits together are limited to three per household. SA ¶ 2.1(c)(4).

### 2. Qriocity Accountholder Benefits

The Settlement provided that each Qriocity Accountholder filing a valid claim would receive one free month of Music Unlimited service (the music portion of the Qriocity service). SA ¶ 2.2. The Sony Entities have advised that the Music Unlimited service was discontinued in the ordinary course of business on March 29, 2015. Because the Music Unlimited service is no longer available, the Settling Parties agreed that Settlement Class Members submitting valid claims for the Qriocity User Benefit shall receive a $9.99 cash payment, which is the retail value of the previously offered Music Unlimited service. A copy of the letter agreement between the Settling Parties explaining and clarifying that benefit is attached hereto as Exhibit A.

### 3. SOE Accountholder Benefits

*SOE User Benefit.* SOE Claimants are eligible to receive $4.50 worth of "Station Cash" (*i.e.*, 450 units of Station Cash) to be credited to the SOE Claimant's Account. SA ¶ 2.3(b). Station Cash is a virtual currency that players can use to purchase game items through the in-game marketplace in almost all SOE titles.[10] If valid claims for SOE User Benefits exceed $4,000,000 the amount of each SOE User Benefit under this subparagraph shall be proportionately reduced. SA ¶ 2.3(b). This benefit was available to eligible SOE Claimants for

---

[10] On February 2, 2015, Sony publicly announced the sale of SOE to an entity affiliated with principals of a private equity firm, Columbus Nova. SOE continues to exist as the same corporate entity, subject only to this change in ownership and an accompanying change in name to Daybreak Game Company LLC ("Daybreak"). SOE (now Daybreak) remains a party to the Settlement and is subject to its terms, including all requirements that it will continue to honor the obligations under the Settlement.

3:11-md-02258-AJB-MDD

valid claims on a per Settlement Class Member basis, regardless of the number of SOE accounts an SOE Claimant has or had. SA ¶ 2.4(e)(iii).

*Unused Wallet Credit Payments*. SOE Claimants with an SOE Account that was logged onto at least once during the period of time from January 1, 2011 to May 14, 2011, that was not accessed between May 15, 2011 and April 18, 2014 (the date of the Settlement) on account of the SOE Intrusion, are eligible to receive payment in cash equal to any Unused SOE Wallet Credit in their SOE Account(s) for which the Unused SOE Wallet Credit in the account is equal to or exceeds $2.00. SA ¶¶ 2.1(a), 2.3.

### 4. Reimbursement of Identity Theft Losses

The Sony Entities agreed to reimburse Settlement Class Members for claimed, documented, and unreimbursed Identity-Theft-Related-Charges,[11] not to exceed $2,500 per claim, which are proven by the Settlement Class Member more likely than not to have directly and proximately resulted from the PSN Intrusion or the SOE Intrusion and not from any other source. SA ¶ 2.5. Valid claims under this provision are subject to an aggregate cap of $1,000,000. SA ¶ 2.5(d).

### 5. The Costs of Notice and Claims Administration

Under the Settlement, the Sony Entities were obligated to pay all costs of Notice, up to a cap of $1,250,000, and all costs of claims administration. SA ¶¶ 3.2, 8.4. The actual costs of Notice, as confirmed by the Notice Specialist, Kinsella Media, LLC, amounted to $1,249,622.

---

[11] "Identity-Theft-Related-Charges" means out-of-pocket payments (not otherwise reimbursed) for expenses that are incurred as a direct result of someone assuming the Settlement Class Member's identity and taking out a line of credit, establishing and using a new financial account, or otherwise obtaining monies and other things of value fraudulently in the name of the Settlement Class Member (other than unauthorized charges on a payment card account associated with a Settlement Class Member's PSN Account, Qriocity Account or SOE Account). SA ¶ 2.5(a).

3:11-md-02258-AJB-MDD

### 6. Attorneys' Fees, Costs, and Expenses

Pursuant to the Settlement, the Sony Entities agreed to pay Co-Lead Settlement Class Counsel, subject to Court approval, up to the amount of $2,750,000 for attorneys' fees, costs, and expenses. SA ¶ 7.2. The Settling Parties did not discuss the amount of attorneys' fees, costs, and expenses until after the substantive elements of the Settlement had been agreed upon. SA ¶ 7.1. The amounts of any award of attorneys' fees, costs, and expenses were intended to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement. SA ¶ 7.5.

### C. Confirmatory Discovery

Pursuant to the Settlement, Co-Lead Settlement Class Counsel were entitled to reasonable confirmatory discovery from the Sony Entities to confirm their assessment of the Settlement as fair, reasonable, and adequate. SA ¶ 10.4.

At Co-Lead Settlement Class Counsel's request, the Sony Entities provided Co-Lead Settlement Class Counsel with eight boxes of documents containing detailed, non-public information regarding the Intrusions and made Jason Harkins, the Chief Security Officer at Sony Network Entertainment International, LLC, and Rich Lawrence, the Chief Technology Officer at Sony Online Entertainment, available for interview. These individuals provided detailed information about SNE and SOE, respectively, in regards to: (1) overview of the PSN and SOE systems, including the declining balance wallet feature; (2) the timeline of the Intrusions and public announcements; (3) the Welcome Back offer; (4) details of the Sony Entities' investigation of the Intrusions; (5) each company's security profile, system architecture, security teams, PCI compliance, and diligence before and after the Intrusions; (6) the scope of the Intrusions, including what information was and was not placed at risk of compromise; (7) the "DDos attacks" experienced before and after the Intrusions; (8) the sophistication of the hackers; and (9) the

3:11-md-02258-AJB-MDD

number of Settlement Class Members and the associated contact information possessed by the Sony Entities.

At the conclusion of the confirmatory discovery process, Co-Lead Settlement Class Counsel determined that the settlement was fair, reasonable, and adequate.

### D. The Court-Approved Notice Program Was Substantial and Effective

Where a Class has been certified under Fed. R. Civ. P. 23(b)(3), such as the Settlement Class, "the [C]ourt must direct to class members the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2). Notice serves to "afford members of the class due process which, in the context of the Rule 23(b)(3) class action, guarantees them the opportunity to be excluded from the class action and not be bound by any subsequent judgment." *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–74 (1974)). "[D]ue process requires reasonable effort to inform affected class members through individual notice, not receipt of individual notice." *Rannis v. Recchia*, 380 F. App'x 646, 650 (9th Cir. 2010).

Here, the Court-approved Notice Plan was extremely effective. The Notice Plan was developed and implemented by Kinsella Media, LLC, one of the largest and most respected class action notice providers in the country. As summarized herein and explained in detail in the Declaration of Shannon R. Wheatman, Ph.D ("Wheatman Decl."), Notice was provided in accordance with the Court-approved Notice Plan at a cost of $1,249,622. Wheatman Decl. ¶ 4. Pursuant to the Notice Plan, direct Notice was delivered via email and postcard, publication notice appeared in leading consumer magazines, notice was published in targeted local newspapers in U.S. territories and protectorates, notice was provided on Internet websites, a press release was issued, and a settlement website and toll-free number

3:11-md-02258-AJB-MDD

were established. *Id.* ¶¶ 8–24. The Notice Program is estimated to have reached 83.4% of potential Settlement Class Members an average of 3 times each. *Id.* ¶¶ 24, 32–33. Such Notice readily satisfies the "best practicable" standard. *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, at 3 (2010) (recognizing 70% reach to be reasonable).

Summary Notice of the Settlement was emailed to PSN Accountholders and Qriocity Accountholders who had an email address associated with their accounts and to SOE Accountholders who provided email information associated with their accounts. *Id.* ¶¶ 9–10. Starting on January 22, 2015, a total of 45,497,612 Email Notices were sent to Settlement Class Members. *Id.* ¶ 9. As of March 30, 2015, a total of 24,895,248 Email Notices had been delivered. *Id.* Additionally, 14,170 Postcard Notices (13,151 of which were delivered) were sent to SOE Accountholders who did not have email information associated with their SOE account, but did provide sufficient information for a postal mailing. *Id.* ¶¶ 9, 11.

Publication Notice appeared in the following consumer magazines with a combined circulation of 8,500,000: *Maxim*, *Sports Illustrated*, and *Game Informer*. *Id.* ¶ 13. Publication Notice also appeared in one-quarter page advertisements (or equivalent), translated into Spanish where necessary, in targeted local newspapers published in U.S. territories and possessions. *Id.* ¶ 16. Additionally, a press release was distributed on PR Newswire's Full National Circuit, reaching approximately 5,000 media outlets and 5,400 websites, resulting in 252 news stories appearing on news websites, news services websites, and other media outlets. *Id.* ¶ 26. All print advertising of the Settlement included the Settlement website address, www.psnsoesettlement.com, and a toll-free number for potential Settlement Class Members to call with questions regarding or to request information relating to the Settlement. *Id.* ¶ 18.

The Notice Plan provided that Notice would also appear in *PCGamer* magazine. *Id.* ¶ 15. Due to an error on its part, *PCGamer* inadvertently failed to run the advertisement. *Id.* To make up for this omission, *PCGamer* delivered 750,000 impressions of the Notice on its website and the Notice Provider also ran an additional 1,000,000 targeted impressions on Facebook.com. *Id.* The online substitutions were a positive element for the Notice Program. *Id.*

The Notice Program included a substantial Internet component. Notice of the Settlement was provided through Internet advertising on, *inter alia*, Gaming Networks, Online Networks, and mobile/table applications and websites, delivering 435,802,717 impressions. *Id.* ¶ 19. Targeted Notice of the Settlement was placed on social media websites, including Facebook.com, Twitter.com, and Reddit.com. *Id.* ¶ 21. Notice was also advertised through Google Display Network on a variety of news sites, blogs, and other niche sites to reach potential Settlement Class Members. *Id.* ¶ 22.

On January 21, 2015, a Settlement website was established at www.psnsoesettlement.com. *Id.* ¶ 27. Notice was posted on the Settlement website in English and Spanish. *Id.* The Settlement website allowed Settlement Class Members to view information about the Settlement, including copies of the Short Form Notice, Detailed Notice, Settlement Agreement (and all amendments), and Preliminary Approval Order, and to view and file claim forms. *See id.*; www.psnsoesettlement.com. The Settlement website also contains answers to commonly asked questions, and includes contact information for the Claims Administrator. *See id.* As of March 31, 2015, there have been 782,346 unique visitors to the Settlement website. Wheatman Decl. ¶ 27.

On January 21, 2015, a toll-free number was established. Wheatman Decl. ¶ 28. The number allowed Settlement Class Members to speak with a live operator in English or Spanish. *Id.* The number also allowed Settlement Class Members to

3:11-md-02258-AJB-MDD

listen to answers to frequently asked questions, and to request that a copy of the Claim Forms or Detailed Notice be mailed to them. *Id.* As of March 31, 2015, there had been 4,599 calls to the toll-free number. *Id.*

Altogether, it is estimated that the Notice Program reached 83.4% of potential Settlement Class Members an average of 3 times each. *Id.* ¶¶ 24, 31–32. This figure does not include the additional reach generated by the press release and Settlement website, because the effect of such exposures is not calculable. *Id.* ¶ 31. The Notice Program, with its extensive and thorough efforts to reach as many Settlement Class Members as possible, provided the Settlement Class with the best notice practicable under the circumstances. *Id.* ¶¶ 30, 35–38.

## ARGUMENT

## I.    Final Approval of the Settlement is Appropriate

A class action settlement may only be approved after a hearing and a finding that the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e). "A strong judicial policy favors settlement of class actions." *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 972 (E.D. Cal. 2012).

When determining whether a settlement is fair, reasonable, and adequate, courts consider the following factors:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) any opposition by class members.

*Id.* at 974–75 (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)). Analysis of these factors here supports that the Settlement satisfies the required standard of fair, reasonable, and adequate.

## A. The Strength of Plaintiffs' Case and the Risk, Complexity, and Likely Duration of Future Litigation

Balancing the risks of continued litigation against the immediacy and certainty of the significant recovery provided for by the Settlement supports that the Settlement should be approved. When reviewing a class action settlement agreement:

> The court shall consider the vagaries of the litigation and compare the significance of immediate recovery by way of compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, it has been held proper to take the bird in hand instead of a prospective flock in the bush.

*Grant v. Capital Mgmt. Servs., L.P.*, No. 10-CV-WQH BGS, 2014 WL 888665, at *3 (S.D. Cal. Mar. 5, 2014) (citations and quotations omitted).

Plaintiffs and Co-Lead Settlement Class Counsel believe the claims asserted in the litigation have merit. They would not have fought so hard to advance their claims if it were otherwise. But they also recognize the substantial risks involved in continuing this litigation. The Sony Entities have aggressively maintained their position regarding standing, liability, and damages. They deny all three. Co-Lead Settlement Class Counsel are mindful of the inherent problems of proof and possible defenses to the claims asserted in the litigation, and recognize the difficulties in establishing liability on a class-wide basis through summary judgment and at trial.

Prosecuting this litigation through trial and appeal would be lengthy, complex, and impose significant costs on all parties. *See, e.g.*, *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000) (recognizing that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them"). Continued proceedings necessary to litigate this matter to final judgment would likely include substantial motion practice, extensive fact and expert discovery, class certification proceedings, dispositive motion practice and, of course, a trial

and appeal. Given the complex nature of the security breach at issue, a battle of the experts at trial is almost a certainty and, as such, continued proceedings would likely include substantial expert discovery and significant motion practice related to such. Also, considering the size of the Settlement Class and the amount of money at stake, any decision on the merits would likely be appealed, causing further delay, as it would require briefing and likely oral argument.

The Settlement, in contrast, delivers a real and substantial remedy that fairly, reasonably, and adequately addresses the situation confronting the members of the Settlement Class without the risk and delay inherent in prosecuting this matter through trial and appeal. Thus, this factor favors approval of the Settlement. *See Grant*, 2014 WL 888665, at *3; *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."); *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 455 (E.D. Pa. 1990) (approving a class action settlement because, in part, the settlement "will alleviate . . . the extraordinary complexity, expense and likely duration of this litigation").

## B. The Amount Offered by the Settlement

The Settlement provides for extraordinary relief. All Settlement Class Members have the opportunity to submit claims for relief under the Settlement, and the Settlement includes relief specifically tailored to PSN Accountholders, Qriocity Accountholders, and SOE Accountholders. The benefits made available under the Settlement include, *inter alia*, the option to choose, depending on the claimants' individual circumstances, free PS3 and PSP games, free PS3 themes, a free subscription to *PlayStation Plus*, a cash payment of $9.99, and free SOE Station Cash. The Settlement also delivers important peace of mind and security for Settlement Class Members by providing for payment of documented and unreimbursed Identity-Theft-Related-Charges that are proven more likely than not

3:11-md-02258-AJB-MDD

to have resulted from the Intrusions, pursuant to a fair and clear claims process. Additionally, under the Settlement, the Sony Entities will bear all costs of Notice, the Costs of Claims Administration, and Plaintiffs' attorneys' fees, costs, and expenses.

The significant benefits offered under the Settlement support final approval.

### C. The Extent of Discovery Completed and the Stage of the Proceedings

The first cases in this MDL litigation were filed almost four years ago. A number of Co-Lead Settlement Class Counsel have significant experience in data breach consumer class actions such as this and are well-informed of the legal claims at issue and the risks of this case. Since their appointment by the Court, Co-Lead Settlement Class Counsel have been actively and aggressively advancing this matter. Two amended consolidated class action complaints were filed and the Court has ruled on motions to dismiss relating to each such complaint after extensive briefing.

The FAC, which is the operative complaint in this MDL, contains 515 paragraphs and asserts 51 counts against the Sony Entities. [D.E. #128]. On January 21, 2014, after briefing, a hearing, and careful and due consideration, the Court entered a 97-page Order granting in part and denying in part Defendants' motion to dismiss the FAC. [D.E. #167]. The Court denied the Sony Entities' motion to dismiss with respect to the following causes of action: (1) California Unfair Competition Law, California False Advertising Law, and California Consumers Legal Remedies Act claims "based on misrepresentations and omissions regarding reasonable network security and industry-standard encryption" and Plaintiffs' ability to seek restitution under the UCL and FAL; (2) Florida Deceptive and Unfair Trade Practices Act and Michigan Consumer Protection Act claims requesting declaratory and injunctive relief; (3) Missouri

3:11-md-02258-AJB-MDD

Merchandising Practices Act claim seeking damages and equitable relief; (4) New Hampshire Consumer Protection Act claim seeking individual damages and injunctive relief; (5) California Database Breach Act claims requesting injunctive relief; and (6) partial performance/breach of the covenant of good faith and fair dealing claims. Order at 97 [D.E. #167].

Co-Lead Settlement Class Counsel and counsel for Defendants engaged in several rounds of settlement negotiations during the past two years. Throughout the settlement negotiations, Co-Lead Settlement Class Counsel pursued informal discovery from Defendants that was appropriately targeted at information relevant to the settlement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement.") (citations and quotations omitted); *see also* Manual for Complex Litigation (Fourth) § 13.12 (2004) (recognizing that the benefits of settlement are diminished if it is postponed until discovery is completed and approving of targeting early discovery at information needed for settlement negotiations). Informal discovery, of course, is a recognized method of minimizing the cost, delay, and burden associated with formal discovery. *See* Manual for Complex Litigation (Fourth) § 11.423 (2004). Indeed, to further such ends, courts are to "encourage counsel to exchange information, particularly relevant documents, without resort to formal discovery." *Id.* In addition to informal discovery, Co-Lead Settlement Class Counsel have also collected and reviewed publicly-available information regarding the parties and claims at issue.

As detailed above in Section III.C and pursuant to the Settlement, Co-Lead Settlement Class Counsel also conducted confirmatory discovery. SA ¶ 10.4. The confirmatory discovery process confirmed to Co-Lead Settlement Class Counsel

3:11-md-02258-AJB-MDD

that they relied on accurate information when reaching the Settlement and reaffirmed their conclusion that the Settlement is fair, reasonable, and adequate.

This factor favors final approval of the Settlement.

### D. The Views and Experience of Counsel

"Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's outcome in litigation." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 697 (9th Cir. 2009). When both parties are represented by experienced counsel, their mutual desire to adopt a proposed settlement's terms "while not conclusive, 'is entitled to significant weight.'" *Arnold v. Fitflop USA, LLC*, No. 11-CV-0973 W KSC, 2014 WL 1670133, at *7 (S.D. Cal. Apr. 28, 2014) (quoting *Bros. v. Cambridge Lee Indus., Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985)).

The Settlement is supported by experienced and well-qualified counsel. The Court appointed Co-Lead Settlement Counsel as the Plaintiffs' Steering Committee after a selection process that involved numerous attorneys applying for leadership positions. *See* Order at 6 (Nov. 29, 2011) [D.E. #60]. The collective experience of Co-Lead Settlement Class Counsel leading consumer class actions and other complex litigation matters, including data security breach class actions, is extraordinary.[12] The Sony Entities are similarly well-represented. Harvey Wolkoff and Mark Szpak each have significant experience litigating class actions, and Ropes & Gray LLP is consistently recognized as one of the top law firms in the country. Co-Lead Settlement Class Counsel and counsel for the Sony Entities support the Settlement and believe the Settlement to be fair, reasonable, and adequate.

---

[12] *See* Decl. of Ben Barnow, Exh. C; Decl. of Stuart A. Davidson, Exh. C; Decl. of Timothy G. Blood, Exh. C; Decl. of David McKay, Exh. C; Decl. of Adam J. Levitt, Exh. C; Decl. of Fred T. Isquith, Exh. C; Decl. of Gayle M. Blatt, Exh. C; Decl. of Brian R. Strange, Exh. C.

The support of experienced counsel favors final approval of the Settlement.

### E. The Reaction of Absent Class Members

Settlement Class Members' reaction to the Settlement has been overwhelmingly positive. As of April 1, 2015, only one "objection" had been received, which is almost certainly invalid, because it was accompanied by an opt-out request from the same person and opt-outs cannot object to the Settlement. To be timely, all opt-outs and objections to the Settlement must be post-marked no later than April 10, 2015. Preliminary Approval Order at 7. On or before April 24, 2015, Co-Lead Settlement Class Counsel will file a reply brief addressing any objections to the Settlement.

## II. The Requested Award of Attorneys' Fees, Costs, and Expenses is Reasonable

Co-Lead Settlement Class Counsel request that the Court approve payment by the Sony Entities of attorneys' fees, costs, and expenses in the amount of $2,750,000. Sony has agreed to pay such amount in addition to providing all other benefits under the Settlement, subject to Court approval.

Courts presiding over certified class actions "may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Where no common fund exists, courts employ a lodestar analysis to analyze class counsel's fee request. A lodestar analysis begins with multiplying the number of hours reasonably expended on the litigation by counsel's reasonable hourly rates. *Chaikin v. Lululemon USA Inc.*, No. 3:12-CV-02481-GPC-MDD, 2014 WL 1245461, at *6 (S.D. Cal. Mar. 15, 2014) (quoting *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996)). That figure—the lodestar—is the presumptively reasonable fee amount. *See Van Gerwen v. Guarantee Mut. Life Ins.*, 214 F.3d 1041, 1045 (9th Cir. 2000).

Co-Lead Settlement Class Counsel and their firms reasonably incurred $77,724 in costs and expenses in furtherance of the litigation from November 29, 2011 to present.[13] A breakdown of these costs and expenses incurred is included on each of the Declarations of counsel attached hereto.[14] Plaintiffs respectfully request that they be awarded $77,724 to be reimbursed for these amounts expended. *See, e.g.*, *Shames v. Hertz Corp.*, No. 07-cv-2174-MMA (WMC), 2012 WL 5392159, at *20 (S.D. Cal. Nov. 5, 2012) (class counsel are entitled to reimbursement of costs and expenses reasonably incurred) (citations omitted).

Co-Lead Settlement Class Counsel and their firms spent in excess of 5,580 hours advancing this MDL from November 29, 2011 to present. Multiplying the total hours by the reasonable hourly rates charged by Co-Lead Settlement Class Counsel and their firms equates to a lodestar of in excess of $3,320,000. Subtracting costs and expenses incurred from $2,750,000, equates to a requested attorneys' fee award of $2,672,276 for a negative lodestar multiplier of .80.

The requested award is reasonable and appropriate considering the time and expense required to achieve successful resolution of this MDL matter, the complex nature and scope of this MDL, and the excellent benefits achieved by the Settlement.

---

[13] The Court's November 29, 2011 Order directs that "[O]nly time spent on matters common to all claimants in MDL 2258 will be considered in determining fees. No time spent on developing or processing any case for an individual client (claimant) will be considered or should be considered." Order at 6 [D.E. #60]. In compliance therewith, Co-Lead Settlement Class Counsel are only reporting time, costs, and expenses incurred on November 29, 2011 and thereafter.

[14] *See* Decl. of Ben Barnow, Exh. B; Decl. of Stuart A. Davidson, Exh. B; Decl. of Timothy G. Blood, Exh. B; Decl. of David McKay, Exh. B; Decl. of Adam J. Levitt, Exh. B; Decl. of Fred T. Isquith, Exh. B; Decl. of Gayle M. Blatt, Exh. B; Decl. of Brian R. Strange, Exh. B.

### A. Co-Lead Settlement Class Counsel and Their Firms Report Reasonably Spending in Excess of 5,580 Hours Advancing the Litigation

Attached in support of Plaintiffs' application for an award of attorneys' fees, costs, and expenses are the sworn declarations of Ben Barnow, Stuart A. Davidson, Timothy G. Blood, David McKay, Adam J. Levitt, Fred T. Isquith, Gayle M. Blatt, and Brian R. Strange (collectively, the "Attorney Declarations"). In each of these declarations, the declarant attorney attests to the total common benefit time his or her firm spent litigating this matter, the hourly rates, and years of experience of the attorneys from their firm. Exhibit D to the Barnow Declaration summarizes the total hours and lodestar reported by each declarant in furtherance of the litigation. Altogether, Co-Lead Settlement Class Counsel and their firm report having spent in excess of 5,580 hours advancing the matter. Additional time will also be spent and costs and expenses incurred in preparation for the Final Fairness Hearing, attending the Hearing itself, and in implementing the Settlement.

The Declaration of Ben Barnow details, on behalf of the Co-Lead Settlement Class Counsel, the significant time and labor required to bring this matter to successful resolution. The supporting declarations support that such time and effort was reasonably expended considering the number of cases, Plaintiff Steering Committee Counsel, and issues involved in this highly-publicized complex multidistrict litigation proceeding, and the number, novelty, and complexity of the data security breach and other consumer claims asserted in the litigation. Among other things, Co-Lead Settlement Class Counsel researched the unique issues pertaining to this litigation; interviewed clients and potential experts; researched and drafted complaints, including the 515 paragraph Amended Consolidated Complaint alleging 51 causes of action against the Sony Entities; and opposed two motions to dismiss filed by the Sony Entities. Barnow Decl. ¶¶ 27–

3:11-md-02258-AJB-MDD

28. The seriousness and completeness of those efforts contributed to a 97-page Order that is often cited by other courts today. *See* Order [D.E. #167].

Throughout the litigation, Co-Lead Settlement Class Counsel have worked to ensure the advancement of this matter in an efficient and effective manner. Barnow Decl. ¶ 16. Assignments were discussed and agreed upon to protect against duplication of efforts and to maximize the collective resources of Co-Lead Settlement Class Counsel and their firms, as well as applicable experience. *Id.*

The Settlement was reached after several rounds of extremely hard-fought negotiations occurring over a period of years. *Id.* ¶¶ 38–40. The negotiations involved, among other things, a number of in-person meetings and the assistance of a mediator. *Id.* In the FAC, Plaintiffs alleged the parties had reached an agreement in 2012, but the Sony Entities failed to negotiate attorneys' fees, costs, and expenses in good faith—a count that survived Defendants' motion to dismiss. *See* FAC ¶¶ 505–15 [D.E. #128]; Order at 97 (Jan. 21, 2014) (denying Sony Entities' motion to dismiss Plaintiffs' partial performance/breach of covenant of good faith and fair dealing claim). After entry of the Court's Order on Defendants' motion to dismiss the FAC, the Settling Parties renewed negotiations, resulting in the Settlement. Barnow Decl. ¶ 40.

Co-Lead Settlement Class Counsel's duties did not end when they signed the Settlement Agreement. *Id.* ¶¶ 42–50. Thereafter, they prepared and filed Plaintiffs' Motion for Preliminary Approval and related documents with the Court, and presented the matter to the Court. *Id.* ¶¶ 41–42. Pursuant to the Settlement and as detailed further herein at Section III.C., confirmatory discovery was conducted to confirm the accuracy of representations made during the settlement negotiation process. *Id.* ¶¶ 44–45. At the conclusion such process, Co-Lead Settlement Class Counsel reaffirmed their belief that the Settlement readily satisfies the standard of fair, reasonable, and adequate. *Id.* ¶ 45.

3:11-md-02258-AJB-MDD

Co-Lead Settlement Class Counsel also worked with the Notice Provider, the Claims Administrator, and counsel for the Sony Entities to effectuate the Settlement. *Id.* ¶ 43. For example, Co-Lead Settlement Class Counsel and counsel for the Sony Entities responded to questions from certain state attorney generals' offices regarding the Settlement and resolved those questions. *Id.* They and others from their firms communicated with potential Settlement Class Members seeking information regarding the Settlement. *Id.* Additional time will be spent drafting and filing Plaintiffs' reply brief in support of final approval, responding to any objections to the Settlement, traveling to and appearing at the Final Fairness Hearing, and resolving any appeals that may be filed. *Id.* ¶¶ 47–50.

Altogether, the hours expended by Co-Lead Settlement Class Counsel and their firms were, as supported by their declarations, reasonable and appropriate. This excellent and hard-fought Settlement finely tailored to the facts of this 65-case MDL leaves no serious doubt as to the appropriateness of the attorneys' fee, cost, and expense award requested.

## B. The Hourly Rates of Co-Lead Settlement Class Counsel and Their Firms are Reasonable

The hourly rates charged by Co-Lead Settlement Class Counsel and their firms are reasonable and appropriate. District courts look to the prevailing market rates in the forum in which they sit for similar work done by attorneys of comparable skill, experience, and reputation when assessing the reasonableness of attorneys' billing rates. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). Affidavits by plaintiff's counsel concerning prevailing rates in the community and rate determinations in other cases are sufficient evidence of the prevailing market rates in the community. *See Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*, No. 10-CV-419-GPC (WVG), 2014 WL 5438532, at *4 (S.D.

3:11-md-02258-AJB-MDD

Cal. 2014) (citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 8 F.2d 403, 407 (9th Cir. 1990)).

Each of the Attorney Declarations details the name, total number of hours expended, customary hourly rate, and years of experience of each attorney from his or her firm who worked on this matter from November 29, 2011 to present.[15] The hourly rates of Co-Lead Settlement Class Counsel and attorneys from their firms are reasonable, taking into consideration the experience and skill of such attorneys and market rates for such skill in the Southern District of California. Co-Lead Settlement Class Counsel are among the most experienced and successful class action plaintiff's attorneys in the country—particularly with respect to data breach and privacy cases—and were each specifically chosen by the Court to lead the prosecution of this 65-case MDL litigation. *See* Order [D.E. #60] (appointing Co-Lead Settlement Class Counsel as the Plaintiffs' Steering Committee); *see also* Decl. of Ben Barnow, Exh. C; Decl. of Stuart A. Davidson, Exh. C; Decl. of Timothy G. Blood, Exh. C; Decl. of David McKay, Exh. C; Decl. of Adam J. Levitt, Exh. C; Decl. of Gayle M. Blatt, Exh. C; Decl. of Brian R. Strange, Exh. C.

The billing rates of Co-Lead Settlement Class Counsel and their firms are consistent with rates that have been accepted as reasonable in this District and other district courts in numerous other class actions. *See, e.g.*, *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (affirming of attorney's fees where partners billed hourly rates of up to $875); *Morey v. Louis Vuitton N. Am., Inc.*, No. 11-cv-1517 WQH (BLM), 2014 WL 109194, at *6–7 (S.D. Cal. Jan. 9,

---

[15] *See* Decl. of Ben Barnow, Exh. A; Decl. of Stuart A. Davidson, Exh. A; Decl. of Timothy G. Blood, Exh. A; Decl. of David McKay, Exh. A; Decl. of Adam J. Levitt, Exh. A; Decl. of Fred T. Isquith, Exh. A; Decl. of Gayle M. Blatt, Exh. A; Decl. of Brian R. Strange, Exh. A.

3:11-md-02258-AJB-MDD

2014) (approving hourly rates of $675, $675, and $650 for three partners admitted

to practice in 2000, $500 for an associate admitted to practice in 2007, and $350

for an associate admitted to practice in 2011); *Chaikin v. Lululemon USA Inc.*, No.

3:12-cv-02481 GPC MDD, 2014 WL 1245461, at *6–7 (S.D. Cal. Mar. 17, 2014)

(approving hourly rates of $675 and $650 for two partners admitted to practice in

2000, $500 for an associate admitted to practice in 2000 and an associate admitted

to practice in 2002, and $350 for an associate admitted to practice in 2011);

*Hartless v. Clorox Co.*, 273 F.R.D. 630, 644 (S.D. Cal. 2011) (approving hourly

rates of Robbins Geller Rudman & Dowd, Blood Hurst & O'Reardon, and other

firms ranging from $675 for experienced partners to $100 for paralegal time);

*Stuart v. RadioShack Corp.*, No. C-07-4499 EMC, 2010 WL 3155645, at *6 (N.D.

Cal. Aug. 9, 2010) (approving $1.5 million fee award where the average hourly

rate was $708).

Robbins Geller Rudman & Dowd and Blood Hurst & O'Reardon, the firms

of Paul Geller and Tim Blood, respectively, have offices located in California. The

rates charged by Messrs. Geller's and Blood's firms are consistent with those

charged by other Co-Lead Settlement Class Counsel and their firms. Several

California courts have found the billing rates charges by Messrs. Geller's and

Blood's firms to be reasonable in class action cases. *See, e.g.*, *Hartless*, 273 F.R.D.

at 644 (approving hourly rates of Blood Hurst & O'Reardon, LLP); *Shames v.

Hertz Corp.*, No. 07-cv-2174-MMA (WMC), 2012 WL 5392159, at *18 (S.D. Cal.

Nov. 5, 2012) (same); *Dennis v. Kellogg Co.*, No. 09-cv-1786-L (WMC), 2013 WL

6055326, at *7 (S.D. Cal. Nov. 14, 2013) (approving hourly rates of Blood Hurst

& O'Reardon, LLP as "fall[ing] within typical rates for attorneys of comparable

experience"); *Johnson v. General Mills, Inc.*, No. SACV 10-00061-CJC(ANx),

2013 WL 3213832, at *6 n.3 (C.D. Cal. June 17, 2013) (approving hourly rates and

time spent by Robbins Geller Rudman & Dowd LLP and Blood Hurst &

O'Reardon, LLP, stating "[t]he Court has considered class counsel's rates and finds they are reasonable because of the experience of the attorneys and prevailing market rates") (citing Blood Hurst & O'Reardon, LLP's firm resume); *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087-BTM (KSC), 2014 WL 6473044, at *9 (S.D. Cal. Nov. 18, 2014) (approving the hourly rates of Blood Hurst & O'Reardon, LLP, stating "the hourly rates charged by Class Counsel are reasonable and are typical rates for attorneys of comparable experience"); Amended Final Order, *Negrete v. Allianz Life Ins. Co.*, No. CV-05-6838-CAS(MANx), at 26 (C.D. Cal. March 17, 2015) (finding the hourly rates charged by attorneys from Robbins Geller Rudman & Dowd to be reasonable for complex class action litigation in Los Angeles).

The 2013 National Law Journal ("NLJ") Billing Survey attached hereto as Exhibit B further supports the reasonableness of the rates charged by Co-Lead Settlement Class Counsel and their firms. The NLJ Billing Survey includes hourly rates billed at 17 national law firms based in California. The partners at such firms reported billing rates of as high as $1,195 per hour, and the average top billing rate for partners reported by such firms was $778. The survey further supports the reasonableness of the billing rates reported by Co-Lead Settlement Class Counsel and other attorneys from their firms.

### C. The Requested Award Is Reasonable and Appropriate

As noted above, the lodestar of Co-Lead Settlement Class Counsel and their firms is presumptively reasonable. *Van Gerwen*, 214 F.3d at 1045. In rare or exceptional cases, the Court may adjust the lodestar amount upward or downward, (*see id.*), based on one or more of the following considerations:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the

3:11-md-02258-AJB-MDD

circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Morales*, 96 F.3d at 363 n.8 (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)). Consideration of such factors indicates that a lodestar adjustment is not necessary or appropriate in this litigation.

### 1. Time and Labor Required

As detailed above and in the Declaration of Ben Barnow submitted herewith, substantial time and labor were required to litigate this complex MDL matter to successful resolution.

### 2. Novelty and Difficulty of the Questions Presented and the Requisite Skill to Perform the Legal Service Properly

This litigation presented complex and novel questions of law relating to multidistrict consumer class action data security breach litigation and required commensurate skill to litigate the case in an efficient and effective manner. As with any consumer security breach class action matter, significant and difficult issues relating to standing, causation, and the appropriateness and amount of available remedies were present. Additionally, the First Amended Consolidated Class Action Complaint asserts claims under federal law and the laws of California, Florida, Massachusetts, Michigan, Missouri, New Hampshire, New York, Ohio, and Texas. [D.E. #128]. As such, specialized skills in federal law, the laws of several states, consumer remedies, and multidistrict consumer class action litigation were also required to achieve the significant benefits that the settlement made available to the Settlement Class.

### 3. The Preclusion of Other Employment

The efforts of Co-Lead Settlement Class Counsel in the management of this class action necessarily infringed on the time and opportunity they had available to accept other employment. The reality of complex cases is that work is not easily

shifted to other attorneys unfamiliar with the matter. As a result, less time becomes available to Co-Lead Settlement Class Counsel to attend to other matters. Time devoted to this litigation and its resolution necessarily limited the time available for other employment.

### 4. Whether the Fee Is Fixed or Contingent

This case was prosecuted by Co-Lead Settlement Class Counsel on a purely contingent basis, thereby assuming the risk of no payment for a considerable amount of work over an extended period of time. Co-Lead Settlement Class Counsel and their firms spent more than 5,580 hours advancing this case without any compensation, and without knowing whether their efforts would ever be rewarded. Thus, this factor heavily supports the reasonableness of the current fee request. *See, e.g*, *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994) ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless of whether they win or lose."); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 54 (2d Cir. 2000) ("[A]ttorneys' risk is perhaps the foremost factor in determining an appropriate fee award.") (citation and quotation omitted).

### 5. Limitations Imposed by the Client of the Circumstances and the Nature and Length of the Professional Relationship with the Client

Co-Lead Settlement Class Counsel are not aware of any limitations imposed by clients in this matter that had any effect on the litigation or the settlement process. Additionally, given this case's status as a consumer class action and the fact that 65 cases were consolidated into this MDL, the nature and length of relationships with the clients neither weighs in favor of, or against, approval of the Settlement.

### 6. The Amount Involved or the Results Obtained

As detailed further herein, the results obtained by the settlement are excellent and finely tailored to the facts of this case. Among other things, PSN Accountholders are eligible to receive free PS3 and PSP games, free PS3 themes, or free subscriptions to *PlayStation Plus*, Qriocity Accountholders are eligible to receive a $9.99 cash payment, and SOE Accountholders are eligible to receive free Station Cash. The Settlement also provides for payment of Settlement Class Members' claimed and documented, unreimbursed Identity-Theft-Related-Charges proven to have more likely than not resulted from the Intrusions. Such an excellent result warrants the award of attorneys' fees, costs, and expenses sought here.

### 7. The Experience, Reputation and Ability of the Attorneys

Co-Lead Settlement Counsel are each successful plaintiff's counsel with significant experience in litigating consumer class actions. Additionally, certain of Co-Lead Settlement Class Counsel also have substantial experience litigating consumer data security breach class actions, such as this matter. The services rendered were performed efficiently and effectively, reflecting the practical and accumulated knowledge of counsel. Additionally, the Sony Entities are represented by Ropes & Gray, a highly respected international law firm, well-known for vigorously representing its clients in complex litigation such as this matter and defending clients involved with data breach litigation. The ability and determination of Defendants' counsel enhances the significance of the results achieved by Co-lead Settlement Class Counsel.

### 8. The "Undesirability" of the Case

Co-Lead Settlement Class Counsel took on several large corporations with access to substantial legal resources and talent in a challenging and largely undeveloped area of law. It required determination and effort to resolve this matter with benefits inuring to the Settlement Class in the magnitude that has occurred.

3:11-md-02258-AJB-MDD

The case consumed significant financial resources and time of Co-Lead Settlement Class Counsel. Thus, the risks assumed by Co-Lead Settlement Class Counsel in handling this case on a contingency basis were significant. At its inception, it was less than clear that a positive result for plaintiffs would be obtained. No one knew the amount of time that would be involved, or the costs of advancing the case and preparing it for settlement or trial, except that the case had inherent risks and would be an uphill battle. In light of these considerations, the risks assumed by Co-Lead Settlement Class Counsel were substantial. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (risk is a relevant circumstance when awarding attorney's fees).

### 9. The Customary Fee and Awards in Similar Cases

The amount requested for attorney's fees, costs, and expenses compares favorably with attorney's fees awarded in similar cases. By way of example, in connection with a settlement reached in *In re TJX Companies Retail Security Breach Litigation*, relating to a security breach involving the theft of approximately 45,000,000 credit and debit cards, the court applied a lodestar analysis and found p laintiffs' counsel's request for $6,500,000 in attorneys' fees to be reasonable. 584 F. Supp. 2d 395, 408 (D. Mass. 2008). Similarly, in *In re Countrywide Financial Corp. Customer Data Security Breach Litigation*, relating to a security breach involving approximately 17 million individuals, the court awarded $3,500,000 in attorneys' fees. No. 3:08-MD-01998, 2010 WL 3341200 (W.D. Ky. Aug. 23, 2010). Indeed, one of Co-Lead Settlement Class Counsel was a lead counsel in each of those cases, where he and his colleagues worked to bring about a fair, reasonable, and adequate resolution to the litigation, just as Co-Lead Settlement Class Counsel and their firms have achieved here on behalf of the Settlement Class. These awards and others like them in similar cases further support the reasonableness of the requested amounts.

# **CONCLUSION**

As the above demonstrates, the Settlement is fair, reasonable, and adequate, and satisfies the standard for final approval. Therefore, Plaintiffs, individually and on behalf of the Settlement Class, by and through Co-Lead Settlement Class Counsel, pray that this Honorable Court enter an order:

(a)     Finding that the Settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class, and granting final approval to the Settlement;

(b)     Granting Representative Plaintiffs' request for attorneys' fees, costs, and expenses in the amount of $2,750,000; and

(c)     Granting such other and additional relief as the Court may deem just and appropriate.

Dated:   April 3, 2015                 Respectfully submitted,

By: _____/s  Ben Barnow_____
              BEN BARNOW

BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, Illinois 60602
(312) 621-2000
(312) 641-5504 (fax)
b.barnow@barnowlaw.com

PAUL J. GELLER
ROBBINS GELLER RUDMAN &
   DOWD LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000
(561) 750-3364 (fax)
pgeller@rgrdlaw.com

TIMOTHY G. BLOOD (149343)
BLOOD HURST & O'REARDON, LLP
600 B Street, Suite 1550
San Diego, California 92101
(619) 338-1100
(619) 338-1101 (fax)
tblood@bholaw.com

3:11-md-02258-AJB-MDD

GAYLE M. BLATT (122048)
CASEY GERRY SCHENK
FRANCAVILLA
  BLATT & PENFIELD, LLP
110 Laurel Street
San Diego, California 92101
(619) 238-1811
(619) 544-9232 (fax)
gmb@cglaw.com

DAVID A. MCKAY
LAW OFFICES OF DAVID A. MCKAY
  LLC
555 North Point Center East, Suite 400
Alpharetta, Georgia 30022
(678) 366-5180
(678) 366-5001 (fax)
david@damckaylaw.com

ADAM J. LEVITT
GRANT & EISENHOFER, P.A.
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
(312) 214-0000
(312) 214-0001(fax)
alevitt@gelaw.com

BRIAN R. STRANGE (103252)
STRANGE & CARPENTER
12100 Wilshire Boulevard, Suite 1900
Los Angeles, California 90025
(310) 207-5055
(310) 826-3210 (fax)
lacounsel@earthlink.net

*Co-Lead Settlement Class Counsel*

3:11-md-02258-AJB-MDD

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and that I shall cause the foregoing document to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

/s  Ben Barnow_____

BEN BARNOW
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, Illinois 60602
(312) 621-2000
(312) 641-5504 (fax)
b.barnow@barnowlaw.com